UNITED STATES DISTRICT COURT IN THE DISTRICT OF DELAWARE

Meghan Kelly                        )          Civil Action No.: 1:21-1490 (CFC)
        Plaintiff,                )
        v.                        )
Disciplinary Counsel Patricia B.    )
Swartz, et.al                       )
        Defendants.               )

## PLAINTIFF MEGHAN KELLY'S 180th Affidavit

Comes now Plaintiff Meghan Kelly, I declare and affirm that the foregoing statement is true and correct.

1.     Yesterday or possibly even last week I called the law librarian and asked if I could print out documents. She said that she could no longer print out documents from me sent to her email as she had done previously. Unlike Upper and Middle DE, she indicated patrons do not have access to print out privately saved documents from their email or otherwise in Lower DE. She indicated she was looking into resolving that issue by means other than by merely printing out things the law library has access to or using the copy machine as she does for other patrons.

2.     I asked if I figure out a way to print out my documents could I print my appellate brief due March 12, 2024. She said yes. I indicated I would need 11 copies and the Supreme Court's page limits was 40 for the main brief. I would not need the appendix since I printed out what I will use. I asked if that was okay. Peggy said sure so long as I bring my own paper. She also indicated I would most likely need to bring an original copy and use the copy machine since she did not think I would successfully print by using the law library's computers.

3.     Early this morning I left a message indicating I was grateful for the law librarian's help and I expected to come in today. I called the Chancery court and spoke with Will to get

permission to park behind the court.  I indicated I intended to go to the law library with additional detail. Will indicated it was okay.

4.      When I arrived at the law library, it was strange the bailiff escorted me to the door and left the door open for a second time. I usually use my card key to access it.  This is the second time I was escorted to the door and the door was left opened.  The previous time was the day I called US Supreme Court Clerk Donald Baker after my PA Supplemental brief necessary for my petition was neither accepted or returned or rejected with notice sent to me in accordance to the Court's rules and case law.

5.      When I came into the law library I indicated to Peggy I had different ideas on how to gain access to my documents should I need help to print them out as Peggy agreed to do previously so long as I bring in my own paper.  She said sure.  I confirmed with the law librarian that she was available when the brief was due March 11-12 so I could print it out.  She confirmed.

6.      I spent hours testing different ways unsuccessfully.  I experienced difficulty gaining access to CMF on the library's computers, my personal laptop with correctly autogenerated passwords and username and the library's computer.

7.      I have evidence I attach hereto of the message "Invalid username and password" despite using autogenerated correct information and the correct one on the law library's computer.  When I called PACER in the late afternoon from home, PACER indicated it receive failed attempts on their side should I access PACER.  They could not see the failed attempts which occurred including the attempt I documented attached to an email.

8.      While at the law library I called the DE District Court.  They did not see any problems with my CMF.  I also called PACER from the law library.  The representative

2

indicated he was taking calls for a different issue relating to saving research to client identification not the unique issue I was experiencing. I asked him to please document my concern.

9. All of the sudden I regained access on all 3 devices.

10. I showed the law librarian I could print documents contained in PDF on PACER with her permission by using my own paper to print out one page of a document.

11. Upon successfully printing to her surprise since she did not think I could find a way, Peggy immediately changed her mind and said no I could not print. Yesterday or possibly last week Peggy said sure it was okay to print if I brought my own paper. I said I would need 11 briefs. I told her I have not written the briefs, but I printed out the appendixes so I will not need to do so, per the attached pictures of boxes in my car of the Motion for permission to file in forma pauperis and the appendices for the Brief and Motion IFP.

12. I previously left two reams of paper and Peggy on a different occasions months ago indicated it was fine to print so long as it was not excessive. I always get permission from Peggy and rarely print or even go to the law library because Defendants placement of my license on inactive/disabled prevents me from working as an attorney at my former law firm but for my religious beliefs contained in my petitions to defend the same. I am impoverished without a bank account or income which is burdening my parents. I sought to eliminate or reduce an obstacle to my access to the courts in case I am unable to print effectively.

13. Poverty creates a substantial burden. In addition my printer is having problems. I have a backup which may be in need of warranty help. But the one I hoped to use makes everything look dark per the attached exhibit.

14.     If you notice I printed out certificate of service pages with a line to fill in the affidavit and the date in my last affidavit, and separately printed out declaration pages in light of printing problems.  Throughout this case printers have been inaccessible and at warranty. So, I protected myself by printing out cert of service and declaration pages I may sign separately and I have saved as PDFs the affidavits.

15.     I immediately called the DE Supreme Court to get help after Peggy changed her mind.  I spoke with JoAnne she transferred me to Lisa.  I left a long message.  I also emailed Lisa and copied the law librarian.  The law librarian then kicked me out in retaliation for asking for help. The 1st Amendment right to petition does protect the right to access to the courts to complain to the government about the government, even about arbitrary treatment by the DE Supreme Court's agent the law librarian without fear of punishment.

16.     I showed proof to opposing counsel that I spoke with Peggy yesterday though it may have been the end of last week where we discussed printing at length.  I am under great duress and do not have the means to research with ease since I cannot afford to pay for lexis or Westlaw.  I cannot even afford to drive to the law library when I want to or need to at times because gas is unaffordable given I have no income.  Please see the attachments I incorporate herein.

17.     Truth be told I wanted to show the US Supreme Court there were so many splits in the jurisdiction and I wanted to report Jimmy Chong for discipline to show how the court retains authority by resolving cases and controversies before it as opposed to partial professional bureaucrats partial towards themselves instead of the impartial rule of law.

18.     I wanted to show the disciplinary proceedings unconstitutionally remove the people's check upon both public and private individuals and entities which is the petitioned

coupled with due process. So, it removes a constitutional freedom by eliminating it for business and partiality to self as opposed to the impartial rule of law that self-regulation eliminates.

19.     Courts retain constitutional authority by ruling on cases before it, but the right to petition is removed by the accused professionals in partial boards and the common people the public who are not able to participate to preserve their interest of professionals of their choice from arbitrary removal by the whims of the state such as the esteemed Richard Abbott. The public forum represents itself. The state's legal fiction of the public good is not the people. It is deceptive in that the public forum is the government not the private people. The government must not sacrifice the Constitutionally protected interests of the people's lives, liberty or property based on partiality to itself or its foreign or private parties I see as agents through contracts, grants in violation of the 4th and 14th Amendment Equal Protections component, and due process applicable to the courts and other judicial forums delegated with judicial power.

20.     I woke up this morning thinking how awesome it was that Chief Colm F Connelly cared about patent straw people from being exploited to defraud the public in patent claims when he reported Jimmy Chong for discipline. I had little hope the Board would correct him or prevent attorney misconduct. So I wanted to do more research to show the courts are all over the place with splits everywhere with what Constitutional rights judges and lawyers have.

21.     I started writing an email before leaving my home to go to the law library.

22.     Peggy kicked me out when after I called the DE Supreme Court today and left a message with Lisa Dolph. I also emailed Lisa since Lisa helped me gain access to the law library before to research and tools I needed in order to exercise my right to petition fairly without obstruction by the state in terms of unfair detrimental reliance. This prior time is documented in this court's records. At that time when I was on the phone, the law librarian had

not kicked me out of the law library.  After I got off the phone and emailed Lisa Dolph she said I no longer had rights I had previously were accustomed to that others had.  The 1st Amendment right to petition does protect the right to access to the courts to complain to the government without fear of punishment by the state including its agent the law librarian.  I indicated I did not want to discuss it further because I wanted to do research.  I disagreed with her, and did not seek to speak about the disagreement since she was the opponent in my dispute to be resolved before DE Supreme Court's clerk.  Or at least I thought  since Lisa Dolph helped me regain access to the law library I was previously denied beforehand.  I was not going to disobey the law librarian and did not intend to print anything else that day.  Nevertheless, I was kicked out of the law library which prevented me from researching as I intended.

23.    In haste I texted concerns attached hereto with typos since my fingers are like sausages.  In addition my CMF was also not working so I emailed PACER and opposing counsel of concerns.  I am deeply sorry for the typos.  Yet I act in haste to assert rights to prevent their vitiation.

24.    Instead of taking my time and gathering research to back my concerns I sent an email requesting discipline of Jimmy Chong to the PA ODC and the DE Disciplinary forum the administration of admissions Mercedes Ulmstead this evening.

25.    I would rather do what is right imperfectly than nothing.  I was really impressed that Chief Judge Connelly did what was right as opposed to ignoring it to bring in profit.  I thought that was awesome, just like neighbors thought Honorable Maryellen Noreika was remarkable for holding the powerful to the rule of law instead of allowing them to be above the law by association. I am getting teary eyes since she gave people hope the courts looked after them instead of looking at them as products of productivity slave human capital to be exploited

6

or thrown away by the state.  That is special. That is justice by teaching no one is above the law

nor below the law.

21.     So, I wanted to research before I made a complaint, and ti work on my appeal.

Instead I am compelled to preserve the record and cat hastily.  Even imperfect people like me are

protected by the law.

22.     I wrote the US Supreme Court as follows:

REPORT OF DISCIPLINE THOUGH I CONSTITUTIONALLY CHALLENGE A NUMBER
OF RULES AND THE PROCEEDINGS THEMSELVES TO US Supreme court and
Pennsylvania for a gazillion dollar issue that stifles innovation and exploits mom and pop straw
man
From:Meg Kelly (meghankellyesq@yahoo.com)
To:harriet.brumberg@pacourts.us; anthony.sodroski@pacourts.us;
mumstead@supremecourt.gov
Cc:margaret.naylor@delaware.gov; meghankellyesq@yahoo.com; david.weiss@usdoj.gov;
supremectbriefs@usdoj.gov; zi-xiang.shen@delaware.gov
Date:Tuesday, March 5, 2024 at 07:08 PM EST
Good morning Harriet, Anthony and Mercedes,

I write to report discipline concerning an attorney who is a member of the Pennsylvania Disciplinary
Board, Jimmy Chong.   I constitutionally challenge a number of state and federal disciplinary rules and the
proceedings themselves.  I further have challenges as to whether and to what extent Constitutional
protections apply to lawyers and judges.  There are splits between the forums as to what rights if any
other than by deceit by statement of rules lawyers and judges have. The courts are all over the place.

I would prefer the resolution of attorney/discipline correction be resolved before Art III judges and state
judges in a case and controversy rather than by professional bureaucrats' partial towards business whose
focus is on material gain as opposed to protecting the lives and liberties the Constitution avers to protect.
Disciplinary proceedings remove the people's freedom, the right to petition which the public may
participate in or intervene in before Board proceedings with limited jurisdiction unrelated to discipline.
They are deprived of the ability to fight for their counsel of choice.  The accused professional's due
process freedom to petition fairly is removed by the nature of secret state boards partial towards
professional goals as opposed to the impartial application of the Constitution to the rule of law which
protects freedoms from being sacrificed for business.

Without getting into my Constitutional challenges I report discipline.

DE Chief Judge Colm F Connelly discovered Jimmy Chong appeared to represent people without their
direct consent through agents.  These agents exploited straw men to make money off of by filing patent
violations for things the disputed owner of the patent did not even appear to utilize other than to make
money in law suits similar to the vast apparent problems in Texas.  See the attached documentary
relating to Texas The Patent Scam (1080p) FULL DOCUMENTARY - Education, Finance, Business
(youtube.com)



**I.     The Patent Scam (1080p) FULL DOCUMENTARY - Education, Finance, Business**

Also note Chief Justice Roberts appeared to address part of the problem not all of it with regards to rules instead of in an actual case and controversy which eliminate the people's most powerful check upon both private and public individuals and entities the 1st Amendment right to petition coupled with due process under the 5th and 14th for a fair and impartial opportunity to be heard in an actual case or controversy. US Amend I, V, XIV. U.S. Chief Justice Roberts pledges to review patent venue rules



**II.     U.S. Chief Justice Roberts pledges to review patent venue rules**

In a year-end report on the federal judiciary, U.S. Chief Justice John Roberts said he would direct the Judicial...

Jimmy Chong was my bar representative as I took the bar. He was paid in part by the money I paid for the bar class. During the time I stayed at Widener Jimmy Chong invited me to work out with him at the JCC in Upper DE. He showed me his penis which I did not want to see near the picnic tables behind the JCC. I left obviously in shock and disgust as that was assault. I am a Christian. I believe men go to hell when they lust after women not their wives should they not

repent. I believe sex is marriage before God. I told my hall mate DaLesia Boyd when I returned indicating that was unacceptable.

Attached, please evidence Chief Justice Colm F Connelly found warranting discipline. Also please find evidence he acts as judiciary as a member of the PA Board of discipline.

I was in shock. The State retaliated against me for exercising my right to petition by the government and its private and public partners, the state's agents of Widener's bar representative Micah Yarbrough, Widener's bar Professor & Director of Bar Programs retaliated against me for contacting the state since the roof of the dorm I resided in leaked on my bar material destroying them. I requested copies of new material. He said if I did not sign an agreement not to sue and to take replaced bar material in full satisfaction of the harm caused by the leak in the Widener dorm room I paid or stay in during the bar he would accuse me of misconduct. He followed through on his threat. My admission was delayed. I documented these concerns in affidavits and may include them in footnotes. Sadly, there are years of retaliation by the state or its agent based on my petitioning the courts which culminated in a law suit on appeal before the US Supreme Court next week that I do not desire to discuss. Nevertheless, I report this discipline to both USSC and the PA ODC above in part to show you the correct forum to resolve disputes is the public forum of the courts without vitiation of the people's rights or the accused rights.

I believe the US Supreme Court's backing or disputing of whatever judges may say is the law is more fair to prevent attorneys like Jimmy Chong from defrauding the public through patents or straw men. Disciplining attorneys gives other attorneys notice to prevent mistakes and misconduct they may not be aware of that are resolved in secret proceedings.

Do I want either of these people to be destroyed? Absolutely not, but I do not want them to remain above the law by the judiciary or the board's partiality to themselves or their own as opposed to open courts who improve the administration of justice checked by the people's participation in public forums by the petition.

The 1st Amendment right to petition does protect the right to access to the courts to complain to the government without fear of punishment.

The problem relating to Jimmy Chong relates to million if not billions of dollars in unjust gains across the US and possibly patents made to oppress and stagnate innovation by punishing alleged competition for products that people never intended to create to merely make money in bulk patent infringement cases. I would prefer such disputes be resolved in open court to prevent other attorneys from doing the same with requisite due process notice. But if I cannot persuade the courts to eliminate disciplinary proceedings by deferring to whatever judges say is the law checked by the right to petition, even on appeal, I request discipline by the US Supreme Court and the PA ODC. I have affidavits relating to these concerns, but they are in a case which I do not want to provide due to potential conflicts.

9

I write in haste and under great duress in light of recent events.  Attached, please find articles relating to Jimmy Chong, Chif Justice Connelly's astute opinion and his referral of Jimmy Chong for discipline.

I was impressed that Chief Connelly cared about doing what was right instead of making money and productivity. I would prefer judges not bureaucrats judge. I oppose judges and congress from delegating their authority to private partial bureaucrats which infringe upon the people's Constitutional rights in the secretive forums.

The courts are the only court that safeguard individual liberty without compromise for the mob's collective desire through the other two representative branches. The courts safeguard freedoms, when they delegate powers away or permit the legislature or executive branches to do so freedoms are eliminated by those who buy and sell them disparately and partially.

I petition to safeguard the courts and to protect not to destroy them.  On an aside I was denied access to the law library today, March 5, 2024. I do not want to destroy the law librarian copied here either when I complain to her or the DE Supreme Court about infringements to my access to the courts unfairly.

Thank you for your kind consideration. Please excuse any typos. I am a poor typist.

Very truly,
Meg
Meghan Kelly
34012 Shawnee Dr
Dagsboro DE 19939

23.     I want to stress sameness and compelled conformity eliminates individual liberty

by compelled compliance through the representative mob if left unrestrained by the courts or

love written on the hearts of man to overcome conditional compelled conformity by

unconditional love.

24.     I think I need to focus on the importance of the right to petition which is the only

means to empower the judiciary to safeguard life, liberty and property from the other two

branches or even their own in my brief due next week.  I hope my appeal is considered by the US

Supreme Court.

25.     Per the attached document. My back up printer blackens my documents and I am

scared the US Supreme Court may not accept it should I be compelled to use it.

10

26.     I left a message with my case manger indicating my printer blackened documents and I had previously gained permission from the law librarian to print out 11 copies of the brief which was reneged today. So, I requested she and the court accept my brief even if it is blackened like the attached document.

27.     I started to panic because I only saw her on my history not Lisa Dolph. I hoped I did not leave a message for the wrong Lisa.  So, I called her today and left  message in case a second message was left with her in error.

28.     As I waited in the parking lot at first and then in Walmart for Lisa Dolph to please help me regain access to the law library today so I could research I was able to get through to her.  Lisa indicated she could not help me today and would contact the administrator to resolve the issue.  I would have waited all day for the opportunity to research.  So, I was grateful for Lisa telling me not to.  Lisa Dolph also indicated she indeed received the message not the USSC case manager.

29.     I am discouraged, but not giving up on petitioning to defend my life, liberty and property interests and deprivations thereto but for my religious belief in Jesus the Christ as God not the wicked vanity of men who seek comforts, convenience and material gain at the cost of enslaving or sacrificing others for the fleeting whims of their own or the alleged majority or public which means government's selfish interest which sacrifices the people as opposed to serving them.

30.     Attached please also find the letter from Lisa Nesbitt allowing 60 days to petition and the mere submitted request to Honorable Chief Judge John Roberts without the Jan 23 2024 application received by mail on Monday March 4, 2024.

Thank you for your time and consideration.

Dated          3/5/2024          Respectfully submitted,
                                 <u>Meghan M. Kelly</u>
                                 Meghan Kelly, Esquire
                                 34012 Shawnee Drive
                                 Dagsboro, DE 19939
                                 meghankellyesq@yahoo.com

12

Under Religious objection I declare, affirm that the foregoing statement is true and correct

Dated: March 5, 2024

___Megha Kelly_____ (printed)

_____ (signed)







## REPORT OF DISCIPLINE THOUGH I CONSTITUTIONALLY CHALLENGE A NUMBER OF RULES AND THE PROCEEDINGS THEMSELVES TO US Supreme court and Pennsylvania for a gazillion dollar issue that stifles innovation and exploits mom and pop straw man

From:　Meg Kelly (meghankellyesq@yahoo.com)

To:　　harriet.brumberg@pacourts.us; anthony.sodroski@pacourts.us; mumstead@supremecourt.gov

Cc:　　margaret.naylor@delaware.gov; meghankellyesq@yahoo.com; david.weiss@usdoj.gov;
　　　　supremectbriefs@usdoj.gov; zi-xiang.shen@delaware.gov

Date:　Tuesday, March 5, 2024 at 07:08 PM EST

Good morning Harriet, Anthony and Mercedes,

I write to report discipline concerning an attorney who is a member of the Pennsylvania Disciplinary Board, Jimmy Chong.　I constitutionally challenge a number of state and federal disciplinary rules and the proceedings themselves.　I further have challenges as to whether and to what extent Constitutional protections apply to lawyers and judges.　There are splits between the forums as to what rights if any other than by deceit by statement of rules lawyers and judges have. The courts are all over the place.

I would prefer the resolution of attorney/discipline correction be resolved before Art III judges and state judges in a case and controversy rather than by professional bureaucrats' partial towards business whose focus is on material gain as opposed to protecting the lives and liberties the Constitution avers to protect. Disciplinary proceedings remove the people's freedom, the right to petition which the public may participate in or intervene in before Board proceedings with limited jurisdiction unrelated to discipline. They are deprived of the ability to fight for their counsel of choice.　The accused professional's due process freedom to petition fairly is removed by the nature of secret state boards partial towards professional goals as opposed to the impartial application of the Constitution to the rule of law which protects freedoms from being sacrificed for business.

Without getting into my Constitutional challenges I report discipline.

DE Chief Judge Colm F Connelly discovered Jimmy Chong appeared to represent people without their direct consent through agents.　These agents exploited straw men to make money off of by filing patent violations for things the disputed owner of the patent did not even appear to utilize other than to make money in law suits similar to the vast apparent problems in Texas.　See the attached documentary relating to Texas The Patent Scam (1080p) FULL DOCUMENTARY - Education, Finance, Business (youtube.com)



**The Patent Scam (1080p) FULL DOCUMENTARY - Education, Finance, Business**

Also note Chief Justice Roberts appeared to address part of the problem not all of it with regards to rules instead of in an actual case and controversy which eliminate the people's most powerful check upon both private and public

individuals and entities the 1st Amendment right to petition coupled with due process under the 5th and 14th for a fair and impartial opportunity to be heard in an actual case or controversy. US Amend I, V, XIV.U.S. Chief Justice Roberts pledges to review patent venue rules



**U.S. Chief Justice Roberts pledges to review patent venue rules**

In a year-end report on the federal judiciary, U.S. Chief Justice John Roberts said he would direct the Judicial...

Jimmy Chong was my bar representative as I took the bar.  He was paid in part by the money I paid for the bar class.  During the time I stayed at Widener Jimmy Chong invited me to work out with him at the JCC in Upper DE. He showed me his penis which I did not want to see near the picnic tables behind the JCC. I left obviously in shock and disgust as that was assault. I am a Christian.  I believe men go to hell when they lust after women not their wives should they not repent.  I believe sex is marriage before God. I told my hall mate DaLesia Boyd when I returned indicating that was unacceptable.

Attached, please evidence Chief Justice Colm F Connelly found warranting discipline.  Also please find evidence he acts as judiciary as a member of the PA Board of discipline.

I was in shock.  The State retaliated against me for exercising my right to petition by the government and its private and public partners, the state's agents of Widener's bar representative  Micah Yarbrough, Widener's bar Professor & Director of Bar Programs retaliated against me for contacting the state since the roof of the dorm I resided in leaked on my bar material destroying them. I requested copies of new material. He said if I did not sign an agreement not to sue and to take replaced bar material in full satisfaction of the harm caused by the leak in the Widener dorm room I paid or stay in during the bar he would accuse me of misconduct.  He followed through on his threat. My admission was delayed.  I documented these concerns in affidavits and may include them in footnotes. Sadly, there are years of retaliation by the state or its agent based on my petitioning the courts which culminated in a law suit on appeal before the US Supreme Court next week that I do not desire to discuss.  Nevertheless, I report this discipline to both USSC and the PA ODC above in part to show you the correct forum to resolve disputes is the public forum of the courts without vitiation of the people's rights or the accused rights.

I believe the US Supreme Court's backing or disputing of whatever judges may say is the law is more fair to prevent attorneys like Jimmy Chong from defrauding the public through patents or straw men. Disciplining attorneys gives other attorneys notice to prevent mistakes and misconduct they may not be aware of that are resolved in secret proceedings.

Do I want either of these people to be destroyed?  Absolutely not, but I do not want them to remain above the law by the judiciary or the board's partiality to themselves or their own as opposed to open courts who improve the administration of justice checked by the people's participation in public forums by the petition.

The 1st Amendment right to petition does protect the right to access to the courts to complain to the government without fear of punishment.

The problem relating to Jimmy Chong relates to million if not billions of dollars in unjust gains across the US and possibly patents made to oppress and stagnate innovation by punishing alleged competition for products that people

never intended to create to merely make money in bulk patent infringement cases. I would prefer such disputes be resolved in open court to prevent other attorneys from doing the same with requisite due process notice.  But if I cannot persuade the courts to eliminate disciplinary proceedings by deferring to whatever judges say is the law checked by the right to petition, even on appeal, I request discipline by the US Supreme Court and the PA ODC.  I have affidavits relating to these concerns, but they are in a case which I do not want to provide due to potential conflicts.

I write in haste and under great duress in light of recent events.  Attached, please find articles relating to Jimmy Chong, Chif Justice Connelly's astute opinion and his referral of Jimmy Chong for discipline.

I was impressed that Chief Connelly cared about doing what was right instead of making money and productivity. I would prefer judges not bureaucrats judge. I oppose judges and congress from delegating their authority to private partial bureaucrats which infringe upon the people's Constitutional rights in the secretive forums.

The courts are the only court that safeguard individual liberty without compromise for the mob's collective desire through the other two representative branches. The courts safeguard freedoms, when they delegate powers away or permit the legislature or executive branches to do so freedoms are eliminated by those who buy and sell them disparately and partially.

I petition to safeguard the courts and to protect not to destroy them.  On an aside I was denied access to the law library today, March 5, 2024. I do not want to destroy the law librarian copied here either when I complain to her or the DE Supreme Court about infringements to my access to the courts unfairly.

Thank you for your kind consideration. Please excuse any typos. I am a poor typist.


Very truly,
Meg
Meghan Kelly
34012 Shawnee Dr
Dagsboro DE 19939


Jimmy Chong.pdf
166.6kB


4 Judge Connolly Refers IP Edge "Fraud" Saga to DOJ, USPTO, and State Disciplinary Bodies - News _ RPX Insight.pdf
716.3kB


jimmy chong disciplinary board member in charge of disciplining above discipline.pdf
168.5kB


2 Judge Connolly Questions Counsel's Grasp of Informed Consent, Agency Law, and Even Basic English - News RPX Insight.pdf
484.9kB


PATENTS LITIGATION FUNDING order.pdf
3.5MB


letter discipline.pdf
215.3kB

‹ Back to News (/news/details?searchq=)

# Judge Connolly Questions Counsel's Grasp of Informed Consent, Agency Law, and Even Basic English

January 21, 2024

Delaware Chief Judge Colm F. Connolly ended 2023 in dramatic faction, detailing his findings that patent monetization firm IP Edge LLC (https://insight.rpxcorp.com/entity/1034412-ip-edge-llc), a related consulting firm, and the individuals behind them had together engaged in a sweeping "fraud" through their unusually structured patent assertion model. That order teed up various "consequences" for those involved, among them a set of disciplinary referrals for the attorneys representing the IP Edge-linked plaintiffs under scrutiny based on a variety of professional rule violations. Now, Judge Connolly has grilled the attorneys for two more of the plaintiffs in IP Edge's web about whether they engaged in some of the same ethical violations—including one of the same litigators tagged in the court's prior decision, Jimmy Chong (of Chong Firm PA), as well as his cocounsel David Bennett (of Direction IP Law). In a January 17 hearing, an increasingly irritated and incredulous Judge Connolly questioned their grasp of the legal and ethical issues at play, concluding that Chong had earned a second disciplinary referral, and ordering a conspicuously forgetful Bennett to produce documents in order to lay out some basic facts.

Under the primary IP Edge monetization model under scrutiny by Judge Connolly, individuals with little to no prior experience with patent monetization would be selected to become "passive investors" in LLCs to which patent assets would be assigned and which would then file suit against defendants in federal courts around the country. As later revealed by Judge Connolly, the subsequent litigation would be run through a "consulting" arm of IP Edge, MAVEXAR LLC (https://insight.rpxcorp.com/entity/1319932-mavexar-llc), that is controlled by the firm's three principals (attorneys Gautham ("Gau") Bodepudi, Sanjay Pant, and Lillian Woung). Taken together, those LLC plaintiffs made IP Edge the most prolific NPE plaintiff, by an order of magnitude, for multiple years leading into and through 2022.

Judge Connolly became aware of this strategy as a result of the failure of several IP Edge plaintiffs—including Lamplight Licensing LLC (https://insight.rpxcorp.com/entity/11768759-lamplight-licensing-llc), Mellaconic IP LLC (https://insight.rpxcorp.com/entity/9603026-mellaconic-ip-llc), and Nimitz Technologies LLC (https://insight.rpxcorp.com/entity/11508870-nimitz-technologies-llc)—to comply with a pair of April 2022 standing orders requiring certain litigants to make certain detailed corporate and third-party litigation funding disclosures. He then ordered their individual owners, and some of their attorneys, to attend a pair of evidentiary hearings in early November 2022. Those hearings left Judge Connolly with systemic concerns regarding IP Edge's assertion model: that by assigning patents to associated plaintiff LLCs without disclosing their connections to IP Edge and MAVEXAR, those two entities had perpetrated a fraud on the USPTO and/or the district court. The hearings also raised questions about the "accuracy of statements" made in the plaintiffs' filed disclosures, in

addition to concerns over whether the real parties of interest are before the Court. As a

result, Judge Connolly handed down a series of extraordinarily sweeping orders
(https://insight.rpxcorp.com/news/72588-judge-connolly-s-new-standing-orders-are-serious-
business) requiring production to the court of a range of documents related to the plaintiffs'
legal representation, corporate ownership and control, assets, and potential liabilities. The
ensuing "Series of Extraordinary Events (https://insight.rpxcorp.com/entity/1034412-ip-edge-
llc)" further snowballed to include multiple unsuccessful *mandamus* challenges contesting
those production orders on various bases, as well as document production by those plaintiffs
that turned out to be incomplete in certain respects.

On November 27, 2023, Judge Connolly issued an order (https://insight.rpxcorp.com
/litigation_documents/15465765) that detailed the results of his investigation across 105
blistering pages—finding that IP Edge had been the "de facto" owner of the patents asserted
by its litigating affiliates and held that the entity and its principals should face "consequences"
for their improper attempt to "use separate LLCs to insulate themselves" from liability. He
called upon the Department of Justice (DOJ) and the USPTO to potentially investigate these
misrepresentations. As indicated above, Judge Connolly also teed up potential punishment for
some of the individuals involved: He referred certain attorneys employed by IP Edge (which is
not a law firm) to a Texas disciplinary body for the unauthorized practice of law and referred
the LLCs' local and lead counsel to state disciplinary bodies for improperly treating IP Edge as
their true client.

Among the plaintiffs' counsel hit with such a referral was Jimmy Chong, flagged over his
conduct as Delaware counsel for Lamplight and Mellaconic IP. Judge Connolly flagged a
variety of issues with his representation of both entities—including the fact that Chong
obtained signed engagement letters from the clients (indirectly, via MAVEXAR), filed litigation
on their behalf, and settled some of their cases without having ever communicated with their
sole owners and managing members (Mellaconic's Hao Bui, otherwise a food truck owner; and
Lamplight's Sally Pugal, otherwise a manager at a medical office).

Judge Connolly found that Chong (and, to varying degrees, the other plaintiff attorneys named
in the order) had committed multiple violations of the rules governing the professional conduct
of attorneys through that lack of communications. In particular, the court found that Chong had
failed to secure the informed consent of his two clients, especially with regard to decisions
related to filing, settling, and/or dismissing their cases. Judge Connolly also held that Chong
and the other plaintiffs' counsel had improperly delegated their fiduciary duties to MAVEXAR,
finding that any supposed consent provided in their engagement letters was illusory, and that
the issue was "especially concerning" given the "obvious disparity in the sophistication" of the
plaintiffs (*i.e.*, their owners)—as a result of which, the MAVEXAR consulting agreements "and
counsel's actions in these cases deprived the LLC plaintiffs of the benefit of independent
counsel". This was further evident, per Judge Connolly, through the lopsided financial
relationships between the plaintiffs and MAVEXAR, which appears to be entitled to 90% or
more of each plaintiff's settlement proceeds. Judge Connolly wasted no time in sending
referral letters to the relevant disciplinary agencies for the attorneys named in the order—
sending one (https://insight.rpxcorp.com/litigation_documents/15472367) to the Delaware
Office of Disciplinary Counsel (ODC) with respect to the conduct of both Chong and George
Pazuniak of O'Kelly & O'Rourke, LLC (counsel for Nimitz).

A subsequent set of orders (https://insight.rpxcorp.com/news/78586-judge-connolly-calls-

counsel for other IP edge-tied plaintiff in for questioning in certain cases filed by Swirlate IP

LLC (https://insight.rpxcorp.com/entity/8669361-swirlate-ip-llc) and Waverly Licensing LLC (https://insight.rpxcorp.com/entity/12117977-waverly-licensing-llc), both also represented by Chong, indicated that his problems were far from over. On December 28, Judge Connolly ordered Chong and Bennett (Chong's cocounsel in the Swirlate litigation) to appear in person on January 17, warning that both attorneys must be "prepared to address the Court's concern" that the "same improprieties" prompting the referrals "may have occurred in connection with the litigation" filed by those two additional plaintiffs.

Judge Connolly held that hearing as scheduled for both Swirlate and Waverly, with both attorneys appearing as ordered. A full transcript is available here (https://www.rpxcorp.com /wp-content/uploads/sites/3/2024/01/Swirlate-IP-and-Waverly-Licensing-Chong-and-Bennett-Hearing-1-17-2024.pdf).

Beginning with Chong, Judge Connolly's questioning over his representation of Waverly got testy rather quickly. Right out of the gate, when Judge Connolly asked whether he had communicated directly with the plaintiff's owner, Son Nyugen, prior to filing suit, Chong attempted to frame his answer around having communicated *with Waverly*, characterizing the signing of a retainer agreement obtained via MAVEXAR (here described as Waverly's "agent") as constituting such communications. After Judge Connolly repeatedly asked him to address his communications with Nguyen, only to have Chong keep responding that he had done so with Waverly, Judge Connolly grew impatient—with Chong finally responding that no, he had not communicated with Nguyen before signing his engagement and filing suit:

```
10    directly with Mr. Nguyen, the sole owner and manager of

11    Waverly, before you filed these lawsuits in Waverly's

12    name?

13            MR. CHONG:  I did not have -- there was an

14    in-between --

15            THE COURT:  It's a really easy question.  It's

16    a yes-or-no question, and, frankly --

17            MR. CHONG:  But --

18            THE COURT:  I'm very surprised that you can't

19    answer that question.

20            MR. CHONG:  I understand it's a yes-or-no

21    question; however, Mr. Nguyen is not my client; Waverly is

22    my client.

23            THE COURT:  I didn't ask you who your client

24    was.  I asked you, and it's the last time I'm going to ask

25    you:  Did you have direct communications with Mr. Nguyen

 1    before you filed these lawsuits in Waverly's name?

 2            MR. CHONG:  I did not have direct communication

 3    with Mr. Nguyen.

 4            THE COURT:  All right.  How did you obtain

 5    Waverly's consent, informed consent, to file these

 6    lawsuits in its name?

 7            MR. CHONG:  Through Waverly's agent.

 8            THE COURT:  How did you obtain Waverly's

 9    consent to communicate with its putative agent?

10            How did you obtain that informed consent

11    directly from the client to negotiate and to obtain

12    directions from its agent?

13            MR. CHONG:  From its agent, I had

14    communications.
```

This was apparently enough for Judge Connolly to conclude that Chong's conduct had included similar ethical violations as in the Lamplight and Mellaconic cases, sufficient to warrant another referral to the Delaware ODC (the applicable disciplinary body).

> I've already referred you to the Delaware Bar Disciplinary Counsel. I'm going to do so here because our rules require that you obtain the informed consent from the client in order for you to engage and rely on these negotiations -- I should say directions from a third party.

Chong then objected to the discussion of this new referral in open court, arguing that under Rule 13 of the "Delaware Disciplinary Rule" (apparently, referring to the Delaware Lawyers' Rules of Disciplinary Procedure), there needs to be "confidentiality through these hearings". Judge Connolly asked how that could possibly impact the hearing then in progress and pointed out that he had not yet referred Chong to the ODC, just that he was "going to do so".

Rather, Judge Connolly stated that his purpose in discussing the matter was just to
confirm whether Chong had communicated directly with Waverly (via Nguyen) before filing
suit, with any additional commentary from Chong welcome but unnecessary:

> The sole purpose right now is for me to ascertain whether or not you had direct
> communications with Waverly before you filed the lawsuit. And the answer you are
> telling me is no. And I'm telling you that . . . Therefore, I am going to refer you to
> disciplinary counsel. And I don't actually need to have you answer any other questions,
> but you are welcome to, if you want to. But that suffices, in as far as your appearance
> here in the Waverly cases. That's all I needed to ascertain.

When Chong attempted once more to relitigate the "direct communications" issue, Judge
Connolly appeared to lose his patience further—questioning both his command of the English
language and his knowledge of the ethical rules he had already been found to violate:

```
16              MR. CHONG:  But I did have direct
17      communication. I had conversations to Waverly through
18      their agent.
19              THE COURT:  I think you need to learn English,
20      then.  "Direct" and "through" are --
21              MR. CHONG:  I'm sorry?
22              THE COURT:  You need to learn to speak English,
23      because "direct" and "through" can't be used in a sentence
24      the way you have just used them.
25                  You're not having direct communications with a
 1      principal if it's through their agent.
 2                  And, you know, look, I don't -- you are welcome
 3      to state your case.  You have that opportunity, but what
 4      I'm saying is, based on that representation alone, I don't
 5      need any more information, and I do believe it's
 6      appropriate to refer your conduct in this case -- in these
 7      cases -- to disciplinary counsel.  Because it's a
 8      fundamental proposition of ethical conduct of lawyers that
 9      they get the direct approval of a client to file a
10      lawsuit.  And they can, at times, rely on directions from
11      a third party, but only after obtaining the, quote,
12      "informed consent" of the client, and you are telling me
13      you didn't do that here.
```

Following yet another back-and-forth in which Chong tripled down on the same argument, to
which Judge Connolly again pointed out that communications through an agent cannot be
direct by definition, he reiterated his decision to refer the matter to ODC—remarking that
Chong could clearly use a refresher on the relevant principles:

```
 8    cases, I am going to refer Mr. Chong to disciplinary

 9    counsel.  And, really, he needs, it sounds like, to be

10    just educated about the fundamentals of agency principals,

11    what a principal is versus an agent, what it means to

12    obtain informed consent, and he needs to apprise himself

13    better of the Rules of Professional Conduct in our

14    jurisdiction and that apply in this Court.
```

Judge Connolly then turned to Swirlate, similarly asking Chong whether he had any direct communications with the plaintiff's owner and sole employee, Dina Gamez. Here, though Chong explained that as local counsel, he relied on lead counsel Bennett to communicate with the client, and that he obtained his engagement agreement through Bennett.

Bennett then found himself in the hot seat, at which point he professed a lack of knowledge in response to various table-setting questions from Judge Connolly. In particular, Bennett claimed not to be familiar with the Nimitz, Backertop, and Mellaconic cases, though he later admitted to having read the November 2023 Nimitz order (which extensively discusses those lawsuits) that Judge Connolly cited in the order compelling Bennett's testimony. Judge Connolly next attempted to jog his memory with respect to emails in which Bennett and the counsel in those cases discussed how to respond to his various orders in late 2022 (evidentiary and otherwise). In each instance, Bennett contended that due to the passage of time, he only recalled "generally, but not specifically", the events in those cases.

Judge Connolly then returned to his main line of inquiry, explaining that he wanted to ascertain whether Bennett, too, had failed to obtain the informed consent of his client, Swirlate (and, by extension, Gamez), to file and settle lawsuits on its behalf—as had formed the basis of his disciplinary referrals for Chong and the other counsel named in the November 2023 order. While Bennett similarly argued that he had received Gamez's permission to file suit through an engagement agreement signed by her, he again claimed not to recall where the email through which he obtained that agreement came from. Rather, Bennett merely remarked that the relevant email chain would have included MAVEXAR as it was acting as her agent. Judge Connolly then asked whether Bennett had "relied exclusively on communications with Mavexar to take actions in these cases on behalf of Swirlate"; while Bennett responded in the negative, he also conceded that he had received Gamez's supposedly informed consent "through [MAVEXAR]". Nor, for that matter, could Bennett recall whether he had "communicated with Ms. Gamez in the first instance to obtain her informed consent", as phrased by Judge Connolly, saying only that he would have to look back at his engagement agreement. (That said, as noted further below, Bennett would later suddenly remember more about those conversations.)

Judge Connolly responded by stating that he would issue another production order to fill in the gaps in Bennett's apparently spotty memory as to whether he had complied with his ethical duties:

```
 5     do, then, since you don't recall, I'm going to have you

 6     have to produce that documentation so I can ascertain

 7     whether, in fact, you comported with the rules of ethics

 8     to obtain the informed consent of a client before filing

 9     these lawsuits.  All right?

10              MR. BENNETT:  So, I'm sorry.  What is Your

11     Honor requesting?

12              THE COURT:  Well, I will draft an order that

13     will get at it.  But, basically, what I need to assure

14     myself of is that -- because I'm not assured, based on the

15     answers you've given me, that you, in fact, obtained

16     informed consent of Swirlate to file these lawsuits.
```

Bennett then appeared to express surprise and asked what rules he had broken—to which Judge Connolly reminded him that local rules require all attorneys appearing in the District of Delaware to comply with the Model Rules of Professional Conduct, which it would "appear [he] violated . . . because [he] did not obtained the informed consent" of his client. Nor, said Judge Connolly, could he see how Bennett could not have violated those model rules if he "relied exclusively on the directions of Mavexar or IP Edge or a third party to file the lawsuit or to dismiss the lawsuit on its behalf".

Bennett, unlike Chong, at least appeared to have prepared a substantive counterargument, arguing that certain Third Circuit cases supported his position that it was proper for MAVEXAR to communicate certain information as Swirlate's agent. However, Judge Connolly was unmoved, reminding Bennett that the cited decisions presumed that the attorney had properly secured the client's consent for such an arrangement in the first place: "[I]n order to get a client's informed consent to take directions from a third party, you have to get the informed consent from the client". Bennett also expressed confusion as to why Gamez, as its owner and managing partner, would not be considered another agent, asserting that a legal entity like Swirlate "could only communicate through their agents". Judge Connolly, of course, disagreed: "No, actually, that's not true. Swirlate has a natural person associated with it as all entities do. It's got a sole owner and managing partner according to the disclosure that Swirlate filed with this Court, and that's Dina Gamez". After Bennett actually asked the court to remind him "who [he would] have to speak to in the client's position" to obtain informed consent, Judge Connolly explained that it would be Gamez, as the only "natural person associated with the client", who would be able to give such consent.

Bennett also attempted to secure a guarantee that all produced material would be kept confidential, prompting another incredulous response from Judge Connolly: "I can't give you that guarantee, no. I can't do that. I've never given—I don't know of a Court that would ever do that". In any event, Judge Connolly reminded Bennett that he could "short circuit" the whole production process if the attorney would look back through his files and just send a letter to confirm, as the court suspected, that he "never had communications directly with Dina Gamez to obtain the informed consent of Swirlate to file these lawsuits in its name, and instead . . . relied exclusively on communications with a third party, *i.e.*, Mavexar or IP Edge"—given that the court would already, at that point, be "prepared to just refer [him] to the bar authorities in Illinois and let them do their job".

Yet Bennett apparently preferred to try and relitigate his original point that obtaining consent from MAVEXAR, as Swirlate's agent, is the same as having received such consent from Swirlate itself. This prompted Judge Connolly to once again circle back to explain a key legal principle (and again, with an apparent tone of disbelief):

> You can't obtain informed consent of a principal to follow the directions of an agent through the agent. I mean, it just guts the whole definition of what informed consent of the principal means. It makes the rule and the requirement of informed consent to be absolutely meaningless. The whole point on the rule is to make sure that the client is giving the informed consent.

Judge Connolly then confirmed that he would move ahead with a production order, particularly in light of the fact that Bennett—in attempting to show that Swirlate's consent had been effective—revealed, perhaps accidentally, that he had received verbal confirmation from Gamez that MAVEXAR "was working for her". Remaining questions as to the timing of Bennett's statements, as to whether he had had such communications before or after he filed the lawsuits, left enough ambiguity that the court found that it could not yet simply refer the matter to the Illinois disciplinary body as Bennett had requested. Indeed, Judge Connolly indicated that his own review of the materials to be produced was for Bennett's own protection:

> All right. So let's find that out because I don't want to refer you to the disciplinary authority if it turned out you got the informed consent. And because it also affects your good standing or whether you have good standing in this Court, it's not something I can just, you know, punt.

Judge Connolly issued the promised production order (https://insight.rpxcorp.com /litigation_documents/15540536) on January 23, holding that Swirlate must produce to the court "no later than February 22, 2024 copies of the following documents and communications that are in the possession, custody, and control of Swirlate IP LLC, Dina Gamez, David R. Bennett, Direction IP Law, Jimmy Chong, and the Chong Law Firm":

> 1) Any and all retention letters and/or agreements between Swirlate IP LLC and Direction IP Law or the Chong Law Firm.

> 2) Any and all communications and correspondence, including emails and text messages, that Dina Gamez had with David R. Bennett, Direction IP Law, Jimmy Chong, the Chong Law Firm, Mavexar LLC, IP Edge LLC, Linh Deitz, Papool Chaudhari, and/or any representative ofMavexar LLC and/or IP Edge LLC regarding:

>> a) The formation of Swirlate IP LLC;

>> b) Assets, including patents, owned by Swirlate IP LLC;

>> c) The potential acquisition of assets, including patents, by Swirlate IP LLC;

>> d) The nature, scope, and likelihood of any liability, including but not limited to attorney fees, expenses, and litigation costs, Swirlate IP LLC could incur as a result of its acquisition of and/or assertion in litigation of any patent;

>> e) U.S. Patent Nos. 7,154,961 and 7,567,622;

f) The retention of Direction IP Law and the Chong Law Firm to represent Swirlate
IP LLC in these cases;

g) The settlement or potential settlement of these cases;

h) The dismissal of these cases; and

i) The cancelled December 6, 2022 hearing.

3) Any and all communications and correspondence, including emails and text
messages, that David R. Bennett, Jimmy Chong, or any employee or representative of
Direction IP Law or The Chong Law Firm had with Mavexar LLC, IP Edge LLC, Linh Dietz,
Papool Chaudhari, and/or any representative of Mavexar LLC and/or IP Edge LLC
regarding:

a) The formation of Swirlate IP LLC;

b) Assets, including patents, owned by Swirlate IP LLC;

c) The potential acquisition of assets, including patents, by Swirlate IP LLC;

d) The nature, scope, and likelihood of any liability, including but not limited to
attorney fees, expenses, and litigation costs, Swirlate IP LLC could incur as a result
of its acquisition of and/or assertion in litigation of any patent;

e) U.S. Patent Nos. 7,154,961 and 7,567,622;

f) The retention of Direction IP Law and the Chong Law Firm to represent Swirlate
IP LLC in these cases;

g) The settlement or potential settlement of these cases;

h) The cancelled December 6, 2022 hearing

The order is similar in scope to those issued against other IP Edge plaintiffs involved in this
saga—apart from the reference to the December 6, 2022 evidentiary hearing, which Chong,
Bennett, and Gamez had been ordered to attend in person. Judge Connolly canceled that
hearing after he stayed the Swirlate cases in light of the Federal Circuit's own stay in the
Nimitz litigation. While the Federal Circuit lifted the latter stay on December 8, 2022, Judge
Connolly does not appear to have ever lifted the Swirlate stay, and he did not reschedule the
evidentiary hearing (at least, with respect to securing testimony from Gamez).

For a blow-by-blow of the November 2022 evidentiary hearing that kicked this whole saga
into high gear, see "Recent Delaware Evidentiary Hearings Characterized as 'Perverse Prying'
by a 'Lone-Wolf Prosecutor' Were Wide-Ranging (https://insight.rpxcorp.com/news/72588-
recent-delaware-evidentiary-hearings-characterized-as-perverse-prying-by-a-lone-wolf-
prosecutor-were-wide-ranging)" (November 2022). A deep dive on the recent order in which
Judge Connolly laid out the results of his investigation can also be found here: "Judge
Connolly Refers IP Edge 'Fraud' Saga to DOJ, USPTO, and State Disciplinary Bodies
(https://insight.rpxcorp.com/news/78087-judge-connolly-refers-ip-edge-fraud-saga-to-doj-
uspto-and-state-disciplinary-bodies)" (December 2023).

Editor's Note: This article was updated after publication to reflect the contents of the production order issued against Swirlate IP.

**RP⟨**

(/)

Copyright ©
2008-2024
RPX
Corporation.
All Rights
Reserved

## Related News

**Litigation Research (/use_cases /litigation_research)**

Motion for Clarification and "Scheduled Procedures" Push Off Additional Delaware Scrutiny (/news/79562-motion-for-clarification-and-scheduled-procedures-push-off-additional-delaware-scrutiny)
February 18, 2024

**Litigation Strategy (/use_cases /litigation_strategy)**

Judge Connolly Calls Counsel for Other IP Edge-Tied Plaintiffs in for Questioning (/news/78586-judge-connolly-calls-counsel-for-other-ip-edge-tied-plaintiffs-for-questioning)
January 7, 2024

**Risk Analysis (/use_cases /risk_analysis)**

Judge Connolly Refers IP Edge Fraud Saga to DOJ, USPTO, and State Disciplinary Bodies (/news/78087-judge-connolly-refers-ip-edge-fraud-saga-to-doj-uspto-and-state-disciplinary-bodies)
December 3, 2023

**Business Development (/use_cases /business_development)**

Whether Fraud on the Court or "Titillating Gossip", Delaware Inquiry to Resume This Week (/news/74719-whether-fraud-on-the-court-or-titillating-gossip-delaware-inquiry-to-resume-this-week)
April 9, 2023

**Active Matter Management (/use_cases /active_matter_management)**

Plaintiff Signals Plan to Seek US Supreme Court Intervention, Characterizes Judge Connolly as Its "Adversary" in the Case (/news/73766-plaintiff-signals-plan-to-seek-us-supreme-court-intervention-characterizes-judge-connolly-as-its-adversary-in-the-case)
February 4, 2023

**Monitoring (/use_cases /monitoring)**

## Use Cases

## Quick Links

Contact Us (/contact_us)

RPX Empower (https://empower.rpxcorp.com/)

RPX Analyst (https://analyst.rpxcorp.com/)

RPX Corporation (https://www.rpxcorp.com/)

## Others

Privacy Policy (/company/privacy-policy)

Terms of Use (/company/terms-of-service)

## Details

### Key Parties

| Party | | |
|---|---|---|
| IP Edge LLC (/entity/1034412-ip-edge-llc) | 📊 Analyze ⌄ | View Other Articles (/News/Details?Searchq=ents%3A%281034412%29) |
| Swirlate IP LLC (/entity/8669361-swirlate-ip-llc) | 📊 Analyze (/analytics /district_court?party_plain_or_def %5B%5D=8669361 %2A%2ASwirlate+IP+LLC+%2849%29) | View Other Articles (/News/Details?Searchq=ents%3A%288669361%29) |
| Waverly Licensing LLC (/entity /12117977-waverly-licensing-llc) | 📊 Analyze (/analytics /district_court?party_plain_or_def %5B%5D=12117977 %2A%2AWaverly+Licensing+LLC+%2817%29) | View Other Articles (/News/Details?Searchq=ents%3A%2812117977%29) |

### Campaigns ⓘ

Swirlate IP LLC (7,154,961) (/litigation_campaign/79577-swirlate-ip-llc-7-154-961)

Waverly Licensing LLC (9,608,472) (/litigation_campaign/88696-waverly-licensing-llc-9-608-472)



*The*

# DISCIPLINARY BOARD
*of the Supreme Court of Pennsylvania*

*Dedicated to protecting the public, maintaining the integrity of the legal profession, and safeguarding the reputation of the courts.*

# Annual Report
# 2022

Issued: March 16, 2023

## The Disciplinary Board of the Supreme Court of Pennsylvania

www.padisciplinaryboard.org

Phone: (717) 231-3380

Fax: (717) 231-3381

601 Commonwealth Avenue, Suite 5600

PO Box 62625

Harrisburg, PA 17106

*Education Committee*

The Education Committee Chair is Gretchen A. Mundorff. Board member John C. Rafferty, Jr. serves as a member of this committee.

The role of the committee is to propose and carry out education and training opportunities for the profession, Hearing Committee members, and Board members.

Under the leadership of Committee Chair Mundorff, the committee planned and held an in-person training event for newly-appointed Hearing Committee members in Hershey, Pennsylvania. Participants attended the 6-hour training event, which included presentations by Board members; Hearing Committee members; Board staff; the Chief Disciplinary Counsel and Deputy Chief Disciplinary Counsel; and, Respondent's Counsel, Ellen Brotman. The program was designed to educate these new members about the disciplinary system and their responsibilities as Hearing Committee members.

In addition to their participation in Hearing Committee training, Board members had the opportunity to participate at conferences related to disciplinary matters. Board members continued their efforts to participate in numerous CLE presentations throughout the year.

Board members, staff, and Hearing Committee members attended the 19th Annual Meeting of the National Council of Lawyer Disciplinary Boards (NCLDB) virtually, in February 2022. Attendees included: David S. Senoff, Board member; Jesse G. Hereda, Executive Director and member of the NCLDB Board of Directors; Marcee D. Sloan, Board Prothonotary and Secretary of the NCLDB Board of Directors; Laura K. Mohney, Counsel to the Board; Kimberly M. Henderson, Special Counsel; and Hearing Committee members Jimmy Chong, Vincent S. Cimini, Lindsay S. Fouse, Nelson B. Gaugler, Catherine Harrington, Amy M. Kirkham, Joseph C. Romano, Dawn Tancredi, and Heidi Villari.

‹ Back to News (/news/details?searchq=)

## Judge Connolly Refers IP Edge "Fraud" Saga to DOJ, USPTO, and State Disciplinary Bodies

December 3, 2023

Since late last year, Delaware Chief Judge Colm F. Connolly has expressed increasing concerns over the activities of multiple litigating plaintiffs linked to IP Edge LLC (https://insight.rpxcorp.com/entity/1034412-ip-edge-llc) and a related consulting firm, MAVEXAR LLC (https://insight.rpxcorp.com/entity/1319932-mavexar-llc): namely, that by failing to disclose those relationships as required in his courtroom, those entities had possibly committed fraud. However, he has stopped short of detailing the possible ramifications of those actions—until now. On November 27, in a blistering, 105-page order (https://insight.rpxcorp.com/litigation_documents/15465765), Judge Connolly found that IP Edge had been the "de facto" owner of the patents asserted by its litigating affiliates and held that the entity and its principals should face "consequences" for their improper attempt to "use separate LLCs to insulate themselves" from liability: He has now called upon the Department of Justice (DOJ) and the USPTO to potentially investigate these misrepresentations. Judge Connolly has also teed up potential punishment for some of the individuals involved: He has referred certain attorneys employed by IP Edge (which is not a law firm) to a Texas disciplinary body for the unauthorized practice of law and has referred the LLCs' local and lead counsel to state disciplinary bodies for improperly treating IP Edge as their true client.

IP Edge's indirect dispute with Judge Connolly arose as a result of two standing orders that he imposed in his courtroom in April 2022, respectively requiring the comprehensive disclosure of information on a party's corporate control and the presence of certain third-party litigation funding relationships (and where present, comprehensive disclosure of the nature of that relationship). As RPX has extensively reported, after Judge Connolly learned that several IP Edge plaintiffs—including Lamplight Licensing LLC (https://insight.rpxcorp.com/entity/11768759-lamplight-licensing-llc), Mellaconic IP LLC (https://insight.rpxcorp.com/entity/9603026-mellaconic-ip-llc), and Nimitz Technologies LLC (https://insight.rpxcorp.com/entity/11508870-nimitz-technologies-llc)—had initially failed to make sufficient disclosures under those new rules, he ordered their individual owners, and some of their attorneys, to attend a pair of evidentiary hearings in early November 2022.

Those two hearings, referenced in greater detail below, laid bare IP Edge's historical monetization model: It has frequently hired individuals with no prior connection to patent monetization as the owners/managers of its litigating LLCs in exchange for the promise of passive income from any litigation proceeds. That practice, per Judge Connolly, suggested that by assigning patents to those LLCs without disclosing connections to IP Edge and MAVEXAR, which is controlled by IP Edge's principals (Texas attorneys Gautham ("Gau") Bodepudi, Sanjay Pant, and Lillian Woung), those two entities had perpetrated a fraud on the USPTO and/or the district court. Those hearings also left the court with expressed "concern[s]" over the "accuracy of statements" made in the plaintiffs' filed disclosures, in addition to concerns over "whether the real parties of interest are before the Court"—leading Judge Connolly to hand down a series of extraordinarily sweeping orders

business) requiring production to the court of a range of documents related to the plaintiffs' legal representation, corporate ownership and control, assets, and potential liabilities.

Plaintiff challenges to the propriety of those production orders as well as to Judge Connolly's underlying standing orders themselves failed, including a series of district court motions rejected by Judge Connolly and a set of *mandamus* petitions rejected by the Federal Circuit. Yet while each of those entities ultimately produced the requested materials, issues remained. Judge Connolly later remarked after a review of the produced material that some of it was incomplete, for example by including emails referring to attachments not themselves produced, or in some instances by omitting documents from one LLC that were produced for the other.

Yet the substantive issues revealed by Judge Connolly's review of the produced materials and the November 2022 testimony, as recounted in his November 27, 2023 order (https://insight.rpxcorp.com/litigation_documents/15465765), were far more significant—and led the court to make three key findings:

> (1) [C]ounsel of record for the LLC plaintiffs violated numerous rules of professional conduct by actions they took and failed to take; (2) lawyers at IP Edge engaged in the unauthorized practice of law in Texas; and (3) real parties in interest in the patents in these cases, including a foreign government, were not disclosed to the PTO, defendants, or the Court.

### Nimitz: Emails Suggest Blurred Lines Between Plaintiff, IP Edge, and MAVEXAR—and a Foreign Government's Retained Interest in Litigation Proceeds

Judge Connolly then proceeded to detail the basis for these findings, starting with Nimitz—for which he noted that the entity has been represented in these cases solely by George Pazuniak of O'Kelly & O'Rourke, LLC; that its address corresponds to a FedEx dropbox; and that its sole owner, Mark Hall (who is otherwise a fulltime account manager and salesman for "energy analytic software" company **Enverus**), had testified that its asserted patent (7,848,328 (https://insight.rpxcorp.com/patent/US7848328B2)) was the entity's only asset. Here, Judge Connolly highlighted Hall's testimony at the November 4, 2022 hearing, observing that he "was unable . . . to describe anything about the patent or how Nimitz came into possession of it".

> Q. Do you know what the name of th[e] [#328] patent is?
>
> A. I do not.
>
> * * * *
>
> Q. What technology is covered by the [#]328 patent?
>
> A. I haven't reviewed it enough to know.
>
> * * * *
>
> Q. How did you pay for the [#328] patent?
>
> A. There was an agreement between Mavexar and myself where I would assume liability.
>
> Q. What does that mean?
>
> A. No money exchanged hands from my end.

patent, but no money—you didn't exchange any money for it?

A. No.

Q. So is that what you're saying?

A. Yes.

*Q. So how do you come to own something if you never paid for it with money?*

*A. I wouldn't be able to explain it very well. That would be a better question for Mavexar.*

Q. Well, you're the owner?

A. Correct.

*Q. How do you know you're the owner if you didn't pay anything for the patent?*

*A. Because I have the paperwork that says I'm the owner.*

(Emphasis added by the court.)

The origins of that patent—and, in particular, a financial interest held by its prior owner—would prove significant to Judge Connolly's conclusions here, Hall's lack of knowledge on these points notwithstanding. Specifically, as noted by Judge Connolly, the '328 patent originated with **Nokia** but was assigned in 2013 to France Brevets SAS (https://insight.rpxcorp.com/ent/430160-france-brevets-sas), a public-private monetization firm characterized by the court as "a so-called 'sovereign state fund' owned by the French government". The patent was then assigned to Burley Licensing LLC (https://insight.rpxcorp.com/entity/10537555-burley-licensing-llc), another IP Edge-linked entity, in March 2021, with the accompanying USPTO assignment cover sheet listing its submitter as Hau Bui (the owner of a food truck as well as a "fried chicken joint", and also the sole owner of Mellaconic). That same assignment sheet also listed, for the submitter's email address, that of IP Edge office manager Linh Deitz, who had been Bui's "primary communication with Mavexar" according to his November 4, 2022 testimony.

When a patent assignment is recorded with the USPTO, the submitter is required to attach documentary evidence that the assignment actually occurred. That attachment is often not the full assignment agreement between the transferor and the recipient of rights. Often there may be terms in that full assignment agreement that the parties to the transfer would like to keep confidential (as recordation is a public event). Thus, an assignment of rights is routinely attached to a full assignment agreement (typically, as "Exhibit A" to it) so that it is separable— *i.e.*, so that it can be separated from the full assignment agreement with ease and then submitted to the USPTO. However, as will become clear below, any discrepancies between the proof of assignment submitted to the USPTO and the entire set of terms in the full assignment agreement between the parties can be treacherous.

Even more was revealed in the full assignment agreement that Nimitz produced to the court: France Brevets was in fact entitled to a 35% cut of the gross revenue that resulted from "monetizing and enforcement" of the transferred patents, apparently contradicting language elsewhere in the agreement providing that the assignment to Burley encompassed "all income, royalties, damages and payments now or hereafter due or payable with respect" to the '328 patent (and the others assigned). Moreover, the full assignment agreement required Burley to transfer the patents back to France Brevets if it had failed to file suit over the patents

lacked the ability to transfer the patents without France Brevets's consent—seemingly, contradicting language in the proof of assignment representing that the transfer included "*all right, title, and interest that exist today and may exist in the future in and to*" the covered patents (emphasis by the court).

Other produced materials, per Judge Connolly, further suggest that the lines between Nimitz, IP Edge, and MAVEXAR were at least blurred, and possibly even fictional. On August 16, 2021, before Nimitz was even formed, Texas attorney Duy Tran—then an IP Edge director—emailed Pazuniak a set of claim charts detailing infringement by the defendants later sued by Nimitz, copying IP Edge's Deitz and Brandon LaPray, an attorney then employed by IP Edge (and now deceased). In response to a question the following day about whether France Brevets was still the owner of the '328 patent, LaPray responded as follows: "Hi George - It is not. **We** bought the patents from France Brevets. Below is the Plaintiff info. **We** will get the assignment recorded" (emphasis by the court), disclosing the entity name "Nimitz Technologies LLC", listing an address, and naming Hall as its managing member. Yet at that point, Nimitz had yet to be formed, and that formation did not finally occur until hours *after* that email was sent.

This back-and-forth was troublesome, suggested Judge Connolly, because while "[t]he fact that Mr. Hall is Nimitz's managing member does not preclude there from being other members of the LLC, and it could be reasonably inferred from Mr. LaPray's use of 'we' in his email to Mr. Pazuniak that IP Edge (or an affiliate like Mavexar) had an ownership interest in Nimitz", Pazuniak had testified at the November 4 hearing that Nimitz was solely owned by Hall—and that Deitz had been merely representing Nimitz as its agent. Per Judge Connolly, this squarely contradicts the facts laid out in the aforementioned emails:

> As the email exchanges make clear, Mr. Pazuniak could not have "understood" when he was first contacted by Ms. Deitz (or anyone else from IP Edge or Mavexar) that Ms. Deitz (or anyone else) was an agent for or "was representing" Nimitz because Mr. Pazuniak did not learn of Nimitz's existence until after he had already begun his review (at IP Edge's request) of the claim charts for four potential litigation "targets" and after Mr. Pazuniak himself had asked IP Edge who "the proposed Plaintiff" would be in the #328 patent infringement actions contemplated by IP Edge.

Moreover, Judge Connolly flagged additional material as suggesting that Hall's involvement in the assignment of the '328 patent from Burley to Nimitz had been little more than a retroactive rubber-stamp: That assignment was filed with the USPTO on August 20, 2021 and was purportedly signed electronically by Bui (for Burley) and Hall (for Nimitz), but a document produced by Deitz showed that Deitz did not ask Hall to sign the agreement *until August 24*, four days later.

The contents of that assignment from Burley to Nimitz made it clear that Nimitz had inherited Burley's issue with respect to France Brevets, Judge Connolly also found. Since Nimitz had agreed to assume all of Burley's obligations as part of its consideration for the assignment, Nimitz was thus obligated to provide France Brevets the same 35% of the gross revenue from its assertion of the '328 patent, and was bound by the same reversionary interest. Again, the court had already both explained that this was problematic, as the proof of assignment otherwise represented that the transfer to Burley (and, thus, to Nimitz) included the right to all income related to the '328 patent and all rights and title to the patent as well. (Judge Connolly also found that the French government dissolved France Brevets in October 2022, after Nimitz had "settled 11 cases in this court", but noted that nothing in the produced materials indicates that France Brevets "ever relinquished or transferred its interest in the settlement proceeds" from the '328 patent.)

agreement produced to the court: a "Consulting Services" agreement between Nimitz and MAVEXAR, executed the day after the assignment, with IP Edge principal Pant (one of the firm's two managing partners, per the court) signing for the latter. In exchange for MAVEXAR's help with monetizing any patents owned by Nimitz, Nimitz agreed to provide a certain percentage of all "Net Proceeds", defined as "Gross Recovery" (itself the gross amount of all monetization proceeds) minus "Costs and Expenses", to MAVEXAR. While neither that agreement, nor any other produced documents, specified the percentage to be received by MAVEXAR, Hall had testified that he believed Nimitz received just 10% of the proceeds. Thus, Judge Connolly posited, while the full assignment agreement provided that IP Edge (via Burley) had conveyed the right to all income from the '328 patent to Nimitz, "it appears that at the time the Burley/Nimitz Patent Assignment was filed with the PTO Mavexar was contractually entitled to 90% of the profits generated from licensing and litigating the #328 patent".

Nor, for that matter, did Hall—again, the disclosed sole owner of Nimitz—appear to play any role in selecting the LLC's litigation counsel. While the produced documents do not confirm the precise circumstances by which this selection was finalized, Judge Connolly explained, the common thread was once more Deitz, who sent Hall an engagement letter with Pazuniak's firm that somehow made its way back to Pazuniak in executed form. That letter set a variety of terms regarding the firm's representation of Nimitz, including the firm's right to recover between 25-40% of the litigation proceeds depending on timing. Yet while Pazuniak proceeded to file litigation on behalf of Nimitz, and file 13 motions to dismiss on behalf of the plaintiff, at no point was Hall advised of these actions (nor was his consent sought), per the materials reviewed by the court. Those materials further indicate that Pazuniak and Hall had *no contact whatsoever* until he was invited to a series of meetings to discuss Judge Connolly's ordering of the evidentiary hearings.

The communications about those meetings also apparently revealed the involvement of two other key figures in this story: Bodepudi, IP Edge's other managing partner; and attorney Papool Chaudhari. Judge Connolly remarked that Chaudhari's "role at IP Edge and Mavexar is not entirely clear": While he used an IP Edge email and email signature in relevant communications, the court observed that he never identified a title. In testimony at the November 4, 2022 evidentiary hearing, Jimmy Chong of Chong Law Firm PA, Delaware counsel for Lamplight and Mellaconic IP, identified Chaudhari as the person he would "typically" speak with at MAVEXAR.

Regardless of the nature of Chaudhari's role at IP Edge or MAVEXAR, Judge Connolly found that the "document productions make clear that he, more than any other individual, directed LLC plaintiffs' counsel of record in these cases about how to respond to my orders and he oversaw the prepping of Messrs. Bui and Hall for their testimony at the November 4, 2022 hearing". Those materials also explicitly confirm that "Chaudhari very much wanted Mavexar to be hidden from the Court", Judge Connolly found, citing an email sent to one of Mellaconic's lawyers in the wake of the first of his production orders: "Again we reiterate that we do not want to disclose Mavexar by name, but rather just disclose that recourse funding exists" (emphasis in original). (This email was marked "Common interest Attorney-Client Privilege", but Judge Connolly rejected this attempt to assert privilege—noting that the email copied Bodepudi and Pant, an IP Edge assistant, and the counsel for three IP Edge-linked LLCs, but that it did not disclose a communication to or from a client, as "[c]ounsel have consistently maintained in these actions that IP Edge and Mavexar are *not* their clients"—so the materials so marked are thus not privileged.)

Interests

Judge Connolly then turned to Mellaconic, remarking that the relevant circumstances were similar to those of Nimitz: Its litigation counsel, including Chong and co-counsel, filed numerous cases on its behalf, while its sole owner and member Bui (who "makes his daily living as the proprietor of a food truck and restaurant") knew nothing about the substance or provenance of Mellaconic's only assets (its asserted patent, 9,986,435 (https://insight.rpxcorp.com/patent/US9986435B2), and other patent assets), trusting MAVEXAR to direct him in whether to sign off on their activity. Bui agreed to do so, again, in exchange for a percentage of Mellaconic's litigation proceeds, here 5%.

The court highlighted Bui's confusion, at the November 4 evidentiary hearing, over the extent of the obligations he had assumed in exchange for this "passive income": When the court questioned Bui over what liability he had taken on, Bui indicated that he did not understand the term "liability" in the first place: "It was clear from the substance of Mr. Bui's testimony and his facial expressions and body language that he was not familiar with the word 'liability'", despite the fact that the agreement assigning the '435 patent to Mellaconic, and the entity's consulting agreement with MAVEXAR, both "expose him to potential financial liability" as characterized by the court.

That assignment agreement, which conveyed the '435 patent from Empire Technology Development LLC (https://insight.rpxcorp.com/entity/939223-empire-technology-development-llc) to Mellaconic, had problems similar to the ones relevant to the Nimitz cases. Like the Nimitz assignment agreement, a shorter proof of assignment for this conveyance was filed with the USPTO, indicating that the transfer included the right to all income from the patent, while the full assignment agreement produced to the court again revealed that the prior assignee, Empire, had retained an interest, here 50%, in the litigation proceeds, contradicting the proof of assignment. Additionally, the court observed that Mellaconic also had a consulting agreement with MAVEXAR that was "identical" to the one between MAVEXAR and Nimitz. Since Bui had testified that he received 5% of Mellaconic's proceeds, the court thus observed that MAVEXAR was "contractually entitled to 95% of the profits generated from licensing or litigating those assets".

While the order does not mention a similar "chicken or the egg" problem as with Nimitz (i.e., regarding actions being taken by IP Edge and MAVEXAR on the entity's behalf before it was even formed), another parallel was that for an extended period of time, Bui had no contact with his counsel: local counsel Chong, and Ohio attorneys Howard Wernow and Andrew Curfman of law firm Sand, Sebolt & Wernow, LP that served as lead counsel. Although Mellaconic produced no materials related to its engagement with Chong's firm apart from its engagement letter, its production related to Sand, Sebolt revealed further issues. In addition to establishing that the firm would be entitled to a contingency fee of 15%-45% of Mellaconic's litigation proceeds, that firm's agreement gave the firm the broad authority to discuss the case with any third parties, including consultants, engaged by the plaintiff (at least including IP Edge and MAVEXAR). The engagement agreement also makes just a passing mention of conflicts of interest and none whatsoever about the risks associated with patent litigation (such as liability for attorney fees under Section 285)—all the while absolving the firm of any liability incurred by third parties.

None of those attorneys appeared to have had any contact with Mellaconic until after its cases had been filed and settled, when Judge Connolly's investigations were in full swing. Chong's first direct contact with Bui appears to have been an email around that time asking Bui to confirm that he wanted Chong to communicate directly with MAVEXAR. As for the attorneys

Bodepudi and Pant. The court also batted away a series of claims of privilege for a string of relevant communications, including for the above email with Chong (rejected because it only discussed the general terms of their engagement) and emails with Sand, Sebolt (rejecting as improper a claim for "Common Interest Attorney-Client Privilege", for reasons similar to the Nimitz cases).

Judge Connolly further states that he came away from his questioning of Bui with skepticism that Bui actually reviewed any of the substance of the proposed lawsuits put before him, concluding "that his 'review of litigations' filed on behalf of his LLCs consisted of signing off on attorney engagement letters". This interpretation, the court explains, is borne out in produced documents, which detail communications regarding proposed settlements between IP Edge's LaPray and Mellaconic's counsel, but none on that topic that were sent to Bui.

### Lamplight: Key Questions Remain Unanswered; Retainer Agreement Names Mystery Party; Informed Consent Issues

Judge Connolly next proceeded to lay out the issues with respect to Lamplight—once again, noting that the plaintiff is an LLC with a disclosed sole owner, Sally Pugal, who is not an IP industry professional (working as a manager for a medical office); and that its sole asset is its asserted patent (9,716,393 (https://insight.rpxcorp.com/patent/US9716393B2)) and another patent application. As was the case with Nimitz, Lamplight acquired those assets through another IP Edge-linked intermediary: The assets passed from **Thomson Licensing** to IP Edge's Magnolia Licensing LLC (https://insight.rpxcorp.com/entity/9243935-magnolia-licensing-llc) in July 2020 as part of a larger transaction, and from Magnolia to Lamplight in November 2021.

While the proof of assignment filed with the USPTO for the latter transaction refers to a prior agreement between Thomson and Magnolia, one stating that Magnolia or "prior owners may have granted licenses, covenants not to sue, releases and other encumbrances with respect to the" transferred assets, Lamplight failed to produce any relevant documents. As a result, Judge Connolly stated, "I do not know the terms of the contingency payment Lamplight owed to Thomson Licensing at the time it filed the Patent Assignment with the PTO or the particulars of the 'other encumbrances' Lamplight 'underst[ood] and acknowledge[d] that [Magnolia] or prior owners may have granted'". Nonetheless, Judge Connolly underscored that the fact that the unproduced full assignment agreement contemplates a "preexisting contingency payment obligation" stands, once again, in direct contrast to the proof of assignment, which otherwise purports to transfer all income, etc. related to the assigned patent assets.

Additionally, while Pugal also signed a consulting agreement on behalf of Lamplight with MAVEXAR, the court again had less information to go on than the other entities, as she did not appear at either of the November 2022 evidentiary hearings due to a medical issue (as detailed further below). Accordingly, Judge Connolly stated, "I do not know the percentage of licensing revenues Mavexar retains under its agreement with Lamplight".

However, Judge Connolly's questioning of Chong revealed that in some key respects, his attorney-client relationship with Lamplight had some deep flaws. For one, the court observed that "it is unclear that that relationship existed at the time Mr. Chong filed" the LLC's first three cases, as his firm's retention letter with Lamplight was not executed until at least one month later. Moreover, Chong negotiated that letter not with Pugal, but with MAVEXAR—prompting Judge Connolly to ask Chong how (*i.e.*, on the basis of which ethical rules) he could have possibly entered into an attorney-client relationship based solely on communications with a third party and how one would possibly perform a conflicts check under the circumstances. (Chong's answers, perhaps not surprisingly, were brief and equivocal.)

substantively "noteworthy": that the agreement's purpose explicitly related to litigation and licensing over the '393 patent, and that Lamplight had represented that it owned free and clear title to the patent, including the right to all litigation proceeds—again, in apparent conflict with the USPTO full assignment agreement. Additionally, it established that Chong needed Lamplight's consent and approval to file litigation and its written approval to settle cases, and that Chong would earn a 15% contingency fee, minus expenses.

Another mystery stemmed from the agreement's language addressing which entity would trigger those expenses—an otherwise unidentified "NWM": "NWM will obtain written pre-approval from [Lamplight] for any Litigation Expense expected to exceed $500. NWM will exercise its reasonable judgment and best efforts to limit the Litigation Expenses to only those expenses that it considers appropriate and necessary under the circumstances".

When Judge Connolly questioned Chong about that sentence, Chong responded that he remembered negotiations over it and that the language had been a "sticking point for [him]". Yet while Chong asserted that NWM was not MAVEXAR, he appeared not to recall who or what NWM was—and, per the court, produced records include no other mention of that entity. (Perhaps of some relevance, as RPX has previously noted, is that a frequent plaintiff-side patent law firm, often representing NPEs in both transactions and in litigation, is Ni, Wang and Massand PLLC.)

Another issue concerned language establishing that Chong's firm would represent only Lamplight with respect to licensing negotiations and litigation, and that any disputes would be subject to arbitration. This language was accompanied by a provision in which Lamplight (and, by extension, sole owner Pugal) affirmed that it had been advised to retain independent counsel for the purpose of the engagement agreement due to a conflict of interest for Chong's firm, in which Lamplight acknowledged that it had been given the option for the firm to represent it at its normal hourly fee rather than under this agreement, and acknowledged the waiver of rights that typically accompanies an arbitration clause. Yet since the record shows that Chong was the only attorney from the firm who worked on Lamplight matters, and that he had never communicated with Pugal prior to the relevant March 2022 date, the court found that the firm had in fact *not advised Pugal* on the need to retain independent counsel, any conflicts of interest, the option of retaining the firm at an hourly rate, or the waiver of rights resulting from arbitration.

When Chong finally did communicate with Pugal, it was once again in response to Judge Connolly's impending evidentiary hearing. Here, the court noted that when Deitz calendared a meeting to discuss that hearing, she sent the invite to Pugal, copying IP Edge's Chaudhari and Bodepudi; and then sent the same invite separately to Chong and his legal assistant, copying Chaudhari and Bodepudi but not Pugal. This piecemeal communication was no accident, the court found: "Sending separate emails appears to have been IP Edge's general practice. It is readily apparent from the emails and texts produced in response to the November 10 Memorandum Order that IP Edge strove to maintain a separation between the nominal owners of the plaintiff LLCs and the lawyers who filed cases on behalf of those LLCs".

However, an increasingly frantic series of communications between Deitz and Pugal, the former's tone alternating between friendly and ominous, suggest that Pugal was becoming increasingly terrified of testifying before Judge Connolly. For instance, in a text message conversation from early October 2022, Pugal tried to pull out—to which Deitz responded that Pugal could become personally liable for sanctions if she failed to appear:

> Deitz: Can you talk? I want to talk to you before your call with our team. . . . I know this is inconvenient for you but this is very important.

Deitz: *Sally this not only affects you but also our company.* There are fees that can be charged to you from the court. We are try[ing] to make it work with your schedule but you have to work with us. This is not something to take lightly. This is an order from a federal judge. Sally please call me back.

(Emphasis by the court.) While Pugal appeared to be reassured by a subsequent phone call (for which the record does not identify the participants), and promised to pick a date for her testimony, she went silent for a week—prompting more texts from Deitz that relayed pressure from Chaudhari and her counsel, followed by an email directly from Chong (which, as noted above, appeared to be his first communication with her).

Pugal apparently agreed to be added to the November 4, 2022 hearing in a subsequent conversation with Chong, but she began ducking the requested weekly meetings with the IP Edge team and her counsel—citing work commitments, a series of medical appointments related to certain unspecified health issues, and the increasing strain on her mental health triggered by the prospect of testifying. At multiple points, Pugal told her team she could not participate, including one text to Deitz on October 19, 2022: "I hate to do this but let me just [be] honest with you[.] I don't think I am comfortable of doing this trial[.] I have nightmares almost every night thinking about it and so stressed[.] . . . Already so stressed at work and all of this [sic] Doctors appointments my [Primary Care Physician] order X-rays MRI and CT[.] Sorry Linh[,] I cannot do it".

Deitz's response expressed some sympathy for Pugal's predicament, but Deitz's concern for IP Edge appeared to outweigh those concerns: The following day, she asked Pugal for an update, and relayed another warning from Chaudhari about sanctions: "This judge isn't going to rest until Sally appears in his courtroom in Delaware. [A]nd if she doesn't appear on 11/4, a date she requested, there's probably going to be sanctions". Driving the point further home, Deitz reminded Pugal that "[s]anction means fees that you will be charged to pay (I mentioned that to you last night)"—suggesting that the referenced conversation was at least one of the first times that sanctions were fully explained to Pugal.

Deitz also took the opportunity to badmouth Judge Connolly in delivering a further warning, apparently unaware that her written conversation could (and did) end up being produced for his review: "Unfortunately the judge is a prick and there is not telling how much fees there could be. *We['ve] paid fees before and I promise you it's a lot. Don't want to scare you but you need to be fully aware*" (emphasis by the court). Pugal again attempted to withdraw in response, stating that however much those fees would be, she would not have the money to pay—reminding Deitz that she "do[es]n't even make money on any of the compan[ies] including this". (This reminder could be a reference to the fact that Pugal has been associated with several other apparent IP Edge NPEs, based on RPX's review of Texas public records: at least Crave Licensing LLC (https://insight.rpxcorp.com/entity/8488159-crave-licensing-llc), Deshodax LLC (https://insight.rpxcorp.com/entity/1199414-deshodax-llc), Inspire Licensing LLC (https://insight.rpxcorp.com/entity/9653064-inspire-licensing-llc), Optical Licensing LLC (https://insight.rpxcorp.com/entity/8488160-optical-licensing-llc), Mentone Solutions LLC (https://insight.rpxcorp.com/entity/1595397-mentone-solutions-llc), and Parkside IP LLC (https://insight.rpxcorp.com/entity/2915830-parkside-ip-llc).) Yet Deitz responded with an even more ominous warning: "*Sally[] I'm sorry but you can't do that. You put not only fees that you will have to pay but you put my company at risk. You are putting me in a really tight spot*" (emphasis by the court).

her attorneys, toward using her apparent health issues as an excuse not to testify. For instance, Chaudhari sent her a conspicuously cheerful email days after she ignored another meeting request:

> Good morning Sally! How are you? We missed you on the Lamplight call this week. Is everything ok? Linh mentioned you are having some health issues. So sorry to hear that! We need to talk with you about that and how that might affect you not going. You might be able to be excused for the Nov 4 hearing next week, but we need to talk with you about to figure that all out.
>
> Can you please text or call Linh and she can set up a time for you to talk with us?
>
> Thank you! Have a nice day!! :)
>
> Papool

Chong chimed in as well, albeit with somewhat more urgency: "I'm so sorry that you are not well. Is there anything that I can do for you? We should really talk sooner than later".

At this point, Chong informed Judge Connolly for the first time that Pugal might not be able to attend the hearing due to a health issue, despite the fact that he had "still [received] no word from Ms. Pugal". Deitz then began to pressure her to sign a declaration regarding her health issues, with Chaudhari—in a considerably saltier, November 2 email copying Chong and his paralegal, LaPray, Deitz, and Bodepudi, but not Pugal—stating that obtaining a doctor's note was unlikely given Pugal's radio silence:

> Jimmy,
>
> As you know, Sally finally got back to Linh with the text that was sent to you. I understand you want a doctor's note, but given that we just finally heard back from Sally after being ghosted for quite some time and the hearing being on Friday, it isn't likely or feasible that we'll have one by the hearing. Hence, we are preparing a declaration that Linh will take to her tonight for her to sign. We will also have Linh ask Sally to get a doctor's note asap that states that her doctor will not permit her to fly.
>
> Given the circumstances and timing for Friday, that's the best we can do.
>
> Papool

That declaration—apparently not drafted by Chong, Judge Connolly found based on produced materials—was sent to Pugal, signed by her, and filed with the court that same day.

Later that month, and weeks after the hearing, Chong sent a pair of emails to Pugal asking her to confirm for the record that he had her consent to communicate with MAVEXAR directly. Pugal responded in the affirmative, though not until weeks had gone by—during which time "Chong had filed and settled six lawsuits in Lamplight's name".

### Ethical Violations by Plaintiffs' Counsel: Shortcuts and Conflicts of Interest, Oh My

Having thus extensively detailed the unusual circumstances surrounding these plaintiffs' legal representation, Judge Connolly then proceeded to spell out just how many ethical rules he believes these attorneys have broken. Most broadly, he explained that regardless of where they practice, attorneys always owe their clients a fiduciary duty: one that "includes undivided loyalty, candor, and provision [to the client] of material information" (citation omitted). As he notes the Third Circuit has held, this is "not a matter to be taken lightly"—as bar membership

disclosure of conflicts of interest so that the client may decide if the representation is in his or her best interest and of the terms of proposed settlement agreements, as it is the client's, not the attorney's, decision whether to settle a case". A court may "countenance no shortcuts", per the Third Circuit: such disclosures must be "meaningful" for clients to give truly informed consent.

Judge Connolly found that the attorneys here under scrutiny—Pazuniak, Chong, Wernow, and Curfman—fell well short of that standard as codified in the American Bar Association's Model Rules of Professional Conduct, which binds attorneys practicing before the District of Delaware. Among the Model Rules he found to be violated here are Rule 1.2(a), requiring a lawyer to "abide by a client's decision whether to settle a matter"; and Rule 1.4, which establishes a duty to "promptly inform" the client of matters that require the client's "informed consent", including settlements—as counsel here had "fail[ed] to have any communication with their clients before filing, settling, and dismissing the clients' cases". Here, Pazuniak had filed and moved to dismiss 11 cases on Nimitz's behalf without consulting Hall, the sole natural person associated with it. Chong had done the same for the two others: as sole counsel on record for Lamplight's six cases, which he filed and settled without consulting owner Pugal; as co-counsel with Wernow in 12 Mellaconic cases filed and settled without consulting with owner Bui; and as co-counsel with Curfman for six more Mellaconic cases similarly filed and settled without such consent.

In addition, he found that those attorneys had also violated Model Rules 1.7, which in part prevents attorneys from representing clients where they have a concurrent conflict of interest involving a third party; and 1.8(f), which bars someone other than the client from compensating an attorney except where the "client gives informed consent", and where "there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship". Rule 1.7 is implicated here, the court explained, because the attorneys' failure to communicate with their clients prevented them from ascertaining whether actual or potential conflicts existed. Such actual or potential conflicts were possibly established with by the MAVEXAR consulting agreements: "Because of those potential conflicts, counsel's blind adherence to Mavexar's directions to file and settle cases in the clients' names created a significant risk that counsel's actions materially limited their representations of their client".

This risk was illustrated by the lopsided financial relationship between MAVEXAR and Nimitz, Judge Connolly explained. MAVEXAR got 90% of the profits with virtually nothing to lose (just the possibility that Nimitz would fail to reimburse it for fees and costs in excess of recoveries), while Nimitz's 10% cut ("a tiny fraction of the litigation gains") was far outweighed by the potential for liability on both its own behalf and that of Hall (including attorney fees and sanctions) in the event of an adverse decision, plus the aforementioned obligation to further reimburse MAVEXAR. "In light of these vastly different profit and risk profiles, it cannot be said that Mavexar's and Nimitz's interests were the same when it came to deciding to file or to settle the lawsuits Mr. Pazuniak brought in this Court in Nimitz's name", the court found.

The situation was much the same for Lamplight and Mellaconic, given that both had identical consulting agreements with MAVEXAR—with the exception that Mellaconic's cut is even smaller, at just 5%. This "even more lopsided" arrangement "makes it even more likely that Mellaconic's interests conflict with Mavexar's interests with respect to the filing and settling of cases". As detailed above, though, Lamplight's cut is unknown due to that plaintiff's incomplete production on the subject. That said, Judge Connolly noted that Pugal's text messages with Deitz suggest that her cut of the proceeds is similarly small.

Connolly held—especially the duty of loyalty. Yet that was exactly what had happened here: the court found that counsel here had "either ignored or delegated to Mavexar (*i.e.*, IP Edge) their fiduciary duties", even though MAVEXAR's consulting agreements explicitly establish that the firm is "not a fiduciary of" the clients at issue. Judge Connolly rejected counsels' apparent "view that a client can delegate to a third party all litigation decisions, including the decision to settle a case, and that an attorney can conduct all communications with a client through that third party", citing for example Pazuniak's argument (in his Federal Circuit brief) that "section 134(2) of the Restatement 3d of the Law Governing Lawyers" allows him to "authorize Mavexar to act as its consulting agent to act on [Nimitz's] behalf as if it was the client". Not so under these circumstances, countered Judge Connolly—as that provision requires that a client consent to a third party providing direction to the attorney. That clearly did not happen here, given that Pazuniak did not communicate with the client *at all* during the time in which he both filed and settled seven of Nimitz's cases.

The court reached the same position for Mellaconic: While Wernow and Curfman argued that its owner Bui had consented by signing their engagement agreement, the fact that this agreement was a mere form letter, while they had also failed to communicate with the client, meant that this was the sort of "illusory" consent rejected by the Third Circuit.

Moreover, Judge Connolly found the attorneys' relationship with IP Edge and MAVEXAR, and their failure to satisfy their fiduciary duties, particularly troubling due to "the obvious disparity in the sophistication of the LLC plaintiffs as opposed to Mavexar and IP Edge". This point was made especially clear by Bui's testimony at the November 4, 2022 hearing (*i.e.*, his confusion as to the meaning of "liability") and the text messages between Deitz and Hall, as well as the "the lopsided terms of the consulting servicing agreements", the court found. Those agreements and the attorneys' actions, Judge Connolly held, "deprived the LLC plaintiffs of the benefit of independent counsel".

Because the attorneys "here failed to satisfy their 'ethical obligations of giving [their] clients full and meaningful disclosure of conflicts of interest so that the client[s] [could] decide if the representation [wa]s in his or her best interest and of the terms of proposed settlement agreements'" (citation omitted), Judge Connolly decided as a result to refer them "to their respective offices of disciplinary counsel".

### MAVEXAR: Consulting Firm's Attorneys Engaged in Unauthorized Practice of Law

Judge Connolly then turned to MAVEXAR and the outsized role that it had played in the plaintiffs' litigation. While the supposed consulting firm's agreement with the plaintiffs described its "services" as "non-legal", and specifically states that it is "not a law firm", Judge Connolly found that the materials produced by the parties "make clear that numerous Mavexar and IP Edge actors engaged in the practice of law on behalf of Nimitz, Mellaconic, and Lamplight". In particular, he explained that those materials show that "Chaudhari, Bodepudi, and Tran each acted as a lawyer for one or more of the three LLC plaintiffs":

> The lawyer tasks they performed varied by individual and LLC and included providing patent infringement claim charts, drafting and editing legal filings, conducting legal research, summarizing and analyzing legal research, crafting legal arguments, preparing a declaration for Ms. Pugal, and prepping Mr. Bui and Mr. Hall for their testimony at the November 4, 2022 hearing.

(Internal citations omitted.) Under Texas state law, Judge Connolly found, such tasks clearly constitute the practice of law—and observed that individuals may be criminally prosecuted for the unauthorized practice of law, having already found that MAVEXAR and IP Edge are Texas

cannot perform legal work for clients with interests different from their employer's—and reiterated his earlier finding that MAVEXAR and IP Edge indeed had different interests from those of the plaintiffs.

Since, as a result, "it appears that . . . Chaudhari, Bodepudi, and Tran engaged in the unauthorized practice of law", Judge Connolly ruled that he "will refer them to the Texas Supreme Court's Unauthorized Practice of Law Committee".

**IP Edge's Problematic USPTO Assignment Filings: Referral to DOJ and USPTO**

Lastly, Judge Connolly turned his attention to the USPTO proofs of assignment filed by IP Edge through various entities—filings that, in this and previous orders, he had characterized as potentially part of a "fraud upon the court" designed to obscure those entities' connections to IP Edge, and that he had also described as "fictitious patent assignments". Here he found that federal law requires that such assignments recorded with the USPTO be accurate, further noting that to submit an assignment agreement, one must (by clicking an onscreen button) attest to the accuracy of the information—through which the user also acknowledges that "providing false or spurious information" in recorded assignments and agreements is a "misrepresentation to the federal government" that "is prohibited and subject to criminal and civil penalties", as codified in USPTO regulations. In relevant part, one of those regulations provides that such penalties fall under 18 USC § 1001, which "makes it a crime to knowingly submit to a federal agency a 'materially false, fictitious, or fraudulent statement or representation'".

While he stopped short of asserting that such violations had occurred, Judge Connolly held that it was appropriate to refer the matter to both the DOJ and USPTO—both to further inquire whether the Patent Office's rules or Section 1001 were violated, and in case the DOJ decides to "investigate whether the strategy employed by IP Edge to hide from the defendants in these cases and the Court real parties in interest, including France Brevets, violated any federal laws".

**IP Edge at the Center of the Web: Use of Shell LLCs "Has Consequences"**

Judge Connolly then concluded by stating his findings on the IP Edge enterprise more directly and unequivocally than he has at any other point to date: "The reality in these cases is that the de facto owner of the asserted patents—that is, the party that truly controls and profits from their assertion—is IP Edge". IP Edge's attorney LaPray, he indicated, confirmed as much by using the first-person plural in an email about Nimitz—stating that "we", meaning IP Edge, "bought the patents". "IP Edge, however, has gone to great lengths to hide the 'we' from the world", Judge Connolly underscored.

> Rather than having the asserted patents assigned to itself or to its own LLCs, IP Edge arranged for the patents to be assigned to LLCs it formed under the names of relatively unsophisticated individuals recruited by Linh Deitz. The LLCs were empty vessels with no assets until IP Edge arranged for the assignment of the patents to those LLCs.

"The housing of assets in a separate LLC has consequences", Judge Connolly continued, as LLCs can neither appear in court nor file patent infringement cases without counsel—which IP Edge and MAVEXAR had effectively done by improperly performing the function of those LLCs' legal counsel:

Edge and Mavexar are not law firms, Texas law prohibits them from acting as the LLC plaintiffs' lawyers. Messrs. Chaudhari, Pant, Bodepudi, and Tran chose to use separate LLCs to insulate themselves, IP Edge, and/or Mavexar from the potential liabilities of patent litigation. They must accept the consequences that flow from that strategy.

Such consequences must also be faced by the counsel that acted on behalf of IP Edge and MAVEXAR, he added, since those two entities were really their "de facto clients". Rather than giving their nominal LLC clients their undivided loyalty and "providing [them] with sufficient information and unconflicted advice . . . to make informed decisions about whether to bring and settle any proposed lawsuits", they treated those LLCs as "mere inventory": "Their loyalty was not to their clients, but rather to IP Edge".

Judge Connolly has wasted no time in the wake of this order, sending letters for the above referrals within two days of its issuance (see here (https://insight.rpxcorp.com/litigation_documents/15469373) for the letter to the DOJ; and here (https://insight.rpxcorp.com/litigation_documents/15472367), here (https://insight.rpxcorp.com/litigation_documents/15469374), and here (https://insight.rpxcorp.com/litigation_documents/15472366), respectively, for those sent to the applicable disciplinary bodies in Delaware, Ohio, and Texas). He addressed the USPTO referral letter (https://insight.rpxcorp.com/litigation_documents/15470880) to Director Kathi Vidal herself, a potentially notable step given that the proper sanctions for misconduct before the Patent Office, and in particular before the Patent Trial and Appeal Board (PTAB), has been a topic of interest (https://insight.rpxcorp.com/news/73878-vidal-reinstates-sanctioned-ptab-petitioners-in-vlsi-iprs-hits-one-with-fees-and-costs) for Vidal this past year.

For more on other aspects of this extraordinary saga—including the contentious battle over the attempts of another IP Edge LLC's owner, a Texas paralegal, to avoid testifying before Judge Connolly—see "Owner of IP Edge-Linked Plaintiff Seeks Federal Circuit Relief from Contempt Order (https://insight.rpxcorp.com/news/77668-owner-of-ip-edge-linked-plaintiff-seeks-federal-circuit-relief-from-contempt-order) (October 2023).

## Related News

Whether Fraud on the Court or "Titillating Gossip", Delaware Inquiry to Resume This Week (/news/74719-whether-fraud-on-the-court-or-titillating-gossip-delaware-inquiry-to-resume-this-week)
April 9, 2023

As IP Edge's Filing Pause Passes Three Months, Lamplight Seeks to Back Out of Delaware (/news/74101-as-ip-edge-s-filing-pause-passes-three-months-lamplight-seeks-to-back-out-of-delaware)
March 4, 2023

Plaintiff Signals Plan to Seek US Supreme Court Intervention, Characterizes Judge Connolly as Its "Adversary" in the Case (/news/73766-plaintiff-signals-plan-to-seek-us-supreme-court-intervention-characterizes-judge-connolly-as-its-adversary-in-the-case)
February 4, 2023

That Series of Delaware Events Grows More Extraordinary (/news/72830-that-series-of-delaware-events-grows-more-extraordinary)
December 3, 2022

Recent Delaware Evidentiary Hearings Characterized as "Perverse Prying" by a "Lone-Wolf Prosecutor" Were Wide-Ranging (/news/72588-recent-delaware-evidentiary-hearings-characterized-as-perverse-prying-by-a-lone-wolf-prosecutor-were-wide-ranging)
November 16, 2022

## Details

### Key Parties

IP Edge LLC (/entity/1034412-ip-edge-llc)

Analyze ⌄

View Other Articles (/News/Details?Searchq=Ents%3A%281034412%29)

MAVEXAR LLC (/entity/... mavexar-llc)

mavexar-llc)

Mellaconic IP LLC (/entity/9603026- Analytics (/analytics/ptab?lit_party_pa... 🔍 Analyze view (/analytics/district_court?Details?Searchq=Ents%3A%289603026%29)
mellaconic-ip-llc) party_plain_or_def%5B%5D=9603026%2A%2AMellaconic+IP+LLC+%2844%29)

Lamplight Licensing LLC 🔍 Analyze view (/analytics/district_court? Details?Searchq=Ents%3A%2811768759%29)
(/entity/11768759-lamplight-licensing- party_plain_or_def%5B%5D=11768759%2A%2ALamplight+Licensing+LLC+%2810%29)
llc)

Backertop Licensing LLC 🔍 **Analyze ﹀** View Other Articles (/News/Details?Searchq=Ents%3A%2812162669%29)
(/entity/12162669-backertop- with District Court Analytics (/analytics/district_court?
licensing-llc) party_plain_or_def%5B%5D=12162669%2A%2ABackertop+Licensing+LLC+%2812%29)

with PTAB Analytics (/analytics/ptab?lit_party_parent_ent_id_lms=12162669%2A%2ABackertop+Licensing+LLC+%281%29)

### Campaigns ⓘ

Mellaconic IP LLC (9,986,435) (/litigation_campaign/81128-mellaconic-ip-llc-9-986-435)

Nimitz Technologies LLC (7,848,328) (/litigation_campaign/87675-nimitz-technologies-llc-7-848-328)

Backertop Licensing LLC (9,332,385) (/litigation_campaign/90451-backertop-licensing-llc-9-332-385)

Lamplight Licensing LLC (9,716,393) (/litigation_campaign/88702-lamplight-licensing-llc-9-716-393)

opyright ©
08-2024
K
oration.
Rights
erved.

## Use Cases

Litigation Research
(/use_cases/litigation_research)

Litigation Strategy
(/use_cases/litigation_strategy)

Risk Analysis (/use_cases/risk_analysis)

Business Development
(/use_cases/business_development)

Active Matter Management
(/use_cases/active_matter_management)

Monitoring (/use_cases/monitoring)

## Quick Links

Contact Us (/contact_us)

RPX Empower
(https://empower.rpxcorp.com/)

RPX Analyst
(https://analyst.rpxcorp.com/)

RPX Corporation
(https://www.rpxcorp.com/)

## Others

Privacy Policy
(/company/privacy-policy)

Terms of Use (/company/terms-
of-service)

[DSBA] On behalf of the ADR Section - Request for nominations for the Kimmel-Thynge Award 2024

From: Administrator@dsba.org (administrator@dsba.org)

To: dsba@delawlist.org

Date: Tuesday, February 27, 2024 at 02:49 PM EST

 For your security we disabled all images and links in this email. If you believe it is safe to use, mark this message as not spam. **Show images**

 **Why is this message in Spam?**

We believe this message is spam as you marked previous messages from the same sender as spam. If you want to receive future messages from this sender, please mark it as 'Not Spam'.

It's not spam

REQUEST FOR NOMINATIONS FOR THE 2024 KIMMEL/THYNGE ADR AWARD

The ADR Section created this award in honor of Morton Richard Kimmel and Chief Magistrate Judge Thynge's contributions to the development of alternative dispute resolution in Delaware. Specifically, Mr. Kimmel is credited as one of the initial proponents of the adoption of mandatory arbitration in the Superior Court of the State of Delaware. Similarly, Chief Magistrate Judge Thynge is known for her development and management of the alternative dispute resolution program within the U.S. District Court for the District of Delaware, and having acted as mediator in thousands of matters over her tenure as a Magistrate Judge. Award recipients will be persons who embody Mr. Kimmel and Chief Magistrate Judge Thynge's enthusiasm for alternative dispute resolution, and whose contributions to the development of alternative dispute resolution are worthy of recognition.

IMPORTANT: The ADR Section, in its discretion, may give the award to multiple recipients.

We ask that you please submit any nominations by March 31, 2024.

PAST RECIPIENTS INCLUDE THE FOLLOWING:

2022 – Judge Kevin Gross and Judge Joshua W. Martin, III

2021— Mr. David A. White

2020—Ms. Yvonne T. Saville

2019—Mr. Morton Richard Kimmel (posthumously)

2019—Chief Magistrate Judge Mary Pat Thynge

Please send your nominations to either:

Jimmy Chong, ADR Secretary, at chong@chonglawfirm.com
Bernard G. Conaway, ADR Chair, at bgc@conaway-legal.com





**Mark S. Vavala, Esq.**
*He/Him/His*

**Executive Director**
Delaware State Bar Association
704 North King Street, Suite 110
Wilmington, DE 19801
Main: (302) 658-5279
Fax: (302) 658-5212

*DSBA IS MOVING! Effective February 28, 2024, DSBA's new address will be <u>704 N. King Street, Suite 110, Wilmington, 19801</u>*

Sent via the Delaware State Bar Association's DSBA mailing list
<u>DSBA@barlist.delawlist.org</u>
<u>https://www.dsba.org</u>

 image001.jpg
186.8kB

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

**CHAMBERS OF
COLM F. CONNOLLY
U.S. DISTRICT JUDGE**



**U.S. COURTHOUSE
844 N. KING STREET Unit 31
WILMINGTON, DELAWARE 19801-3568
302-573-6310**

December 1, 2023

David A. White, Esquire
Office of Disciplinary Counsel
The Supreme Court of Delaware
405 N. King St., Ste. 420
Wilmington, DE 19801

>       **Re: Messrs. George Pazuniak and Jimmy Chong**

Dear Mr. White:

For the reasons outlined in the enclosed Memorandum Opinion I issued on November 27, 2023, I believe that disciplinary sanctions may be warranted against two Delaware lawyers: George Pazuniak (Bar Number 478) and Jimmy Chong (Bar Number 4839). The information brought to my attention in the cases discussed in the Memorandum Opinion gives me reason to believe that Messrs. Pazuniak and Chong violated numerous provisions of the Model Rules of Professional Conduct.

Would you please let me know what, if any, action is taken by the Office of Disciplinary Counsel with respect to these matters? Thank you.

Sincerely,

Colm F. Connolly

Colm F. Connolly
Chief Judge

Encl.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NIMITZ TECHNOLOGIES LLC,          )
                                   )
          Plaintiff,               )
                                   )
     v.                            )     Civ. No. 21-1247-CFC
                                   )
CNET MEDIA, INC.,                  )
                                   )
          Defendant.               )

---

NIMITZ TECHNOLOGIES LLC,          )
                                   )
          Plaintiff,               )
                                   )
     v.                            )     Civ. No. 21-1362-CFC
                                   )
BUZZFEED, INC.,                    )
                                   )
          Defendant.               )

---

NIMITZ TECHNOLOGIES LLC,          )
                                   )
          Plaintiff,               )
                                   )
     v.                            )     Civ. No. 21-1855-CFC
                                   )
IMAGINE LEARNING, INC.,            )
                                   )
          Defendant.               )

---

| | | |
|---|---|---|
| NIMITZ TECHNOLOGIES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 22-413-CFC |
| | ) | |
| BLOOMBERG L.P., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| MELLACONIC IP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 22-244-CFC |
| | ) | |
| TIMECLOCK PLUS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| MELLACONIC IP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 22-541-CFC |
| | ) | |
| DEPUTY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

ii

LAMPLIGHT LICENSING LLC,   )
  )
     Plaintiff,   )
  )
    v.   )   Civ. No. 22-418-CFC
  )
ABB, INC.,   )
  )
     Defendant.   )

---

LAMPLIGHT LICENSING LLC,   )
  )
     Plaintiff,   )
  )
    v.   )   Civ. No. 22-1017-CFC
  )
INGRAM MICRO, INC.,   )
  )
     Defendant.   )

---

## <u>MEMORANDUM OPINION</u>

November 27, 2023

_Colm F. Connolly_

COLM F. CONNOLLY
CHIEF JUDGE

    I have decided to refer the attorneys of record for the plaintiffs in these cases to the disciplinary counsel of their respective bars. I have also determined it necessary to refer to the Texas Supreme Court's Unauthorized Practice of Law Committee certain attorneys associated with the patent monetization firm IP Edge LLC (IP Edge) and its affiliate Mavexar LLC (Mavexar) for the roles they played in connection with these cases. I have determined as well that a referral of these matters to the United States Department of Justice and the United States Patent & Trademark Office (PTO) for further inquiry is warranted. I explain in this Memorandum Opinion why I made these decisions.

I.

    For reasons detailed in _Nimitz Technologies LLC v. CNET Media, Inc._, 2022 WL 17338396 (D. Del. Nov. 30, 2022), by early September 2022, I had developed concerns that the LLC plaintiffs in these patent infringement cases—Nimitz Technologies LLC (Nimitz), Mellaconic IP LLC (Mellaconic), and Lamplight Licensing LLC (Lamplight)—may have had undisclosed financial relationships with IP Edge and may not have complied with my April 18, 2022 standing order regarding third-party litigation funding. (I adopt and incorporate here _Nimitz_.) To

address those concerns and similar concerns I had about certain LLC plaintiffs in other patent infringement cases, I issued on September 12 and 13, 2022 in 12 cases, including these cases, orders convening a series of evidentiary hearings to determine whether the LLC plaintiffs had complied with the third-party litigation funding standing order. *Id.* at *11. I also directed the owners of the LLC plaintiffs to attend the hearings in person. *Id.*

On November 4, 2022, I held the first of the scheduled evidentiary hearings—a consolidated proceeding for these eight cases. As I explained in *Nimitz*, the evidence adduced at that hearing raised serious concerns that the parties may have made inaccurate statements in filings with the Court; that counsel for the plaintiffs may have failed to comply with the Rules of Professional Conduct; that real parties in interest, such as IP Edge and Mavexar, may have been hidden from the Court and the defendants; and that those real parties in interest may have perpetrated a fraud on the court by fraudulently conveying the patents asserted in this Court to a shell LLC and filing fictious patent assignments with the PTO, all designed to shield the real parties in interest from the potential liability they would otherwise face by asserting in litigation the patents in question. *Id.* at *26.

Believing that I needed more information to decide whether further action was warranted to address these four concerns, I issued in each of these cases on

2

November 10, 2022 a memorandum order requiring the plaintiffs to produce certain records (the November 10 Memorandum Order). *Nimitz Techs. LLC v. CNET Media, Inc.*, Civ. No. 21-1247, D.I. 27; *Nimitz Techs. LLC v. BuzzFeed, Inc.*, Civ. No. 21-1362, D.I. 21; *Nimitz Techs. LLC v. Imagine Learning, Inc.*, Civ. No. 21-1855, D.I. 22; *Nimitz Techs. LLC v. Bloomberg L.P.*, Civ. No. 22-0413, D.I. 18; *Mellaconic IP LLC v. TimeClock Plus, LLC*, Civ. No. 22-0244, D.I. 22; *Mellaconic IP LLC v. Deputy, Inc.*, Civ. No. 22-0541, D.I. 15; *Lamplight Licensing LLC v. ABB Inc.*, Civ. No. 22-0418, D.I. 24; *Lamplight Licensing LLC v. Ingram Micro, Inc.*, Civ. No. 22-1017, D.I. 17.

The November 10 Memorandum Order required each LLC plaintiff to produce documents and communications that the LLC plaintiff's owner and the law firms of its counsel of record had with Mavexar, IP Edge, and certain individuals associated with Mavexar and IP Edge relating to: the formation of the LLC plaintiff; the LLC plaintiff's assets; the LLC plaintiff's retention of its counsel of record; the patents asserted by the LLC plaintiff in these cases; the LLC plaintiff's potential scope of liability resulting from the acquisition of the patents it asserted in these actions; the settlement, potential settlement, and dismissal of these cases; and the November 4 evidentiary hearing. The November 10 Memorandum Order also required each LLC plaintiff to produce (1) monthly statements for any

3

bank accounts held by the LLC plaintiff for the period beginning one month before

it filed its complaints in this Court through the November 10 evidentiary hearing;

(2) documents relating to the use, purchase, or lease of the suite address for the

LLC plaintiff identified in the complaints it filed in the actions; and (3) a sworn

declaration of the LLC plaintiff's owner that identified any and all assets owned by

the LLC plaintiff as of the date it filed its complaints in these actions.

On November 16, 2022, Nimitz filed with the United States Court of

Appeals for the Federal Circuit a petition for a writ of mandamus to reverse the

November 10 Memorandum Order. *In re Nimitz Techs. LLC*, No. 23-103, D.I. 2 at

3 (Fed. Cir. Nov. 16, 2022). On November 17, the Federal Circuit stayed the

November 10 Memorandum Order in the Nimitz cases "pending further action of"

that court. No. 23-103, D.I. 5 at 2 (Fed. Cir. Nov. 17, 2022). I granted

Mellaconic's and Lamplight's requests for stays of their cases pending final

disposition of Nimitz's mandamus petition. Civ. No. 22-0244, D.I. 23; Civ. No.

22-0418, D.I. 25.

On December 8, 2022, the Federal Circuit denied Nimitz's petition and lifted

the stay in the Nimitz actions. *In re Nimitz Techs. LLC*, 2022 WL 17494845, at \*3

(Fed. Cir. Dec. 8, 2022). In doing so, the Court held that the four concerns I had

identified as the basis for the November 10 Memorandum Order

4

[a]ll . . . relate[] to potential legal issues in the case, subject to the "principle of party presentation," *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (discussing the principle and its limits), or to aspects of proper practice before the court, over which district courts have a range of authority preserved by the Federal Rules of Civil Procedure, *see* Fed. R. Civ. P. 83(b); *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991). The district court did not seek information simply in order to serve an interest in public awareness, independent of the adjudicatory and court-functioning interests reflected in the stated concerns.

*Id.* at *2.

Nimitz thereafter filed a combined petition for panel rehearing and rehearing en banc in the Federal Circuit. No. 23-103, D.I. 55 (Fed. Cir. Dec. 28, 2022). On January 31, 2023, the Federal Circuit denied that petition. No. 23-103, D.I. 58 at 2 (Fed. Cir. Jan. 31, 2023). On February 3, Nimitz filed a motion asking the Federal Circuit "to stay issuing the mandate . . . pending the filing of a petition for mandamus and/or writ of certiorari in the United States Supreme Court." No. 23-103, D.I. 61 at 1 (Fed. Cir. Feb. 3, 2023). On February 7, the Federal Circuit issued a written order denying Nimitz's motion to stay the issuance of the mandate. No. 23-103, D.I. 62 at 2 (Fed. Cir. Feb. 7, 2023).

On February 17, 2023, Mellaconic filed a motion to set aside the November 10 Memorandum Order. Civ. No. 22-0244, D.I. 26. On March 2, 2023, Lamplight filed a motion to set aside the November 10 Memorandum Order. No.

22-0418, D.I. 31.  I denied Mellaconic's and Lamplight's motions respectively on May 3, 2023 and May 22, 2023.

Nimitz, Mellaconic, and Lamplight produced documents in response to the November 10 Memorandum Order respectively on April 6, May 9, and May 31, 2023.  It is apparent from the productions themselves that they are not complete. For example, there are in the productions numerous emails that had attachments at the time the emails were sent but the attachments were not included in the productions.  There are documents in one production that should also have been produced in another production but were not.  But in any event, based on my review of the documents that were produced and the evidence adduced at the hearings I held on November 4, 2022 and November 10, 2022, it appears that (1) counsel of record for the LLC plaintiffs violated numerous rules of professional conduct by actions they took and failed to take; (2) lawyers at IP Edge engaged in the unauthorized practice of law in Texas; and (3) real parties in interest in the patents in these cases, including a foreign government, were not disclosed to the PTO, defendants, or the Court.

## II.

I begin with the four Nimitz cases.  Nimitz is a Texas LLC with no employees.  Its sole owner and member is Mark Hall.  George Pazuniak, a

6

Delaware lawyer, filed four of the above-captioned cases and seven other patent

infringement cases in this Court in Nimitz's name between August 30, 2021 and

March 30, 2022.[1]  Mr. Pazuniak is the only lawyer of record for Nimitz in these

cases.  Nimitz asserted in all 11 cases a single patent: U.S. Patent No. 7,848,328

(the #328 patent).  In each of the complaints filed in the 11 cases, Nimitz claimed

to "hav[e] its office address at 3333 Preston Road STE 300, #1047, Frisco, TX

75034."  That address is in fact a Federal Express drop box.

According to a declaration submitted by Mr. Hall in response to the

November 10 Memorandum Order, the #328 patent was "the only asset owned by

Nimitz" when it filed these suits.  App. A at 2.  Mr. Hall was unable at the

November 4, 2022 hearing to describe anything about the patent or how Nimitz

came into possession of it:

---

[1] *Nimitz Techs. LLC v. CNET Media, Inc.*, Civ. No. 21-1247, D.I. 1 (Aug. 30, 2021); *Nimitz Techs. LLC v. Buzzfeed, Inc.*, Civ. No. 21-1362, D.I. 1 (Sep. 27, 2021); *Nimitz Techs. LLC v. Imagine Learning, Inc.*, Civ. No. 21-1855, D.I. 1 (Dec. 31, 2021); *Nimitz Techs. LLC v. Bloomberg, L.P.*, Civ. No. 21-0413, D.I. 1 (Mar. 30, 2022); *Nimitz Techs. LLC v. Bleacher Rep., Inc.*, Civ. No. 21-1246, D.I. 1 (Aug. 30, 2021); *Nimitz Techs. LLC v. Pinterest, Inc.*, Civ. No. 21-1248, D.I. 1 (Aug. 30, 2021); *Nimitz Techs. LLC v. Reddit, Inc.*, Civ. No. 21-1249, D.I. 1 (Aug. 30, 2021); *Nimitz Techs. LLC v. Conde Nast Ent. LLC*, Civ. No. 21-1360, D.I. 1 (Sep. 27, 2021); *Nimitz Techs. LLC v. Skillshare, Inc.*, Civ. No. 21-1363, D.I. 1 (Sep. 27, 2021); *Nimitz Techs. LLC v. Twitter, Inc.*, Civ. No. 21-1364, D.I. 1 (Sep. 27, 2021); and *Nimitz Techs. LLC v. Tastemade, Inc.*, Civ. No. 21-1856, D.I. 1 (Dec. 31, 2021).

7

Q.  Do you know what the name of th[e] [#328] patent
is?

A.  I do not.

\* \* \* \*

Q.  What technology is covered by the [#]328 patent?

A.  I haven't reviewed it enough to know.

\* \* \* \*

Q.  How did you pay for the [#328] patent?

A.  There was an agreement between Mavexar and
myself where I would assume liability.

Q.  What does that mean?

A.  No money exchanged hands from my end.

Q.  You have to—I'm not a financial guy, so you have to
explain it to me.
        So you own the patent, but no money—you didn't
exchange any money for it?

A.  No.

Q.  So is that what you're saying?

A.  Yes.

Q.  *So how do you come to own something if you never
paid for it with money?*

A.  *I wouldn't be able to explain it very well.  That would
be a better question for Mavexar.*

8

> Q. Well, you're the owner?
>
> A. Correct.
>
> Q. *How do you know you're the owner if you didn't pay anything for the patent?*
>
> A. *Because I have the paperwork that says I'm the owner.*

Civ. No. 21-1247, D.I. 26 at 66:5–6; 67:23–24; 69:16–70:11 (emphasis added).

The #328 patent is titled "Broadcast Content Encapsulation."  According to Mr. Pazuniak, the "goal" of the #328 patent is to provide "a method to stream multiple versions of a specific content [such as movies and live events] so as to efficiently make the content available to users operating on diverse platforms and in diverse environments."  Civ. No. 21-1247, D.I. 14 at 8.

The application for the #328 patent and any and all patents issued from that application were assigned to Nokia Corporation in 2008.  That assignment was recorded with the PTO in 2008; and thus, when the PTO issued the #328 patent in 2010, it identified Nokia as the assignee on the face of the patent.  Civ. No. 21-1247, D.I. 1-1.

In February 2013, Nokia assigned the #328 patent, seven other U.S. patents, and certain patent applications and foreign patents to France Brevets, a so-called

9

"sovereign state fund" owned by the French government.[2]  France Brevets recorded the Nokia/France Brevets assignment of the #328 patent application with the PTO in July 2013.

On August 12, 2021, Burley Licensing LLC (Burley) electronically filed with the PTO an assignment of the #328 and ten other U.S. patents.  *See* App. C. The Patent Assignment Cover Sheet for that filing identifies Hau Bui as the submitter, but the email address provided for the submitter is Linh Deitz's IP Edge email address.  *Id.* at 1.  Ms. Deitz's title with IP Edge is Office Manager.  Mr. Bui testified at the November 4, 2020 hearing that Mavexar formed Burley and that "Linh D[ei]tz was [his] primary communication with Mavexar."  Civ. No. 21-1247, D.I. 26 at 93:21; 100:19–23.  Putting aside the question of who actually filed the assignment with the PTO, that person attached as "Exhibit A" to the Patent Assignment Cover Sheet a PDF of a five-page document titled "Patent

---

[2] According to the French Ministry of Higher Education and Research, France Brevets is a French investment fund specializing in intellectual property that was formed in 2009 with €100 million in seed money from the French government. *See France Brevets: Un intermédiaire actif entre les titulaires de brevets et les utilisateurs potentiels* [*France Brevets: an active intermediary between patent holders and potential users*], MINISTRE DE L'ENSEIGNEMENT SUPÉRIEUR ET DE LA RECHERCHE [MINISTRY OF HIGHER EDUCATION AND RESEARCH OF THE FRENCH REPUBLIC] (Nov. 18, 2015), https://www.enseignementsup-recherche.gouv.fr/fr/france-brevets-un-intermediaire-actif-entre-les-titulaires-de-brevets-et-les-utilisateurs-potentiels-46321 [https://perma.cc/C5CA-BPS4].

Assignment." The Patent Assignment is dated March 11, 2021, and according to its terms, France Brevets assigned to Burley on that day "for good and valuable consideration . . . *all* right, title, *and interest that exist today and may exist in the future in and to*" the #328 patent and the other ten U.S. patents listed in the Patent Assignment Cover Sheet as well as several patent applications and foreign patents. App. C at 3 (emphasis added). The Patent Assignment, which has electronic signatures for Hau Bui on behalf of Burley and Didier Patry on behalf of France Brevets, goes on to state that the "right, title, and interest" in the covered patents and patent applications France Brevets assigned to Burley "includ[es] *all income, royalties, damages and payments now or hereafter due or payable with respect thereto*" and "the right to bring any claim, sue, counterclaim, *and recover for the past, present and future infringement* of" those patents and patent applications. App. C at 7 (emphasis added).

The identical France Brevets/Burley Patent Assignment filed by Burley with the PTO is included in Nimitz's production, but in the Nimitz production it is attached as "Exhibit A" to a 15-page "Patent Assignment Agreement" between France Brevets and Burley. *See* App. D. Like the France Brevets/Burley Patent Assignment, the France Brevets/Burley Patent Assignment Agreement is dated March 11, 2021; and it too has electronic signatures for Hau Bui and Didier Patry.

11

App. D at 15. Under the terms of the France Brevets/Burley Patent Assignment Agreement, France Brevets and Burley "agree[d] to execute" and to "fully incorporate" into the agreement as "Exhibit A" the France Brevets/Burley Patent Assignment that was filed with PTO. App. D at 2. But paragraph 4 of the France Brevets/Burley Patent Assignment Agreement, titled "Consideration," expressly states that Burley "shall pay [France Brevets] thirty-five percent (35%) of all Gross Revenue actually received by [Burley] as a result of monetizing and enforcement of" the patents and patent applications covered by the Patent Assignment. App. D at 3. The Patent Assignment Agreement defines "Gross Revenue" as "any fees, payments, revenues, royalties, settlements paid by any licensees or assignees, damages awarded by any court and/or administrative body and/or any other consideration actually received, by [Burley] or [Burley's] Affiliates arising from or in any way related to" the patents and applications listed in the France Brevets/Burley Patent Assignment. App. D at 2. Thus, arguably under the express terms of the Patent Assignment Agreement, Burley was not assigned or entitled to "all income, royalties, damages and payments now or hereafter due or payable with respect" to the #328 patent or the patents and patent applications listed in the France Brevets/Burley Patent Assignment filed with the PTO. App. D at 2.

12

Paragraph 5 of the France Brevets/Burley Patent Assignment Agreement, titled "Assignment," provides in relevant part:

> [Burley] undertakes to transfer back the ownership of the [patents and patent applications listed in the Patent Assignment] to [France Brevets] in the event of non-compliance by [Burley] with, at least, one (1) of the objectives listed hereafter:
>
> – bring an action for infringement against a third party within twelve (12) months from the Effective Date [March 11, 2021]; and
>
> – generate a total minimum Gross Revenue of US $100,000.00 within twenty four (24) months from the Effective Date (collectively the "Compliance Period")
>
> During Compliance Period, [Burley] shall not assign or transfer, without [France Brevet's] consent, the [patents and patent applications listed in the Patent Assignment].

App. D at 5. Paragraph 5's "transfer-back" "undertak[ing]" provision and its prohibition on assigning and transferring the #328 patent during the Compliance Period (i.e., until March 21, 2023) without the consent of France Brevets are arguably at odds with the statement in the Patent Assignment filed with the PTO that France Brevets assigned to Burley "*all* right, title, *and interest that exist today*

13

*and may exist in the future in and to*" the patents and patent applications listed in

the Patent Assignment.[3]

On August 16, 2021—four days after Linh Deitz's IP Edge email account

was used to file the France Brevets/Burley Patent Assignment—Duy Tran, a Texas

lawyer and, at that time, a director of IP Edge,[4] sent an email to Mr. Pazuniak with

_____

[3] Section 3.56 of the Code of Federal Regulations for Patents, Trademarks, and Copyrights provides:

> Assignments which are made conditional on the performance of certain acts or events, such as the payment of money or other condition subsequent, if recorded in the [PTO], are regarded as absolute assignments for [PTO] purposes until canceled with the written consent of all parties or by the decree of a court of competent jurisdiction. The [PTO] does not determine whether such conditions have been fulfilled.

37 C.F.R. § 3.56. "The recording of a document is not a determination by the [PTO] of the validity of the document or the effect that document has on the title to an application or patent." MPEP § 317.03. *See also* 37 C.F.R. § 3.54. As the regulation itself and the guidance of the Manual of Patent Examining Procedure make clear, § 3.56 "serves as notification as to how a conditional assignment will be treated by the [PTO]." *Id.* The regulation in no way authorizes persons to represent to the PTO that an assignment has no conditions when in fact the assignment has conditions.

[4] According to Mr. Tran's LinkedIn page, during his tenure as a director at IP Edge, he "[a]ssisted in the development and implementation of a platform allowing for efficient and accurate management of a docket of over 400 open matters at any given time," "[a]ssisted in the negotiation of over 2000 licensing agreements creating more than $30M of revenue for clients," and coordinated "a team of over 20 outside attorneys." Duy Tran, LINKEDIN, https://www.linkedin.com/in/duy-tran-204aa34b [https://perma.cc/J67T-5KFZ] (last visited November 14, 2023).

14

the subject line "Claim Charts for France Brevet HLS Uploaded." In the text of the email, Mr. Tran explained that he had "uploaded claim charts for 4 targets to [Mr. Pazuniak's] Dropbox" and asked Mr. Pazuniak to "please review" the charts. App. E at 1. Mr. Tran copied Ms. Deitz and Brandon LaPray, also employed by IP Edge at the time, on the email. The claim charts Mr. Tran provided to Mr. Pazuniak map claim 1 of the #328 patent against the websites of Buzzfeed; Twitter; GameSpot.com, a wholly-owned subsidiary of CNET; and BonAppetit.com, a wholly-owned subsidiary of Conde Nast Entertainment. (Mr. Pazuniak eventually filed suits in Nimitz's name for infringement of the #328 patent against Buzzfeed (Civ. No. 21-1362), Twitter (Civ. No. 21-1364), CNET (Civ. No. 21-1247), and Conde Nast Entertainment (Civ. No. 21-1360).)

The next day, August 17, 2021, in a "reply to all" email, Mr. Pazuniak responded to Mr. Tran's email as follows:

> The current Assignee for the '328 Patent is listed on the PTO website as:
>
> FRANCE BREVETS
> 47 RUE DE LA VICTOIRE
> PARIS 75009
> FRANCE
>
> Is this still the current owner and the proposed Plaintiff in the actions?

App. E at 2. Mr. LaPray responded about two hours later:

15

> Hi George – It is not. *We* bought the patents from France
> Brevets. Below is the Plaintiff info. *We* will get the
> assignment recorded.
>
> Nimitz Technologies LLC
> 3333 Preston Road STE 300, #1047, Frisco, TX 75034
> Managing Member – Mark Hall

App. E at 2 (emphasis added).

Nimitz (i.e., Nimitz Technologies LLC) did not exist at the time Mr. LaPray

sent this email. But within hours of the email, Linh Deitz obtained a mailing

address for Nimitz from Staples, and a certificate of formation for Nimitz was filed

with the Texas Secretary of State. *See* Apps. F and G. The certificate identified

Mark Hall as Nimitz's managing member. The Secretary of State approved the

certificate and Nimitz came into existence on August 18, 2021. *See* App. G at 1.

Nimitz did not produce any responses by Mr. Pazuniak to Mr. LaPray's

August 17, 2021 email. The fact that Mr. Hall is Nimitz's managing member does

not preclude there from being other members of the LLC, and it could be

reasonably inferred from Mr. LaPray's use of "we" in his email to Mr. Pazuniak

that IP Edge (or an affiliate like Mavexar) had an ownership interest in Nimitz.

Mr. Pazuniak, however, represented at the November 4, 2022 hearing that he

understood from the outset of his representation of Nimitz that Nimitz was solely

owned by Mr. Hall.

16

That said, Mr. Pazuniak's explanation at the hearing about how he came to represent Nimitz stands in contrast to the emails he exchanged with Messrs. Tran and LaPray on August 16 and 17, 2021:

> MR. PAZUNIAK:  And maybe I would just say some things upfront and save us a lot of trouble.
>
> THE COURT:  That would be great.
>
> MR. PAZUNIAK:  Similar to Mr. Chong, yes, *I was contacted by what I understood to be an agent for Nimitz Technologies.*
>
> THE COURT:  A nonlawyer agent, right?
>
> MR. PAZUNIAK:  It's not a lawyer. It's a lady by the name of Linh D[ei]tz, L-I-N-H D-I-T-Z.
>
> THE COURT:  Wait. I'm sorry. L-I?
>
> MR. PAZUNIAK:  L-I-N-H.
>
> THE COURT:  Okay.
>
> MR. PAZUNIAK:  And the second name, D-I-T-Z. Hopefully, I got it right.
>
> *But the—she was representing Nimitz Technologies.*  And she had provided the basic information.  Thereafter, I did my own investigation, in the sense of double-checking the patent, double-checking the Nimitz Technology.  For example, I did go to the Texas Secretary of State's Website to gain the information about Nimitz Technology, and that's what I put down into the complaint.

17

Similar, I went to the Delaware Secretary of
State's office to obtain information on the defendants,
and making sure that the correct entities were named,
correct spellings and correct addresses.

The complaint was entirely drafted by me.

Prior to that, we, of course, had the retainer
agreement.  That retainer agreement, again, I drafted.
And it was forwarded to Linh D[ei]tz, to forward to Mark
Hall as the principle of Nimitz Technologies.

I knew that he was the principle because of the—I
had double-checked the Secretary of State's office before
I prepared the retainer letter.

THE COURT:  Okay.

MR. PAZUNIAK:  And—

THE COURT:  So you knew he was the principle based
on the Secretary of State's disclosure—

MR. PAZUNIAK:  And—

THE COURT:  —he was the principle of Nimitz?

MR. PAZUNIAK:  He is—Mr. Hall is the—I think that—
I want to make sure I have the phrase right.  He's the
managing member of the entity.  *And it was confirmed by
Ms. D[ei]tz that he was the sole, 100 percent, owner of
the entity.*

Civ. No. 21-1247, D.I. 26 at 41:21–43:15 (emphasis added).  As the email

exchanges make clear, Mr. Pazuniak could not have "understood" when he was

first contacted by Ms. Deitz (or anyone else from IP Edge or Mavexar) that Ms.

Deitz (or anyone else) was an agent for or "was representing" Nimitz because Mr.

18

Pazuniak did not learn of Nimitz's existence until after he had already begun his review (at IP Edge's request) of the claim charts for four potential litigation "targets" and after Mr. Pazuinak himself had asked IP Edge who "the proposed Plaintiff" would be in the #328 patent infringement actions contemplated by IP Edge.

On August 26, 2021, Mr. LaPray followed up on his August 17, 2021 email with this "reply to all" message in the email chain:

> Hi George.
>
> Attached is the assignment. I believe Linh is recording this today but I will let her confirm.
>
> How are the complaints coming along? Are you still good to file this month?
>
> Thanks,
>
> Brandon

App. H at 1. Mr. LaPray attached to his email a two-page document titled "Ex. A-Burley-France – Nimitz Technologies (Fully Executed).pdf." That same day, someone using Linh Deitz's IP Edge email account electronically filed a PDF of that Patent Assignment with the PTO in Nimitz's name. App. H; App. I. The Patent Assignment Cover Sheet for that filing identifies Mark Hall, Nimitz's managing member, as the submitter. App. I at 1.

19

The Patent Assignment is dated August 20, 2021. It is electronically signed by Mr. Hall for Nimitz and by Hau Bui for Burley. (At the November 4, 2022 hearing Mr. Hall testified that he did not know Mr. Bui. Mr. Bui testified that the name Mark Hall "did not ring a bell." Civ. No. 21-1247, D.I. 26 at 72:8–11; 99:10–15.) Although Mr. Hall's electronic signature is dated August 20, 2021 on the assignment, documents produced by Nimitz in response to the November 10 Memorandum Order show that he did not sign it until August 24, 2021—after Linh Deitz emailed him the Patent Assignment and asked him to sign it and return it to her.

According to the terms of the Patent Assignment, Burley assigned to Nimitz on August 20, 2021 "for good and valuable consideration . . . *all* right, title, *and interest that exist today and may exist in the future in and to*" the #328 patent. App. I at 2 (emphasis added). The Patent Assignment also expressly states that the "right, title, and interest" in the #328 patent "includ[es] *all income, royalties, damages and payments now or hereafter due or payable with respect thereto*" and "the right to bring any claim, sue, counterclaim, *and recover for the past, present and future infringement* of" the #328 patent. App. I at 2 (emphasis added).

These statements stand in contrast to a Patent Assignment Agreement submitted as an exhibit at the November 4, 2022 hearing and in the production

20

Nimitz made in response to the November 10 Memorandum Order. App. J. That

Patent Assignment Agreement is between Burley and Nimitz and, like the

Burley/Nimitz Patent Assignment filed with the PTO, it is dated August 20, 2021

and appears to be electronically signed by Hau Bui and Mark Hall. App. J at 4–5.

As in the case of the France Brevets/Burley Patent Assignment Agreement, the

parties to the Burley/Nimitz Patent Assignment Agreement "agree[d] to execute"

and to "fully incorporate" into that agreement another form of assignment (in this

case, the Burley/Nimitz Patent Assignment that was filed with PTO on August 26,

2021). App. J at 1. In paragraph 4 of the Burley/Nimitz Patent Assignment

Agreement—titled "Consideration"—Nimitz assumed all the obligations Burley

had assumed in the France Brevets/Burley Patent Assignment Agreement with

respect to the #328 patent:

> [Nimitz] hereby assumes all of the obligations of the
> Patent Assignment Agreement made and entered into on
> March 11, 2021, by and between France Brevets and
> Burley Licensing LLC ("Prior Agreement"), including
> Paragraph 4 of the Prior Agreement. [Nimitz] also
> understands and acknowledges that [Burley] or prior
> owners may have granted licenses, covenants not to sue,
> releases, and other encumbrances with respect to the
> Patents and Related Patents ("Patent Encumbrances").
> [Nimitz] expressly agrees to be bound by and take the
> [#328 patent] subject to all such Patent Encumbrances.

App. J at 2. Thus, under the terms of the Burley/Nimitz Patent Assignment Agreement—and in contrast with the terms of Patent Assignment filed under Nimitz's name with the PTO on August 26, 2021—France Brevets appears to have a reversionary ownership interest in the #328 patent and the right to 35% of the income generated from the monetization and enforcement of the #328 patent and to preclude Nimitz from assigning or transferring the #328 patent through March 21, 2023.

The terms of the Burley/Nimitz Patent Assignment filed with the PTO on August 26, 2021 also stand in contrast to the form "Consulting Services" agreement between Nimitz and Mavexar dated August 21, 2021 that was included in the Nimitz document production. App. K. The agreement appears to be electronically signed by Sanjay Pant on behalf of Mavexar and Mr. Hall on behalf of Nimitz. App. K at 6. Mr. Pant is a lawyer and one of IP Edge's two Managing Partners. *See Team*, IP EDGE, https://www.ip-edge.com/team/ [https://perma.cc/2D8J-J2YW] (last visited November 20, 2023). Under the terms of the agreement, Mavexar promised to "provide non-legal services," including among other things "assisting [Nimitz] in monetizing" any patents owned by Nimitz. App. K at 1. In exchange for those services, Nimitz agreed to pay Mavexar a percentage of the "Net Proceeds," which the agreement defines as

22

"Gross Recovery minus Costs and Expenses."  App. K at 2.  The agreement

defines "Gross Recovery" as "the gross amount of any monies and other forms of

consideration received through monetization of" Nimitz's patents and further

provides that "Gross Recovery shall include, without limitation, any and all

settlement fees, licensing fees, fees from a sale, or other payment from other

transactions, as well as, any other proceeds (including assets) related to" any

patents owned by Nimitz.  App. K at 2.

Neither the Consulting Services agreement nor any document produced by

Nimitz identifies the percentage of the Net Proceeds Nimitz agreed to pay

Mavexar.  The Consulting Services agreement says only that the percentage is

"[a]s agreed by Client and Consulting Company."  App. K at 2.  Mr. Hall testified

at the November 4, 2022 hearing, however, that he "believe[d]" that Nimitz

received ten percent of the recoveries obtained from asserting Nimitz's patents.

Civ. No. 21-1247, D.I. 26 at 74:9–11.  Thus, although the Burley/Nimitz Patent

Assignment filed with the PTO states that Nimitz's "right, title, and interest" in the

#328 patent "includ[es] all income, royalties, damages and payments now or

hereafter due or payable with respect thereto," it appears that at the time the

Burley/Nimitz Patent Assignment was filed with the PTO Mavexar was

23

contractually entitled to 90% of the profits generated from licensing and litigating the #328 patent.

About an hour after Mr. LaPray sent his August 26, 2021 email to Mr. Pazuniak and told him that Linh Deitz would be recording the Burley/Nimitz Patent Assignment with the PTO, Ms. Deitz emailed Mr. Hall an engagement letter from Mr. Pazuniak's law firm for Mr. Hall to sign.  App. L.  An email sent to Ms. Deitz's email address 30 minutes later from DocuSign System confirmed that Mr. Hall electronically signed the engagement letter.  App. M.  These two emails are the only communications produced by Nimitz that concern the engagement letter, even though the November 10 Memorandum Order required Nimitz, Mr. Pazuniak, and Mr. Pazuniak's firm to produce "[a]ny and all communications and correspondence, including emails and text messages, that [Mr. Hall, Mr. Pazuniak, or any employee of Mr. Pazuniak's law firm] had with Mavexar, IP Edge, Linh D[ei]tz, Papool Chaudhari, and/or any representative of Mavexar and/or IP Edge regarding: . . . the retention of [Mr. Pazuniak's firm] to represent Nimitz in these cases."  No. 21-1247, D.I. 27 at 3–4.  The production includes a copy of the engagement letter signed by Mr. Hall, but it cannot be determined if, when, how, or from whom Mr. Pazuniak obtained that executed version.  App. N.  Nor can it

24

be determined from the production when, how, or from whom, Ms. Deitz obtained the unsigned engagement letter she sent to Mr. Hall on August 26, 2021.

The engagement letter purports to "set forth the terms and conditions on which [Mr. Pazuniak's firm] ('Counsel') shall undertake to represent [Nimitz] ('Client') in litigations in the District of Delaware." App. N at 1. Under the heading "Conflicts, Instructions," the letter identifies "Bon Appeti[t], Pinterest, Skillshare; and Warner Media[], and any affiliate of the foregoing" as the "Adverse Parties" for the engagement. App. N at 1. The letter states that Mr. Pazuniak's firm "will receive a contingency fee" of between 25 and 40 percent of "the Net Amount recovered from any Adverse Party," depending on the timing of the recovery. App. N at 2. And under the heading "Client Acknowledgement," the letter provides:

> Client acknowledges that Client has been encouraged by Counsel to consult independent counsel concerning the negotiation of this fee agreement and its terms. Client has consulted with independent counsel, and has made sufficient investigation and inquiry to determine that this agreement is fair and reasonable to Client; and that this agreement was the product of arm's length negotiation with Counsel. Client acknowledges that Client has either consulted such independent counsel or, having had an adequate opportunity to seek such advice, has declined to follow Counsel's advice to do so.

25

App. N at 4. In point of fact, as of August 26, 2021, neither Mr. Pazuniak nor any lawyer from his firm had ever met, spoken, emailed, or otherwise communicated with Mr. Hall.

As noted above, Mr. Pazuniak ultimately filed on behalf of Nimitz 11 cases in this Court, one case in the Northern District of Texas, and nine cases in the Western District of Texas.[5] Mr. Hall testified, and Mr. Pazuniak did not dispute, that Mr. Pazuniak had no communications with Mr. Hall before he filed the complaints in these actions and that Mr. Hall had no prior knowledge of the complaints before they were filed. Civ. No. 21-1247, D.I. 26 at 76:13–77:3.

---

[5] *Nimitz Techs. LLC v. Reuters News & Media Inc.*, Civ. No. 3:22-1929 (N.D. Tex., filed Aug. 31, 2022); *Nimitz Techs. LLC v. ESPN Productions, Inc.*, Civ. No. 6:21-1384 (W.D. Tex., filed Dec. 30, 2021); *Nimitz Techs. LLC v. Nexstar Media, Inc.*, Civ. No. 6:21-1385 (W.D. Tex., filed Dec. 30, 2021); *Nimitz Techs. LLC v. ViaSat, Inc.*, Civ. No. 6:21-1386 (W.D. Tex., filed Dec. 30, 2021); *Nimitz Techs. LLC v. Oncor Electric Delivery Co. LLC*, Civ. No. 6:22-429 (W.D. Tex., filed Apr. 28, 2022); *Nimitz Techs. LLC* v. CDM Smith, Inc., Civ. No. 6:22-547 (W.D. Tex., filed May 29, 2022); *Nimitz Techs. LLC v. NPG of Texas, L.P.* Civ. No. 6:22-707 (W.D. Tex., filed June 30, 2022); *Nimitz Techs. LLC v. Shop LC Global Inc. d/b/a Shop LC,* Civ. No. 6:22-708 (W.D. Tex., filed June 30, 2022); *Nimitz Techs. LLC v. C.H. Robinson Worldwide, Inc.*, Civ. No. 6:22-1236 (W.D. Tex., filed Nov. 30, 2022); *Nimitz Techs. LLC v. Clayton Homes, Inc.*, Civ. No. 6:22-1239 (W.D. Tex., filed Nov. 30, 2022).

26

Mr. Pazuniak filed motions to voluntarily dismiss 13 of the cases between

December 14, 2021 and October 6, 2022.[6]  Mr. Hall testified, and Mr. Pazuniak did

not dispute, that Mr. Hall was never informed of, let alone asked by Mr. Pazuniak

if he consented to, the terms of the settlements in those cases before Mr. Pazuniak

moved to dismiss the cases.  Civ. No. 21-1247, D.I. 26 at 76:23–77:3.

It appears from Nimitz's document production that the first time Mr.

Pazuniak and Mr. Hall were parties to the same email occurred on October 3,

2022—more than a month after I issued the Memorandum Order scheduling the

November 4, 2022 hearing.  The October 3 email was sent by Linh Deitz to Mr.

Hall.  It was occasioned by IP Edge's decision to convene weekly hearing

---

[6] Civ. No. 21-1247, D.I. 42 (Oct. 26, 2023); Civ. No. 21-1362, D.I. 36 (Oct.26, 2023); Civ. No. 21-1855, D.I. 37 (Apr. 20, 2023); Civ. No. 21-0413, D.I. 33 (Oct. 26, 2023); *Nimitz Techs. LLC v. Bleacher Rep., Inc.*, Civ. No. 21-1246, D.I. 10 (Dec. 14, 2021); *Nimitz Techs. LLC v. Pinterest, Inc.*, Civ. No. 21-1248, D.I. 10 (Dec. 20, 2021); *Nimitz Techs. LLC v. Reddit, Inc.*, Civ. No. 21-1249, D.I. 11 (Dec. 22, 2021); *Nimitz Techs. LLC v. Conde Nast Ent. LLC*, Civ. No. 21-1360, D.I. 10 (Feb. 4, 2022); *Nimitz Techs. LLC v. Skillshare, Inc.*, Civ. No. 21-1363, D.I. 15 (Apr. 27, 2022); *Nimitz Techs. LLC v. Twitter, Inc.*, Civ. No. 21-1364, D.I. 8 (Dec. 14, 2021); *Nimitz Techs. LLC v. Tastemade, Inc.*, Civ. No. 21-1856, D.I. 8 (Apr. 27, 2022); *Nimitz Techs. LLC v. ESPN Productions, Inc.*, Civ. No. 6:21-1384, D.I. 11 (June 29, 2022); *Nimitz Techs. LLC v. Nexstar Media, Inc.*, Civ. No. 6:21-1385, D.I. 10 (June 2, 2022); *Nimitz Techs. LLC v. ViaSat, Inc.*, Civ. No. 6:21-1386, D.I. 11 (May 24, 2022); *Nimitz Techs. LLC v. CDM Smith Inc.*, Civ. No. 6:22-0547, D.I. 7 (Aug. 1, 2022); *Nimitz Techs. LLC v. NPG of Texas, L.P.*, Civ. No. 6:22-0707, D.I. 8 (Oct. 6, 2022); *Nimitz Techs. LLC v. Oncor Electric Delivery Co. LLC*, Civ. No. 6:22-0429, D.I. 11 (Oct. 13, 2022).

preparation calls for each of the plaintiff LLC owners I had ordered to appear in court. *See* App. O. Ms. Deitz cc'd Mr. Pazuniak and two of her colleagues at IP Edge: Gautham [a/k/a Gau] Bodepudi and Papool Chaudhari. The email reads in relevant part:

> Hello Mark,
>
> Your calls to discuss the Connolly hearings will be on Tuesday [October 11] at 12pm CST with our team (Gau and Papool) and lead counsel – George Pazuniak. Please see the link for the materials you can review prior to the video calls. I have sent a calendar invite with a link to join the calls.
>
> \* \* \* \*
>
> Sincerely,
>
> Linh D[ei]tz
> Office Manager
> IP Edge LLC

App. O.

Mr. Bodepudi is IP Edge's other Managing Partner and, like Mr. Pant, he too is a lawyer. *See Team*, IP EDGE, https://www.ip-edge.com/team/ [https://perma.cc/2D8J-J2YW] (last visited November 20, 2023). Mr. Chaudhari's role at IP Edge and Mavexar is not entirely clear. He uses an IP Edge email account and he puts "IP Edge" below his name in his email signature, but he does not include a job title in the signature. When I asked Mr. Chong at the November

28

4, 2022 hearing, "who[m] do you speak with at Mavexar?" he said, "[T]ypically, it's going to be Papool Chaudhari." Mr. Chong explained: "I work with [Mr. Chaudhari] through Mavexar. He may have a law firm. He may—but I deal with him through Mavexar." Civ No. 22-0418, D.I. 23 at 7:16–18; 8:12–21. According to Mr. Chaudhari's LinkedIn page, he is a Texas lawyer who serves as the general counsel of an unnamed "technology licensing company." Papool Chaudhari, LINKEDIN, https://www.linkedin.com/in/papool-chaudhari-846b417 [https://perma.cc/M5KN-B4HA] (last visited November 16, 2023). Whatever formal position Mr. Chaudhari may hold or have held with IP Edge and/or Mavexar, the document productions make clear that he, more than any other individual, directed LLC plaintiffs' counsel of record in these cases about how to respond to my orders and he oversaw the prepping of Messrs. Bui and Hall for their testimony at the November 4, 2022 hearing. The documents also make clear, that Mr. Chaudhari very much wanted Mavexar to be hidden from the Court. For example, within hours of my issuing on September 12, 2022 the first orders convening the November 2022 evidentiary hearings, Mr. Chaudhari wrote this email to Howard Wernow, one of Mellaconic's lawyers:

> Howard
>
> See attached ([Mavexar consulting agreement] for Mellaconic). Again we reiterate that we do <u>not</u> want to

29

disclose Mavexar by name, but rather just disclose that recourse funding exists.

Also, my understanding is that hearing notices on third party funding went out for Creekview, Lamplight, and Backertop, and we have those Mavexar agreements too. I can send those to respective counsel on those cases as well. They are the same as this agreement.

Thanks,

Papool

Papool Chaudhari
IP Edge
papool@ip-edge.com

App. P at 1 (underline in the original).[7]

---

[7] Mr. Chaudhari cc'd on his email Messrs. Pant and Bodepudi, an administrative assistant at IP Edge named Danae Maher, and three lawyers who represented plaintiff LLCs that were subject to the orders I issued on September 12 and 13, 2022. The email is marked "Common interest Attorney-Client Privilege," but the email does not disclose a communication to or from a client and therefore it is not an attorney-client communication, let alone a privileged attorney-client communication. Counsel have consistently maintained in these actions that IP Edge and Mavexar are *not* their clients.

In addition, because, as discussed below, *see infra* Section V, there is prima facie evidence to suggest that IP Edge and Mavexar actors engaged in the unauthorized practice of law (a crime in Texas), any communications IP Edge and Mavexar actors had in connection with these matters fall within the crime/fraud exception to the attorney-client privilege and attorney work product doctrines. *In re Grand Jury Investigation*, 445 F.3d 266, 274 (3d Cir. 2006); *see also Clark v. United States*, 289 U.S. 1, 15 ("To drive the [attorney-client] privilege away, there must be 'something to give colour to the charge'; there must be 'prima facie evidence that it has some foundation in fact.'") (citations omitted).

30

When Mr. Hall did not get on the October 11, 2022 call, Mr. Chaudhari emailed him, cc'ing Messrs. Pazuniak and Bodepudi and Ms. Deitz: "Mark, Are you able to join the weekly call now? We are on." App. Q at 2. The production does not contain a response to this email from Mr. Hall. Shortly after the call concluded, Ms. Deitz emailed Mr. Pazuniak:

> Hello George:
>
> I'm sorry Mark was not able to attend the call today, he had to go into the office and was not able to participate in the call. He is however available this Friday at noon CST. Can you talk then for the call?
>
> Sincerely,
>
> Linh Deitz
> Office Manager
> IP Edge LLC

App. Q at 1. The production does not contain any response to this email, and it cannot be determined from any document in the production whether a call was held that Friday.

The following Tuesday, October 18, 2022, in an email sent to Mr. Hall at 12:06 p.m. central time, cc'ing Messrs. Pazuniak and Bodepudi and Ms. Deitz, Mr. Chaudhari asked: "Mark, [a]re you able to join the weekly video call now? We are on. Here is the link if you need it." App. R. The production does not contain any

31

responses to this email.  Nor does it contain any documents that indicate whether Mr. Hall joined the October 18 video call.

The production contains another email dated October 18, 2022 that was sent by Mr. Pazuniak to Mr. Hall.  It appears from the production that this email is the first direct communication Mr. Pazuniak had with Mr. Hall.  The email reads:

> Mark,
>
> This email is only to you.
>
> Please understand that, as a legal and professional matter, my only client is Nimitz Technologies, and, thus, you.  I do not represent Mavexar or any other entity, and I would be in breach of professional responsibilities if I placed any interest ahead of yours.  Your communications with me are completely privileged, which means that I cannot legally or ethically disclose our communications to anyone.
>
> If you have any questions between now and when we chat on Nov. 3, please feel free to email me or call me.
>
> George

App. S.[8]

---

[8] Although the email is marked "attorney client privileged," it is not a privileged communication, as it does not contain legal advice and merely communicates one of the general terms of Mr. Pazuniak's representation of Nimitz.  *Idenix Pharms., Inc. v. Gilead Scis., Inc.*, 195 F. Supp. 3d 639, 643 (D. Del. 2016); *see also Avgoustis v. Shinseki*, 639 F.3d 1340, 1344 (Fed. Cir. 2011) ("Courts have consistently held that the general subject matters of clients' representations are not privileged.") (internal citations omitted).

III.

I turn next to the two Mellaconic cases.  Like Nimitz, Mellaconic has no employees.  And like Nimitz, Mellaconic has one owner who is also its only member.  That person, Hau Bui, makes his daily living as the proprietor of a food truck and restaurant.  Civ. No. 1:22-cv-0244, D.I. 20 at 86:1–2.  He is also the owner of Burley.  Mr. Bui testified at the November 4, 2022 hearing that Mavexar formed Mellaconic and Burley.  Civ. No. 1:22-cv-0244, D.I. 20 at 90:9–11.  Documents produced by Mellaconic in response to the November 10 Memorandum Order confirm that Linh Deitz filed a certificate of formation for Mellaconic with the Texas Secretary of State on August 4, 2020 that was approved on August 5, 2020.  App. T.

Mellaconic filed two of the above-captioned cases and 17 related cases in this Court between September 30, 2020 and April 27, 2022.[9]  Jimmy Chong, a

---

[9] *Mellaconic IP LLC v. RideCell, Inc.*, Civ. No. 20-1323, , D.I. 1 (filed Sep. 30, 2020); *Mellaconic IP LLC v. Frontpoint Sec. Solutions, LLC*, Civ. No. 21-0447, D.I. 1 (filed Mar. 26, 2021); *Mellaconic IP LLC v. Wyze Labs, Inc.*, Civ. No. 21-0448, D.I. 1 (filed Mar. 26, 2021); *Mellaconic IP LLC v. Central Sec. Group-Nationwide, Inc.*, Civ. No. 21-0573, D.I. 1 (filed Apr. 26, 2021); *Mellaconic IP LLC v Monitronics Int'l, Inc.*, Civ. No. 21-0574, D.I. 1  (filed Apr. 26, 2021); *Mellaconic IP LLC v. Canary Connect, Inc.*, Civ. No. 21-0944, D.I. 1 (filed June 29, 2021); *Mellaconic IP LLC v. Fantasia Trading LLC*, Civ. No. 21-0945, D.I. 1 (filed June 29, 2021); *Mellaconic IP LLC v. Trane Techs. Co. LLC*, Civ. No. 21-1080, D.I. 1 (filed July 28, 2021); *Mellaconic IP LLC v. Linxup, LLC*, Civ. No. 21-

Delaware lawyer with the Chong Law Firm, P.A., is Mellaconic's counsel of record in all 19 cases. In 18 of the cases, either Howard Wernow or Andrew Curfman entered an appearance as co-counsel. Messrs. Wernow and Curfman are Ohio lawyers with the law firm Sand, Sebolt & Wernow, LPA.

All told, Mellaconic has filed 44 patent infringement cases in nine federal judicial districts to date. In all these cases, Mellaconic asserted a single patent, U.S. Patent No. 9,986,435 (the #435 patent), titled "Autonomous, Non-interactive, Content-based Services for Cellular Phone." In each complaint, Mellaconic claimed that it had "its principal place of business at 6009 West Parker Road – Suite 149-1027, Plano, TX 75093." That address is in fact an iPostal drop box.

In a declaration submitted in response to the November 10 Memorandum Order, Mr. Bui stated that Mellaconic had seven assets at the time it filed these

_____

1081, D.I. 1 (filed July 28, 2021); *Mellaconic IP LLC v. Ezlo Innovation Ltd.*, Civ. No. 21-1373, D.I. 1 (filed Sep. 28, 2021); *Mellaconic IP LLC v. Verkada, Inc.*, Civ. No. 21-1374, D.I. 1 (filed Sep. 28, 2021); *Mellaconic IP LLC v. Incognia US Inc.*, Civ. No. 21-1844, D.I. 1 (filed Dec. 29, 2021); *Mellaconic IP LLC v. Carrier Global Corp.*, Civ. No. 21-1853, D.I. 1 (filed Dec. 30, 2021); *Mellaconic IP LLC v. Connecteam, Inc.*, Civ. No. 22-242, D.I. 1 (filed Feb. 25, 2022); *Mellaconic IP LLC v. PrismHR, Inc.*, Civ. No. 22-243, D.I. 1 (filed Feb. 25, 2022); *Mellaconic IP LLC v. TimeClock Plus, LLC*, Civ. No. 22-244, D.I. 1 (filed Feb. 25, 2022); *Mellaconic IP LLC v. Avast Software, Inc.*, Civ. No. 22-540, D.I. 1 (filed Apr. 27, 2022); *Mellaconic IP LLC v. Deputy, Inc.*, Civ. No. 22-541, D.I. 1 (filed Apr. 27, 2022); *Mellaconic IP LLC v. Justworks, Inc.*, Civ. No. 22-542, D.I. 1 (filed Apr. 27, 2022).

suits: the #435 patent, five other patents, and a patent application. App. U. Like

Mr. Hall, Mr. Bui testified at the November 4, 2022 hearing. And as with Mr.

Hall, Mr. Bui knew nothing about the subject matter or value of Mellaconic's

assets and was hard put to explain how Mellaconic came into possession of them:

> Q. What does Mellaconic do?
>
> A. Yeah. Mellaconic owns patents, the rights to patents.
>
> Q. All right. How many patents?
>
> A. I believe six.
>
> Q. And what types of patents?
>
> A. I haven't really looked over them.
>
> Q. Okay. How much did you pay for the patents?
>
> A. I didn't pay for the patents.
>
> Q. So how do you come to own patents if you don't pay for them?
>
> A. I was—came up—someone pushed me with the opportunity, selling the patents.
>
> Q. Who was that? Mellaconic?
>
> A. Mellaconic—no, Mavexar. Sorry.
>
> Q. Mavexar. Well, how did you come in touch with Mavexar?
>
> A. Linh.

35

Q. Is this Linh D[ei]tz?

A. Linh D[ei]tz.

Q. How do you know her?

A. She's a friend.

Q. When did she first approach you about this idea of assuming ownership of patents?

A. I believe in 2020, right when the pandemic hit.

Q. And what did she tell you?

A. She just came up to me and just told me if I would like an opportunity to deal with patents and make passive income.

\* \* \* \*

Q. So it's make a passive income. What does that mean?

A. Like, income. Coming in without, you know—I don't know how to describe it. Just like, kind of like—

Q. How about this? You don't have to do anything; is that fair?

A. Yeah, you don't have to do much, yeah.

Q. Well, what do you have to do?

A. As far as?

36

Q.  As far as getting ownership of the patents.  I assume the patents are worth something, in your mind?  Do you think the patents are worth anything?

A.  Yes.

Q.  All right.  Do you have any sense of how much they're worth?

A.  I'm not an expert in patents.  I wouldn't know.

Q.  Well, did Ms. D[ei]tz or anyone else, when you took ownership of the patents, give you any sense of what they thought the patents were worth?

A.  No.

Q.  Did you have to give up anything in order to assume ownership of the patents?

A.  No, sir.

Q.  Did you have to take on any responsibilities to assume ownership of the patents?

A.  As far as, just like, viewing the litigations and everything that come through.

Q.  Oh, so you do review the litigations?

A.  Yeah.

Q.  Tell me about what you do in that regard?

A.  So Mavexar will send me the litigations of what's going on or the, you know, attorney engagements.  And then I, essentially, if I sign—I approve of them or disapprove of them.

37

Q. How do you know whether to approve or disapprove of an attorney?

A. I mean, I chose Mavexar and they're—they're—what is it?—they're good. Like, you know, they haven't done me wrong.

Q. Well, so do you get a share, then, of lawsuits or settlements that are brought using these six patents? Is that how you make money, passive income, as you call it?

A. Yeah.

\* \* \* \*

Q. What's your share?

A. With?

Q. Of the litigation or settlements. What's your share? Do you get a percentage share?

A. Percentage.

Q. And what is it?

MR. WERNOW: Objection, Your Honor. Just confidential business information.

THE COURT: Go ahead.

A. 5 percent.

\* \* \* \*

38

Q. . . . What did you have to give up in value for you to be able to assume ownership of these patents?

A. I didn't give nothing.

Q. You didn't give them anything. So they were a gift?

A. No. It's—

Q. So what's the—then help me. I'm just trying to understand this concept. If it's not a gift, you're not paying anything, why is someone giving you these patents?

A. You would have to ask Mavexar that.

Q. Did you take on any liability as a result of assuming ownership of the patents?

A. What do you mean by "liability"?

Q. Well, so you don't know?

A. What's that?

Q. You don't know what "liability" means?

A. I mean, I have a general idea, but . . .[10]

---

[10] The court reporter used these ellipses in the transcript to reflect the fact Mr. Bui trailed off and was silent for a notable, indeed awkward, period. *See* LILLIAN I. MORSON, MORSON'S ENGLISH GUIDE FOR COURT REPORTERS 154 (2d ed. 1997) ("Rule 273. If a remark is intended to trail off without a conclusion, use three spaced periods, as recommended by most manuals as a specific use of the ellipsis points. Often the speaker uses body language to complete the idea: a shrug of the shoulders, extended upturned palms."). It was clear from the substance of Mr. Bui's testimony and his facial expressions and body language that he was not

Q.  Was there any risk that you assumed when you
assumed ownership of the patents?

A.  Oh, there's always a risk in everything.

Q.  So what's the risk?

A.  I mean, if things fall through, then I would have to
come out of pocket.

Q.  And what kind of things would you have to come out
of pocket, is your understanding?

A.  So if, like, litigation goes wrong, Mavexar has the
right to come after me for the costs of what was loaned.

\* \* \* \*

Q.  Who pays for the lawyer fees to go out and sue
people using the patents owned by Mellaconic?

A.  Mavexar.

Q.  And what is—do they loan you the money for that?

A.  Yes.  It's a recourse.

---

familiar with the word "liability," a term that, as discussed below, *see infra* pp. 42–
43, is used in the Patent Assignment Agreement that transferred the #435 patent to
Mellaconic and the Consulting Service Agreement Mellaconic had with Mavexar.
*See* App. W at 3; App. X at 4.  Mr. Bui's electronic signatures (if he in fact made
them) on these contracts expose him to potential financial liability.  I make note of
this example and have quoted extensively from Mr. Bui's testimony because the
disparity in legal sophistication between Mr. Bui and the IP Edge and Mavexar
actors who dealt with him underscore that counsel's failures to comply with the
Model Rules of Professional Conduct while representing Mr. Bui and his LLC in
the Mellaconic cases are not merely technical or academic.  *See infra* Section VI.

40

Q.  What do you mean by "recourse"?

A.  Like a loan.

Q.  Well, how did you come up with the terms "recourse"?  I'm just—what does that mean?

A.  All I know is it's like a loan.

Civ. No. 22-0244, D.I. 20 at 86:18–89:19; 91:8–14; 94:10–95:12; 96:8–17.

The seven assets identified in Mr. Bui's declaration are listed in a two-page document titled "Patent Assignment" that was electronically filed with the PTO on August 19, 2020 by someone using Linh Deitz's IP Edge email account.  App. V at 1.  The Patent Assignment is electronically signed by Mr. Bui on behalf of Mellaconic and by Thomas Kang on behalf of Empire Technology Development LLC (Empire).  App. V at 4.  According to the terms of the Patent Assignment, on August 10, 2020 (five days after Mellaconic was created), Empire assigned to Mellaconic "for good and valuable consideration . . . *all* right, title, *and interest that exist today and may exist in the future in and to*" the seven listed assets.  App. V at 3.  The Patent Assignment also expressly states that the "right, title, *and interest*" in the seven assets "includ[es] *all income, royalties, damages and payments now or hereafter due or payable with respect thereto*" and "the right to

41

bring any claim, sue, counterclaim, and recover for the past, present and future infringement of" the seven assets. App. V at 4 (emphasis added).

This last statement in the Patent Assignment stands in contrast with the terms of an 11-page Patent Assignment Agreement produced by Mellaconic in response to the November 10 Memorandum Order. App. W. That Patent Assignment Agreement is also between Mellaconic and Empire and, like the two-page Empire/Mellaconic Patent Assignment filed with the PTO, it is dated August 10, 2020 and appears to be electronically signed by Hau Bui and Thomas Kang. App. W at 11. The Patent Assignment Agreement, however, expressly provides that "[a]s consideration [for the assignment of the assets], [Mellaconic] shall pay [Empire] fifty percent (50%) of the Net Proceeds received by [Mellaconic] as a result of enforcement of" the seven assets. App. W at 2.

As in the case of the Burley/Nimitz Patent Assignment Agreement, in the Empire/Mellaconic Patent Assignment Agreement, Empire and Mellaconic "agree[d] to execute the form of . . . Patent Assignment[]attached as Exhibit A hereto, the terms of such Patent Assignment being fully incorporated herein." App. W at 1. The "Exhibit A hereto" is the same two-page Patent Assignment filed by Mellaconic with the PTO on August 19, 2020.

42

The terms of that Patent Assignment also stand in contrast with the terms of the form "Consulting Services" agreement Mellaconic and Mavexar entered on August 11, 2020. App. X.[11] That agreement is identical to the agreement Mavexar had with Nimitz. As noted above, Mr. Bui testified at the November 4, 2022 hearing that pursuant to that agreement Mellaconic received only five percent of the revenue stream obtained from licensing and litigating Mellaconic's patents. Civ. No. 22-0244, D.I. 20 at 91:5–16. Thus, at the time Mellaconic filed with the PTO an assignment that stated that Mellaconic's "right, title, *and interest*" in the seven assets listed in the assignment "includ[ed] *all* income, royalties, damages and payments now or hereafter due or payable with respect thereto," Mavexar was contractually entitled to 95% of the profits generated from licensing or litigating those assets.

Eight days after the Patent Assignment was filed with the PTO, on August 27, 2020, the first three of the 44 patent cases ultimately brought in Mellaconic's

---

[11] App. X is marked "Common Interest Attorney-Client Privilege," but Mr. Wernow introduced the agreement into evidence at the November 4, 2022 hearing and therefore waived any privilege the agreement might otherwise have enjoyed.

43

name were filed in Texas.[12]  The following week, three Mellaconic cases were

filed in the Southern District of New York.[13]

On September 30, 2020, Mr. Chong filed *Mellaconic IP LLC v. RideCell,*

*Inc.*, Civ. No. 20-1323, in this Court.  Mellaconic's production contains only one

engagement letter for the Chong Law Firm.  App. Y.  The three-page letter is

addressed to "Hau Bui, Managing Member, Mellaconic IP LLC," App. Y at 1, but

it is dated July 14, 2020—roughly three weeks before Mellaconic was formed.

Although there is a place for Mr. Chong's signature on the letter, he did not sign it.

What looks to be an electronic signature for Hau Bui appears below the words

"[u]nderstood and agreed" at the bottom of the letter's third page.  That signature is

dated September 28, 2020.  App. Y at 3.  Mellaconic produced no emails relating

to the Chong Law Firm engagement letter, even though the November 10

Memorandum Order required Mellaconic, Mr. Bui, Mr. Chong and Mr. Chong's

firm to produce "[a]ny and all communications and correspondence, including

emails and text messages, that [Mr. Bui, Mr. Chong, or any employee of Mr.

---

[12] *Mellaconic IP LLC v. Uber Techs., Inc.*, Civ. No. 6:20-cv-785, (W.D. Tex., filed
Aug. 27, 2020); *Mellaconic IP LLC v. Lyft, Inc.*, Civ. No. 6:20-cv-786, (W.D.
Tex., filed Aug. 27, 2020); *Mellaconic IP LLC v. Via Transport. Inc.*, Civ. No.
3:20-cv-2543, (N.D. Tex., filed Aug. 27, 2020).
[13] *Mellaconic IP LLC v. Curb Mobility, LLC*, Civ. No. 1:20-cv-7089, (S.D.N.Y.,
filed Aug. 31, 2020); *Mellaconic IP LLC v. GT Gettaxi Ltd.*, Civ. No. 1:20-cv-
7091, (S.D.N.Y., filed Aug. 31, 2020).

Chong's law firm] had with Mavexar, IP Edge, Linh D[ei]tz, Papool Chaudhari, and/or any representative of Mavexar and/or IP Edge regarding: . . . the retention of [Mr. Chong's firm] to represent Mellaconic in these cases." Civ. No. 22-0244, D.I. 22 at 2–5. Accordingly, and since Mr. Bui's signature on the letter appears to be an electronic signature, it cannot be determined if, when, how, or from whom Mr. Bui received the Chong Firm retainer agreement.

On March 3, 2021, Brandon LaPray of IP Edge sent an email addressed to info@ip-edge.com and apparently blind copied to certain law firms. App. Z. Like many of the emails in the Mellaconic document production, this email is heavily redacted.[14] The email's subject line is "New Opps—[REDACTED BY COUNSEL] and Mellaconic." In the body of the email, Mr. LaPray wrote: "We are looking for lead counsel to handle the below opportunities. If you are interested or would like to discuss, please let us know." The unredacted text below this statement reveals a "Mellaconic" Dropbox link and a reference to the #435 patent. App. Z at 1. In a March 7, 2021 email response to Mr. LaPray, Mr. Wernow wrote: "We would be interested in handling both matters." App. Z at 1.

---

[14] Mellaconic heavily redacted the documents it produced in response to my November 10, 2022 Memorandum Order on relevance grounds. Relevance, however, is not a proper ground for redaction. *Delaware Display Grp. LLC v. Lenovo Grp. Ltd., Lenovo Holding Co.*, No. CV 13-2108-RGA, 2016 WL 720977, at *6 (D. Del. Feb. 23, 2016).

On March 11, 2021, an executive assistant at Sand, Sebolt emailed Ms. Deitz, asking her to "please provide the entity information for Mellaconic (U.S. Patent: 9,986,435) so that I can send over an engagement letter." App. AA at 4–5. Ms. Deitz responded with the address of Mellaconic's P.O. Box and Mr. Bui's name; and that afternoon, the executive assistant emailed an engagement letter to Ms. Deitz. App. AA at 2–4. On March 12, 2021, Ms. Deitz returned a copy of the engagement letter to Sand, Sebolt with an acknowledgement that appears to be electronically signed by Hau Bui. App. AA at 1.

The letter, dated March 11, 2021 and signed by Mr. Wernow, purports to "set forth guidelines regarding [Sand, Sebolt's and Mr. Bui's] respective responsibilities" in connection with Sand, Sebolt's "represent[ion] [of] [Mr. Bui's] intellectual property interests and litigation regarding U.S. Patent No. 9,986,435[]." App. BB at 1, 4. Under the terms of the letter, Mellaconic agreed to pay Sand, Sebolt on a contingency fee basis. The fee varies from 15% to 45% of the net proceeds of the "consideration received by [Mellaconic] resulting from lawsuits filed by [Sand, Sebolt]." App. BB at 1. The letter provides in relevant part:

> *Third Parties.* Our services may require us to act as your agent to third parties. You hereby give us explicit permission to discuss all matters of your case with any third parties, which [sic] you have entered into any type of consulting agreement (i.e., "one of your consultants"). While we use our best judgment in retaining other third

46

parties, such as expert witnesses, you agree not to hold us liable for any liabilities or costs arising from any actions by such third parties or one of your consultants. Additionally, you give us explicit authority to disburse distributions of received proceeds to be sent to a third party or one of your consultants in the ordinary course of our relationship.

*Instructions.* We need you, or one of your consultants, to provide us with full, frank and detailed information. Without it, we are unable to perform our job. Generally, we will not proceed to act on your behalf until we receive instructions from you or one of your consultants.

\* \* \* \*

*Communication.* We will send all communications to the address you provide us or to one of your consultants. Communication may be via regular mail, facsimile and/or e-mail. If we cannot reach you because you did not inform us of changes, our duty to act in the matter ceases.

App. BB at 2. The only discussion related to conflicts of interest in the letter is the statement that Sand, Sebolt "may terminate the engagement if . . . a conflict of interest exists." There is no discussion in the letter about the risks associated with bringing a patent lawsuit. Thus, for example, there is no mention in the letter of the fact that under 18 U.S.C. § 285, the court may award in exceptional cases attorney fees to the prevailing party in a patent infringement case.

Mellaconic produced no emails or texts to which Mr. Bui was a party that referenced or attached the Sand, Sebolt engagement letter. Accordingly, and since

47

the signature for Mr. Bui on the letter appears to be electronic, it cannot be determined from the document production if, when, how, or from whom Mr. Bui was provided the engagement letter or what, if anything, he was told with respect to the letter.

Beginning on March 26, 2021 and extending through April 27, 2022, Mr. Chong, with Sand, Sebolt acting as co-counsel, filed 18 patent infringement cases on Mellaconic's behalf in this Court. All but the two above-captioned Mellaconic cases were settled before I issued my order on September 12, 2022 convening the November 4, 2010 hearing.[15]

_____

[15] *See Mellaconic IP LLC v. Linxup, LLC*, Civ. No. 21-1081, D.I. 10 (Sep. 16, 2021); *Mellaconic IP LLC v. Ezlo Innovation Ltd.*, Civ. No. 21-1373, D.I. 9 (Nov. 10, 2021); *Mellaconic IP LLC v. Verkada, Inc.*, Civ. No. 21-1374, D.I. 9 (Nov. 3, 2021); *Mellaconic IP LLC v. Incognia US Inc.*, Civ. No. 21-1844, D.I. 10 (Mar 29, 2022); *Mellaconic IP LLC v. Carrier Glob. Corp.*, Civ. No. 21-1853, D.I. 12 (Apr. 1, 2022); *Mellaconic IP LLC v. Connecteam, Inc.*, Civ. No. 22-242, D.I. 12 (June 24, 2022); *Mellaconic IP LLC v. PrismHR, Inc.*, Civ. No. 22-243, D.I. 9 (Apr. 15, 2022); *Mellaconic IP LLC v. Avast Software, Inc.*, Civ. No. 22-540, D.I. 10 (May 25, 2022); *Mellaconic IP LLC v. Justworks, Inc.*, Civ. No. 22-542, D.I. 12 (July 27, 2022); *Mellaconic IP LLC v. Frontpoint Sec. Solutions, LLC,* Civ No. 21-0447, D.I. 10 (June 1, 2021); *Mellaconic IP LLC v. Wyze Labs, Inc.,* Civ No. 21-0448, D.I. 9 (June 9, 2021); *Mellaconic IP LLC v. Central Security Group – Nationwide, Inc.,* Civ. No. 21-0573, D.I. 10 (June 9, 2021); *Mellaconic IP LLC v. Monitronics, Int'l, Inc.,* Civ. No. 21-0574, D.I. 9 (June 9, 2021); *Mellaconic IP LLC v. Canary Connect, Inc.,* Civ. No. 21-0944, D.I. 8 (Sep. 9, 2021); *Mellaconic IP LLC v. Fantasia Trading LLC,* Civ. No. 21-0945, D.I. 16 (Oct. 5, 2021); *Mellaconic IP LLC v. Trane Techs. Co. LLC,* Civ. No. 21-1080, D.I. 11 (Nov. 10, 2021).

Although Mr. Chong was counsel of record for Mellaconic in *RideCell,* No.
20-1323, and although he filed the motion to voluntarily dismiss that case in March
2021, it appears that he never communicated with Mr. Bui until the November 4,
2022 hearing.  Indeed, it appears from Mr. Bui's testimony at the hearing, that Mr.
Bui was not aware at that time that Mr. Chong's firm was Mellaconic's counsel.
When I asked Mr. Bui at the November 4, 2022 hearing "what attorneys have
represented Mellaconic?"  He answered: "Sand, Sebolt, as far as I know."  I then
asked: "Anybody else?" to which he replied: "I would have to go back and look."
Civ. No. 22-0244, D.I. 20 at 92:12–16.  When Mr. Bui made this statement, Mr.
Chong was in his sight line, about 20 feet away at counsel's table.

Based on the Mellaconic document production, it appears that the first direct
communication between Mr. Chong and Mr. Bui occurred on November 30, 2022,
about three weeks after the hearing.  In an email to Mr. Bui on that date, Mr.
Chong wrote:

> As you know I represent your business in its patent
> infringement cases.  I have been communicating with it
> through Mavexar based on you retaining it to represent
> you.  I wanted to reach out to you independently and
> confirm that you want me to communicate with the
> Mavexar team directly.

49

App. CC.[16] Ten days later, Mr. Bui replied: "Yes, you can continue to communicate to Mavexar team directly." App. CC.

Although Sand, Sebolt was lead counsel for Mellaconic in 16 cases that were settled before September 12, it appears that neither Mr. Wernow nor Mr. Curfman (nor any other lawyer from Sand, Sebolt) had ever spoken with or otherwise communicated directly with Mr. Bui before those settlements were reached. Based on Mr. Bui's testimony at the November 4, 2022 hearing and the Mellaconic document production, it appears that Mr. Bui's first communication with a lawyer from Sand, Sebolt occurred on October 10, 2022 during a prep call for the November 4, 2022 hearing that included Messrs. Chaudhari and Bodepudi from IP Edge. App. DD.[17] It also appears that Sand, Sebolt did not have Mr. Bui's email address until November 3, 2022, when Mr. Chaudhari provided it to Mr. Curfman at Mr. Curfman's request. App. EE at 2–3.[18] A Sand, Sebolt executive assistant

---

[16] The emails in App. CC are marked privileged, but because they merely communicate the general terms of Mr. Chong's representation of Mellaconic, they are not privileged. *Idenix Pharms.*, 195 F. Supp. 3d 639 at 643; *see also Avgoustis*, 639 F.3d at 1344.

[17] The emails in App. DD are marked "Common Interest Attorney-Client Privilege," but they do not disclose a communication to or from a client. They are therefore not attorney-client communications, let alone privileged attorney-client communications.

[18] The emails in App. EE are marked "Common Interest Attorney-Client Privilege." The subject matter of the emails is travel arrangements for the

then used the email address later that day to send Mr. Wernow's contact information and travel itinerary for the November 4 hearing to Mr. Bui. App. EE at 1. Hours later, Mr. Bui texted Mr. Wernow to let him know he was "headed to the airport." App. FF. This text appears to be the first direct communication Mr. Bui had with a Sand, Sebolt lawyer that did not involve someone from IP Edge.

Using leading and loaded questions at the November 4 hearing, Mr. Wernow tried to adduce evidence that Mavexar had sent Mr. Bui and Mr. Bui had reviewed and approved the complaints that Sand, Sebolt filed under Mellaconic's name:

> Q. And what's your recollection of the complaints that our office, or Mr. Curfman, has sent to you through Mavexar, you review those—
>
> THE COURT: Object to leading. Ask him what he does.
>
> BY MR. WERNOW:
>
> Q. What do you do from Mavexar when someone sends you a complaint?
>
> A. What was that?

---

November 4, 2022 hearing, not legal advice. But in any event, the emails' authors and recipients include IP Edge and Mavexar actors who appear to have engaged in the unauthorized practice of law in Texas; and therefore, even if the emails were otherwise privileged communications, they would fall within the crime/fraud exception to the attorney-client privilege. *In re Grand Jury Investigation*, 445 F.3d at 274.

> Q. What do you do for Mellaconic IP, LLC, when you receive a complaint?
>
> A. I review it and I either confirm it or deny it.
>
> Q. And you can deny it, correct?
>
> A. I can deny it.

Civ. No. 22-0244, D.I. 20 at 106:12–25. I wondered at the time I observed this colloquy whether Mr. Bui understood what a complaint was, and I questioned at the time in my own mind whether Mr. Bui had in fact been provided and asked to review the complaints filed under Mellaconic's name in these cases. As noted above, when I asked Mr. Bui if he took on any responsibilities by assuming ownership of patents, he responded "As far as, just like, viewing the litigations an everything that come[s] through." I was confused by this answer, so I asked in follow-up: "Oh, so you do review the litigations?" to which Mr. Bui replied, "Yeah." I then asked: "Tell me about what you do in that regard?" And Mr. Bui replied:

> So Mavexar will send me the litigations of what's going on or the, you know, attorney engagements. And then I, essentially, if I sign—I approve of them or disapprove of them.

52

Civ. No. 22-0244, D.I. 20 at 89:1–9. My take from Mr. Bui's testimony was that his "review of litigations" filed on behalf of his LLCs consisted of signing off on attorney engagement letters.

Mellaconic's document production seems to confirm my suspicion that Mr. Bui was not provided with complaints before Sand, Sebolt filed them. The November 10 Memorandum Order required Mellaconic to produce any and all communications Mr. Bui had with Sand, Sebolt and Mavexar relating to the #435 patent (which is the only patent asserted by Mellaconic in the complaints it filed in these cases). Mellaconic, however, produced no communications with Mr. Bui that attached or discussed complaints.

It also appears from the document production that Mr. Bui was neither apprised of settlement offers made by TimeClock Plus LLC (TimeClock) nor given advance notice of the settlement that led Mr. Chong to move to dismiss the TimeClock case. A May 19, 2022 email from Mr. Curfman to Mr. LaPray confirms that TimeClock and Mr. Curfman each had made at least two settlement offers as of that date:

> Hi Brandon,
>
> Just spoke to [TimeClock's] counsel on this one. They raised their offer to $20k. Here's the history: We opened at 85, they countered at 15, we matched and lowered to 70k and hinted in the 40-45 range. They just came back

53

at 20k and said there is probably a bit more room but OC
doubts that they will be able to get into the 40k+ range.  I
told him "officially we are still at 70 and I'm 99.9% if we
can get to a number starting with a '4' that we are done.
If we can get to a number starting with a '3', I feel like
we can probably get that done but I am not as confident.
Below that, I don't know how my client will respond.

\* \* \* \*

Respectfully,

Andrew S. Curfman

App. GG.[19]  Mr. LaPray responded less than an hour after he received Mr.

Curfman's email: "We're ok with your suggestion."  App. GG.  On July 13, 2022,

Messrs. Curfman and Chong filed a Motion to Stay and Notice of Settlement in the

Timelock case, stating that "[a]ll matters in controversy between [the parties] have

been settled in principle."  Civ. No. 22-0244, D.I. 12.  The next day, Mr. Curfman

sent this email to Mr. LaPray:

I just wanted to update you on this case.  We have an AIP
[agreement in principle] at $26,250 based on splitting the
difference between their $22,500 offer and our most

---

[19] This email is marked "confidential attorney work product," but for the reasons
stated above, *supra* note 8, the crime/fraud exception applies.  In any event, I have
redacted from the email all text that could arguably be read as revealing the mental
impressions of Mr. Curfman.  *See In re Cendant Corp. Sec. Litig.*, 343 F.3d 658,
661–62 (3d Cir. 2003) (holding the attorney work-product doctrine "shelters the
mental processes of the attorney, providing a privileged area within which he can
analyze and prepare his client's case") (citing *United States v. Nobles*, 422 U.S.
225, 238 & n.11 (1975)).

> recent $30k offer.  You had previously given authority at
> $20k so we were able to get them up over that here.

App. HH.[20]  Mellaconic produced, however, no communications from, to, or

copying Mr. Bui that make mention of any settlement offer from TimeClock.  Nor

are there any documents from, to, or copying Mr. Bui that show that he consented

to settling the case for $20,000 before Mr. Curfman reached an agreement in

principle with TimeClock.

IV.

I turn next to the two Lamplight cases.  Lamplight has no employees, and its

sole owner and member is Sally Pugal.  It is apparent from the Lamplight

document production that Linh Deitz obtained an address for Lamplight and filed

Lamplight's certificate of formation with the Texas Secretary of State.  App. II;[21]

App. JJ.  The Secretary of State approved the certificate and created Lamplight

effective November 17, 2021.  App. JJ at 1.

---

[20] The email is marked "attorney client privilege" but there has been no assertion of
an attorney client relationship between Sand, Sebolt and IP Edge/Mavexar.
[21] App. II is an email marked "Attorney-Client Privilege and/or Common Interest
Attorney-Client Privilege."  The email, however, does not disclose a
communication to or from a client and therefore it is not an attorney-client
communication, let alone a privileged attorney-client communication.

Mr. Chong filed six patent infringement cases in Lamplight's name in this district, including the two at issue here, between November 30, 2021 and July 31, 2022.[22]  Mr. Chong is Lamplight's sole counsel of record in these cases. Lamplight asserted in all six cases a single patent: U.S. Patent No. 9,716,393 (the #393 patent).[23]  The patent is titled "Battery Backup Remaining Time Arrangement."  According to the complaints, the patent "provide[s] an apparatus and associated systems and methods for reducing current consumption from a battery."  Civ. No. 21-cv-1689, D.I. 1 at 3.  Lamplight claimed in each complaint that "its principal place of business [is] located at 3571 Far West Blvd #3144, Austin, TX 78731."  That address is in fact an iPostal drop box.  App. II.

According to a declaration signed by Ms. Pugal, Lamplight's assets at the time it filed these suits consisted of the #393 patent and U.S. patent application number 61/777445.  App. KK at 2.  These assets are the only items listed in a Patent Assignment filed with the PTO in Lamplight's name on November 30, 2021

---

[22] *Lamplight Licensing LLC v. ABB Inc.*, Civ. No. 22-cv-418; *Lamplight Licensing, LLC v. Cyberpower Sys., Inc.*, Civ. No. 21-cv-1689; *Lamplight Licensing, LLC v. Ingram Micro, Inc.*, Civ. No. 22-cv-1017; *Lamplight Licensing, LLC v. Legrand AV, Inc.*, Civ. No. 21-cv-1691; *Lamplight Licensing LLC v. Panduit Corp.*, Civ. No. 22-cv-417; *Lamplight Licensing, LLC v. Vertiv Holdings Co.*, Civ. No. 21-cv-1690.
[23] Civ. No. 22-cv-418, D.I. 3; Civ. No. 21-cv-1689, D.I. 3; Civ. No. 22-cv-1017, D.I. 3; Civ. No. 21-cv-1691, D.I. 3; Civ. No. 22-cv-417, D.I. 3; Civ. No. 21-cv-1690, D.I. 3.

by someone using the email address sallypugal55@gmail.com. App. LL. The two-page assignment is between Magnolia Licensing LLC (Magnolia) and Lamplight and has an effective date of November 19, 2021. It bears the label "Exhibit A" in the top left corner of both pages and appears to be electronically signed by Lori LaPray on behalf of Magnolia and Sally Pugal on behalf of Lamplight. App. LL at 2–3.

Under the terms of the Patent Assignment, "[f]or good and valuable consideration," Magnolia "assign[ed], transfer[red], and convey[ed] unto Lamplight . . . *all* right, title, *and interest that exist today and may exist in the future*" in the #393 Patent and U.S. patent application number 61/777445. App. LL at 1. The assignment goes on to state that "all of the rights, . . . title and interest" in the patent and patent application "includ[e] *all* income, royalties, damages and payments now or hereafter due or payable with respect thereto." App. LL at 1 (emphasis added).

Here again a Patent Assignment Agreement produced in response to the November 10 Memorandum Order stands in contrast with the Assignment filed with the PTO. That seven-page agreement, like the Magnolia/Lamplight Patent Assignment filed with the PTO, appears to be electronically signed by Sally Pugal on behalf of Lamplight and Lori LaPray on behalf of Magnolia and has an

57

effective date of November 19, 2021. App. MM at 4–5. As in the case of the Burley/Nimitz and Empire/Mellaconic Patent Assignment Agreements, in this Patent Assignment Agreement, Magnolia and Lamplight "agree[d] to execute the form of . . . Patent Assignment[]attached as Exhibit A hereto, the terms of such Patent Assignment being fully incorporated herein." App. MM at 1. And as with Nimitz and Mellaconic, the "Exhibit A hereto" is the Patent Assignment filed by Lamplight with the PTO. App. MM at 7–8. Finally, paragraph 4 of the Magnolia/Lamplight Patent Assignment Agreement, titled "Consideration," provides:

> [Lamplight] agrees to comply with and be bound by the terms and conditions of the Patent Assignment Agreement between Thomson Licensing SAS ("TLS") and Magnolia Licensing LLC, with an effective date of July 2, 2020 ("Prior Agreement"), including that the Contingency Payments referenced in the Prior Agreement will continue to be due to TLS. [Lamplight] also understands and acknowledges that [Magnolia] or prior owners may have granted licenses, covenants not to sue, releases and other encumbrances with respect to the [#393 patent and U.S. patent application number 61/777445] ("Patent Encumbrances"). [Lamplight] expressly agrees to be bound by and take the [the #393 patent and U.S. patent application number 61/777445] subject to all such Patent Encumbrances.

App. MM at 3.

58

Lamplight did not produce a copy of the Prior Agreement between Thomson

Licensing and Magnolia or any email or written communication about that

agreement, even though the November 10 Memorandum Order required it to

produce "any and all communications and correspondence, including emails and

text messages, that Sally Pugal had with Mavexar, Linh D[ei]tz, Papool Chaudhari,

Brandon LaPray, and/or any representative of Mavexar regarding . . . assets,

including patents, owned by Lamplight." Accordingly, I do not know the terms of

the contingency payment Lamplight owed to Thomson Licensing at the time it

filed the Patent Assignment with the PTO or the particulars of the "other

encumbrances" Lamplight "underst[ood] and acknowledge[d] that [Magnolia] or

prior owners may have granted." But even if there were no "other encumbrances"

on the #393 patent and U.S. patent application number 61/777445 as of November

30, 2021, Lamplight's assumption of a preexisting contingency payment obligation

stands in contrast to the representation in the Magnolia/Lamplight Patent

Assignment filed on that date with the PTO that Lamplight was entitled to "all

income, royalties, damages and payments now or hereafter due or payable" from

the monetization of the #393 patent and U.S. patent application number 61/777445

patent.

The day after Ms. Pugal executed the Magnolia/Lamplight Patent Assignment Agreement, she entered into a consulting contract with Mavexar. App. NN. The terms of that agreement are identical to the terms of Nimitz's and Mellaconic's agreements with Mavexar; and thus, for the reasons discussed above, Lamplight's agreement with Mavexar also appears at odds with the representation Lamplight made to the PTO that it possessed "all right, title, *and interest*" in "*all* income, royalties, damages and payments now or hereafter due or payable" from the monetization of the #393 patent and U.S. patent application number 61/777445 patent. *Compare* App. LL at 2 *with* App. NN at 2. Because, as discussed more fully below, Ms. Pugal did not appear for questioning at the November 4, 2022 evidentiary hearing, I do not know the percentage of licensing revenues Mavexar retains under its agreement with Lamplight.

On November 30, 2021 Mr. Chong filed the first three patent infringement cases in Lamplight's name in this Court. Civ. No. 21-cv-1689; Civ. No. 21-cv-1690; Civ. No. 21-cv-1691. Mr. Chong insists that his client in these cases is Lamplight. Assuming for argument's sake that at some point he had an attorney-client relationship with Lamplight, it is unclear that that relationship existed at the time Mr. Chong filed these three cases. I tried at the November 4, 2022 hearing to gain clarity about the genesis of Mr. Chong's relationship with Lamplight:

THE COURT:  All right.  How did you come to be the lawyer representing Lamplight?  How did you first hear about Lamplight?  Who talked to you from Lamplight because—for instance, when did you first speak with Ms. Pugal?

\* \* \* \*

MR. CHONG:  I did not speak with her before I filed these cases.  Mavexar had reached out to me on her behalf.  And we had communicated through Mavexar, and had our fee agreement, and so forth, signed as Mavexar was acting as a representative of Ms. Pugal.

THE COURT:  So you are representing an entity that's exclusively owned by somebody, and you signed a retention letter with whom?  With Lamplight?

MR. CHONG:  Yes.

THE COURT:  And you had never met the owner of Lamplight when you signed the retention letter, is what you're telling me?

MR. CHONG:  That is correct.

THE COURT:  And, in fact, it sounds like you never had any discussions with the owner of Lamplight when you signed the retention letter with Lamplight.

MR. CHONG:  I did not speak with her directly.  I spoke with the representatives.

THE COURT:  Her representative who's not an employee of Lamplight.  This is a consulting firm, a separate entity; is that right?

MR. CHONG:  That is correct.

61

THE COURT: Okay. It's Mavexar.

MR. CHONG: That is correct.

THE COURT: All right. Do you know what the rules of ethics are about having a relationship with a client that is initiated by a third party?

I'm trying to think of any other context, so help me out. I'm just trying to think what rules would be applicable. I'm not judging. I'm asking questions here.

But I'm trying to understand how you end up in an attorney-client relationship with an LLC that is exclusively owned by an individual that you have never met and you've had no conversations with an employee of the LLC, and yet you end up in an attorney-client relationship with the LLC.

Do you know what rules would be implicated by that?

MR. CHONG: So Your Honor, I have to stop and think.

THE COURT: How did you run conflicts? I mean, I'm just trying to think how you would run conflicts when you're dealing with a third party that's negotiating with you to set up an attorney-client relationship with somebody else, another entity.

I'm trying to figure out how you run conflicts. Did you run conflicts?

MR. CHONG: Yes, Your Honor.

THE COURT: And it's all based on representations from a third party, not from the client, correct?

MR. CHONG: That is correct, Your Honor.

> THE COURT: All right. So when did you enter the relationship with Lamplight? Ballpark.
>
> MR. CHONG: I would have to find my fee agreement.

Civ No. 22-0418, D.I. 23 at 9:16–12:11.

Mr. Chong was unable to find his fee agreement during the hearing. The November 10 Memorandum Order required Lamplight and Mr. Chong's firm to produce "[a]ny and all retention letters and/or agreements between Lamplight and The Chong Law Firm, P.A." and "[a]ny and all communications and correspondence, including emails and text messages, that [Sally Pugal, Mr. Chong, or any employee of Mr. Chong's law firm] had with Mavexar, IP Edge, Linh D[ei]tz, Papool Chaudhari, and/or any representative of Mavexar and/or IP Edge regarding: . . . the retention of [Mr. Chong's firm] to represent Lamplight in these cases." No. 22-0418, D.I. 24 at 3–4. The sole retainer agreement between Lamplight and Mr. Chong's firm in Lamplight's document production says that it was "made this 28th day of March, 2022"—that is, about four months after Mr. Chong filed the first three Lamplight cases in this Court and one month after he filed a motion to voluntarily dismiss one of those cases. *See* App. OO at 8; Civ. No. 21-cv-1690, D.I. 9. (Lamplight produced two copies of this agreement. The copies are identical save that one copy is signed by both Mr. Chong and Ms. Pugal, while the other copy is signed by only Ms. Pugal. *See* App. OO; App. PP.)

An email from Mr. Chong's paralegal to Linh Deitz, however, suggests that more than a month after March 28, 2022 Mr. Chong still did not have a written retainer agreement with Lamplight. The email in question was sent on May 10, 2022, and it reads in relevant part:

> Hey Linh –
>
> Just wanted to check on Engagement Letters for the following:
>
> - Backertop Licensing LLC (Local)
> - Ridgeview IP LLC (Lead)
> - Waverly Licensing LLC (Lead)
> - Lamplight Licensing LLC (Lead)
> - Creekview IP LLC (Lead)
> - Topdown Licensing LLC (Lead) . . . .

App. QQ. Lamplight did not produce any responses to this email. And even though Mr. Chong insisted at the November 4, 2022 hearing that he negotiated the terms of the March 28, 2022 retainer agreement with Mavexar and "went through a lot of redlining" during those negotiations, Civ No. 22-0418, D.I. 23 at 26:6–7, other than the May 10, 2022 email from Mr. Chong's legal assistant to Ms. Deitz, there are no emails or other written communications in Lamplight's production that discuss Lamplight's retention of the Chong Firm or refer to the March 28, 2022 retention agreement or any draft of a retention agreement.

Putting aside for the moment the question of when Mr. Chong's retainer agreement with Lamplight was executed, the substance of the agreement is

64

noteworthy in several respects. First, the agreement defines the "Scope of the

Agreement" as "concern[ing] litigation and licensing activities with respect to" the

#393 patent. App. OO at 1. Second, and in apparent conflict with the

Magnolia/Lamplight Patent Assignment Agreement discussed above, in section 2

of the retainer agreement Lamplight

> represent[ed] and warrant[ed] that it own[ed] full, clear
> and unencumbered title and the exclusive right to enforce
> all rights with respect to the [#393 patent], including,
> without limitation, the exclusive right to bring actions
> against others for infringement of the [#393 patent], to
> license and sublicense the [#393 patent] and to collect all
> royalties (past or future), license fees, profits or other
> revenue or valuable consideration to be paid or
> exchanged by anyone else for the right to use the [#393
> patent]. . . .

App. OO at 1. Third, consistent with the Model Rules of Professional Conduct,

*see infra* Section V, the agreement explicitly states that Mr. Chong's firm "may file

a Lawsuit pursuing claims for infringement of the [#393 patent]" only "after

consultation with and approval of [Lamplight]," App. OO at 2; that Mr. Chong's

firm "agrees not to enter into any Licensing Agreement or Lawsuit settlement with

an Infringer without the written consent of [Lamplight]," that Lamplight "shall

have the sole and exclusive right to approve, accept and enter into any Licensing

Agreement or Lawsuit settlement," and that Mr. Chong's firm "agrees to make

65

reasonable efforts to keep [Lamplight] informed as to the status of all Lawsuits."
App. OO at 2.

Fourth, the agreement provides that Mr. Chong's firm will be paid "on a contingent fee basis" that entitles the firm to 15% of "any sums [obtained] by way of licensing, settlement, trial or otherwise with respect to" the #393 patent minus "Litigation Expenses." App. OO at 2–3. With respect to Litigation Expenses, section 10 of the agreement states:

> Litigation Expenses exceeding $500 (e.g.[,] deposition and hearing transcripts and expert witness and consultant fees) will ordinarily be billed directly to [Lamplight] by the vendor providing those services. NWM will obtain written pre-approval from [Lamplight] for any Litigation Expense expected to exceed $500. NWM will exercise its reasonable judgment and best efforts to limit the Litigation Expenses to only those expenses that it considers appropriate and necessary under the circumstances.

App. OO at 4. At the November 4 evidentiary hearing, Mr. Chong said he "remember[ed] negotiating th[e] specific sentence" that "NWM will obtain written pre-approval from [Lamplight] for any Litigation Expense expected to exceed $500," and that it was "a sticking point for [him]." Civ No. 22-0418, D.I. 23 at 22:14–23:6. He was, however, unable to identify what or who NWM was:

> THE COURT: So who's NWM? Who's deciding this?
> Who is deciding, in other words, how you're going to, or

66

whether, really, you're going to have certain litigation expenses paid for?

MR. CHONG: You know what, I have to go back and look at my notes. Because that's something where [Mavexar and I] would determine together. We would have that discussion. I mean, I just know there's a lot of back and forth with this—

THE COURT: Well, let me ask you this: Is there any chance that NWM is Mavexar or some other third-party entity?

MR. CHONG: No. I would not have let them ma[k]e that decision. That was—I know I was going back and forth with them. And it was discussed—

THE COURT: And "them." Now, we're not talking Lamplight. The "them" here is Mavexar; is that right?

MR. CHONG: That is correct. They're speaking on behalf of Lamplight.

Civ No. 22-0418, D.I. 23 at 25:5–23. The acronym "NWM" does not appear anywhere in the documents produced by Lamplight other than in the March 28, 2022 retainer agreement. Accordingly, section 10 of the retainer agreement remains a mystery.

Fifth, the retainer agreement states that Mr. Chong's firm "is being engaged by, and will represent only [Lamplight], and no other entity or person in connection with Licensing Negotiations and Lawsuit, unless agreed to by [the] [f]irm in writing." App. OO at 6. Sixth, the agreement provides that the Chong

67

Firm and Lamplight agree to submit any disputes arising from the firm's legal

representation of Lamplight to binding arbitration.  App. OO at 6.

Finally, under the heading "Required Special Disclosures," the retainer

agreement states:

> (a)　[LAMPLIGHT] ACKNOWLEDGES THAT IT
> WAS ADVISED TO RETAIN INDEPENDENT LEGAL
> COUNSEL TO REPRESENT [LAMPLIGHT] IN
> CONNECTION WITH THE NEGOTIATION AND
> EXECUTION OF THIS AGREEMENT, AND WITH
> RESPECT TO THE ARBITRATION CLAUSE
> ABOVE.  [LAMPLIGHT] FURTHER
> ACKNOWLEDGES THAT IT WAS ADVISED THAT
> [THE CHONG] FIRM HAS A CONFLICT OF
> INTEREST THAT PREVENTS IT FROM
> REPRESENTING CLIENT IN ANY WAY WITH
> RESPECT TO THE NEGOTIATION AND
> EXECUTION OF THIS AGREEMENT AND THAT
> [THE CHONG] FIRM HAS NOT DONE SO.
>
> (b)　[Lamplight] acknowledges that prior to signing
> this Agreement, [Lamplight] was given the option of
> retaining Firm to handle the Licensing Negotiations
> and/or Lawsuit on the basis of a normal hourly rate (plus
> costs and expenses incurred) but elected instead to retain
> [the Chong] Firm pursuant to the terms and conditions of
> this Agreement.
>
> (c)　[Lamplight] acknowledges that it has been advised
> that submission to binding arbitration typically results in
> the waiver of significant rights, including the waiver of
> the right to file a lawsuit in a different venue, waiver of
> the right to a jury trial, the possible waiver of broad
> discovery, and the loss of the right to appeal.

App. OO at 7 (capitalization in the original). It is undisputed that Mr. Chong was the only lawyer from his firm who worked on Lamplight matters and that as of March 28, 2022 he had never communicated with Ms. Pugal directly. It is thus undisputed that prior to March 28, 2022 no lawyer from Mr. Chong's firm ever (1) advised Ms. Pugal to retain independent legal counsel in connection with the negotiation of the retainer agreement or the arbitration provision in the retainer agreement, (2) advised her of any conflict of interest Mr. Chong's firm had, (3) offered her the option of retaining the Chong Firm on an hourly basis, or (4) advised her that by submitting to binding arbitration she was waiving significant rights.

It appears that Mr. Chong never communicated directly with Ms. Pugal until sometime in October 2022—about a month after I ordered Mr. Chong and Ms. Pugal to appear in person on November 10, 2022 for an evidentiary hearing. Civ. No. 22-cv-418, D.I. 13. As best I can tell from Lamplight's document production, Ms. Pugal first learned that she had been ordered to appear in court from Linh Deitz on Thursday, September 29, 2022. On that date, Ms. Deitz texted Ms. Pugal: "Hey Sally, can you talk? . . . It's about one of your companies and it's pretty important. Call me when you can please." Ms. Pugal replied: "I will call right now. CP [the initials of the surgeon Ms. Pugal worked for] is out now."

App. RR. No follow-up texts for that day were produced by Lamplight, but a few hours after Ms. Pugal's reply text, Ms. Deitz sent an email to Mr. Chong, cc'ing Messrs. Chaudhari and Bodepudi, asking: "Are you available on Wednesdays anytime between 10 am – noon CST to have a 60[-]minute call with our team and Sally to discuss the Connolly hearing? Unfortunately, that is the only day and times [Ms. Pugal] has available to talk every week." App. SS at 2.[24]

Just after midnight the following Monday, October 3, 2022, Mr. Chong emailed Ms. Deitz that he could make a call on October 5 at noon. App. SS at 1. Hours later, Ms. Deitz emailed Ms. Pugal, cc'ing Messrs. Chaudhari and Bodepudi (but not Mr. Chong), with a calendar invite for a call at that time "to discuss the Connolly hearings . . . with our team and your lead counsel Jimmy Chong." App. TT. About two hours later, in a separate email to Mr. Chong and his legal assistant, cc'ing Messrs. Chaudhari and Bodepudi (but not Ms. Pugal), Ms. Deitz sent the same calendar invite. App. TT. (Sending separate emails appears to have been IP Edge's general practice. It is readily apparent from the emails and texts

---

[24] The emails in App. SS are marked "Attorney-Client Privilege and/or Common Interest Attorney-Client Privilege." Because Messrs. Chaudhari and Bodepudi are parties to the emails and because there is *prima facie* evidence that Messrs. Chaudhari and Bodepudi were engaged in the unauthorized practice of law in Texas, the emails fall within the crime/fraud exception to the attorney-client privilege. *In re Grand Jury Investigation*, 445 F.3d at 274.

70

produced in response to the November 10 Memorandum Order that IP Edge strove to maintain a separation between the nominal owners of the plaintiff LLCs and the lawyers who filed cases on behalf of those LLCs.)

It is clear from the text messages and emails produced by Lamplight that Ms. Pugal did not want to travel to Delaware for a court hearing and did not want to participate in the weekly Wednesday calls Ms. Deitz had scheduled. In a series of text messages with Ms. Deitz between September 30 and October 3, 2022, Ms. Pugal said first that she could not travel to Delaware the week of November 10 because her boss had three surgeries scheduled for that week and then that "I don't think I can make it for the rest of the year." Ms. Deitz offered to "see if they can reschedule to another day," and suggested as a possibility November 4, the date of the Nimitz and Mellaconic hearing. App. UU.

Three hours before the scheduled weekly call on October 5, Ms. Deitz and Ms. Pugal exchanged the following texts:

> Deitz: Can you talk? I want to talk to you before your call with our team. . . . I know this is inconvenient for you but this is very important.

> Pugal: Hi Linh. I don't think I will do it. I will have to cancel. I'm so sorry.

> Deitz: *Sally this not only affects you but also our company.* There are fees that can be charged to you from the court. We are try[ing] to make it work with your

71

> schedule but you have to work with us. This is not
> something to take lightly. This is an order from a federal
> judge. Sally please call me back.
>
> Pugal: Sorry Linh. I am on the phone with facility. I
> will call in a few.
>
> Deitz: Ok.

App. VV at 1–5.

The text thread next picks up immediately after Ms. Pugal participated in the

October 5 call:

> Deitz: Do you feel better after the call?
>
> Pugal: We just finish[ed.] . . . . It went well[.] Very
> informative and very nice people. About the date I will
> let you know in the morning[.] Is that ok? I feel much
> better now. Thank you.
>
> Deitz: I'm glad it went well. You please let me know by
> tomorrow morning.

App. VV at 5–7. It cannot be determined from the documents who besides Ms.

Pugal participated in the call.

The next day, October 6, Ms. Deitz texted Ms. Pugal: "Did you decide

which day you can go—11/4 or 11/10. Papool and counsel are asking." Ms. Pugal

told Ms. Deitz she could go to a hearing on November 4. App. VV at 8–11.

Five days later—on October 11, 2022—Ms. Deitz renewed her texting with

72

Ms. Pugal:

> Hey Sally[.]  Jimmy (your counsel) is going to try to call
> or email you.  I told him to reach you best by email and
> to include me and Papool.  I told him you rarely answer
> your phone at work.  I think it's in regards to trying to
> push your date to 11/4.  I think [h]e is trying to get more
> of an understanding of your work to try and get it pushed
> up.

App. WW.  About an hour later, Mr. Chong emailed Ms. Pugal, copying Ms.

Deitz, Mr. LaPray, Mr. Chaudhari, Ms. Maher, and the general IP Edge email

address:

> Hi Sally:
>
> I hope you are well.  I am preparing a letter to the Court
> to let it know you cannot make 11/10 but can make 11/4.
> I want to ask some questions, are you available for a 5-10
> min call? . . .
>
> Jimmy Chong, Esq.

App. XX at 3.  This appears to be the first email communication, and perhaps the

first direct communication of any kind, that Mr. Chong had with Ms. Pugal.  As of

this date, Mr. Chong had filed six cases in Lamplight's name and moved to dismiss

four of those cases.

　　Ms. Pugal emailed Mr. Chong back and the two spoke by phone later that

day.  At 6:44 p.m., Mr. Chong sent the following email with an attachment to Ms.

Pugal, cc'ing Mr. Chaudhari, Ms. Deitz, Mr. LaPray, and Danae Maher:

> Sally:
>
> Thanks for speaking with me, please confirm I have represented the facts correctly. I have cc'd your representatives on this email as well. If anyone has any concerns with the attached please let me know. Otherwise please confirm and we will get this on file by 10/12.
>
> Thanks.
>
> Very truly yours,
>
> Jimmy Chong

App. XX at 1. Lamplight did not produce any responses to the email, but the day after the email was sent (October 12), Mr. Chong filed a letter with the Court, requesting that I include the Lamplight cases at the November 4 Nimitz/Mellaconic hearing to accommodate the work schedule of Ms. Pugal. Civ. No. 22-0418, D.I. 17; Civ. No. 22-1017, D.I. 13. (I granted the request on October 17, 2022.)

Ms. Deitz's texts to Ms. Pugal on October 12 make clear that Ms. Pugal did not participate in the weekly noon call scheduled for that day:

> Deitz: Hey Sweetie—you missed your call today. Can you talk to them later today? Can you talk at 1 pm today?
>
> Pugal: Sorry I have extremely busy since this morning on the phone[.] I was ready to join the call but I had another important call for [Ms. Pugal's boss]. I don't

think I can join at one[.]  I ha[ve] to leave at 1230 for a
very important Doctor's appointments.  Need to
reschedule[.]  Sorry.

Deitz:  Ok no worries[.]  I will let the team know.  You
will be in the email reply.  I will ask that we resume next
week for your weekly call.

Pugal:  Thank you Linh.

App. YY.

The morning of the following Wednesday, October 19, Ms. Pugal initiated

this text exchange with Ms. Deitz:

Pugal:  Good Morning Linh!  I am so sorry but I won't be
able to make on the meeting today again[.]
Our surgery cancelled last minute and [Ms. Pugal's boss]
is here[.]  I'm leaving early too for doctors
appointment[.]  I hate to do this but let me just [be]
honest with you[.]  I don't think I am comfortable of
doing this trial[.]  I have nightmares almost every night
thinking about it and so stressed[.]
       Already so stressed at work and all of this Doctors
appointments my [Primary Care Physician] order X-rays
MRI and CT[.]  Sorry Linh[,] I cannot do it.

Deitz:  Sally I appreciate you being honest with me but
we already have all the travel arrangements made and I
too am going with you.
       Can you talk to me or Papool right now?
       You mention you are having to go to the doctor for
yourself, are you ok?
       What time are you leaving today to go to your
doctor's appointment?

Pugal:  Not really Linh[.]  I can't at this time[.]  [Ms. Pugal's boss] is here[.]  I also received a call from sister in California last night[.]  My brother not doing well in Las Vegas and can't even go.

Deitz:  Oh no[.]  Sorry to hear about your brother.  Please call me when you leave the office.

Pugal:  Thank you.

Ms. Deitz resumed the text thread the next morning (October 20):

Deitz:  Hey Sally have you talked to your doctor yet?  It does not look like we can get out of the 11/4 date. Papool said— "This judge isn't going to rest until Sally appears in his courtroom in Delaware.  [A]nd if she doesn't appear on 11/4, a date she requested, there's probably going to be sanctions."
    *Sanction means fees that you will be charged to pay (I mentioned that to you last night).*  Unfortunately the judge is a prick and there is not telling how much fees there could be.  *We['v]e paid fees before and I promise you it's a lot.  Don't want to scare you but you need to be fully aware.*

Pugal:  I have been so busy this morning[.]  I will call during my lunch[.]  I understand there is a fee[.] *Whatever the fee is going to be I don't have that kind of money[.]*
    *Linh[,] you know that I don't even make money on any of the company[ies] including this*[.]  I will ask my doctor and see[.]  If she can write me a letter that I can't travel[.]  Because of my medical problem[.]

Deitz:  *I know you don't have that kind of money, that is why I'm trying to explain the severity of not going.*  With the letter from doctor, it will not change you having to come.  I will be on a call at [noon] and they are going to

76

> discuss it more to me. We will more likely need to
> schedule a call with you and someone from my team to
> help ease your concerns. . . .
>
> Pugal: Please do the best you can for me[.] I already
> made up my mind[.] sorry I can't do it.
>
> Deitz: *Sally[.] I'm sorry but you can't do that. You put
> not only fees that you will have to pay but you put my
> company at risk. You are putting me in a really tight
> spot.*

App. ZZ (emphasis added).

From October 21 to October 25, 2022, Ms. Deitz repeatedly texted Ms.

Pugal, asking her to call Ms. Deitz or meet with her in person. Ms. Pugal replied

"Sorry Linh I can't" to one of the requests and ignored the others. On October 24,

2022, Mr. Chong emailed Ms. Pugal (his third email to her), informing her that he

had left her a voice mail and asking if she had time to speak with him. App. AAA.

Ms. Pugal again missed the weekly Wednesday call on October 26,

prompting the following email to her from Mr. Chaudhari, cc'ing Ms. Deitz, Mr.

Bodepudi, and Mr. Chong:

> Good morning Sally! How are you? We missed you on
> the Lamplight call this week. Is everything ok? Linh
> mentioned you are having some health issues. So sorry
> to hear that! We need to talk with you about that and
> how that might affect you not going. You might be able
> to be excused for the Nov 4 hearing next week, but we
> need to talk with you about to figure that all out.

> Can you please text or call Linh and she can set up a time
> for you to talk with us?
>
> Thank you!  Have a nice day!! :)
>
> Papool

App. BBB at 2.  In a reply-to-all response to Mr. Chaudhari's email, Mr. Chong

stated: "I'm so sorry that you are not well. Is there anything that I can do for you?

We should really talk sooner than later."  App. BBB at 1.

On October 31, 2022, with still no word from Ms. Pugal, Mr. Chong

informed me in a letter that he "was first advised by Ms. Pugal's representative" on

October 21 that she had a health-related issue that might prevent her from

attending the November 4 hearing, that he had "attempted to contact Ms. Pugal

multiple times by email and telephone without success," and that he was not

certain Ms. Pugal would attend the November 4 hearing.  Civ. No. 22-0418, D.I.

20.

On November 2, 2022, Ms. Deitz again texted Ms. Pugal, and this time

raised the possibility of getting the hearing "dismissed":

> Hey Sally[.]  I heard you were sick.  I hope you feel
> better soon.  Is it possible to talk with Gau and Papool?
> They think if they draft a declaration for you to sign
> stating you are having medical issues, they can try to get
> the hearing dismissed.  But we need to get this done
> ASAP.  We're supposed to fly out tomorrow.

78

App. CCC at 1.  Ms. Pugal replied a few hours later:

> Hi Linh!  I know you probably hates me so much not
> being so-co-operative with y'all and I am so sorry[.]
> There's a lot going on right now that I am so stressed.  I
> have been sick since last week.

App. CCC at 2.  Ms. Pugal then described her serious health issues for Ms. Deitz

and concluded: "Anyway, I will be glad to talk to them hopefully they can get it

dismissed[.]  Again, my apology[,] Linh."  App. CCC.

Mr. Chaudhari then emailed Mr. Chong, cc'ing Mr. LaPray, Ms. Deitz,

Maher, Mr. Bodepudi, and Mr. Chong's paralegal (but not Ms. Pugal) as follows:

> Jimmy,
>
> As you know, Sally finally got back to Linh with the text
> that was sent to you.  I understand you want a doctor's
> note, but given that we just finally heard back from Sally
> after being ghosted for quite some time and the hearing
> being on Friday, it isn't likely or feasible that we'll have
> one by the hearing.  Hence, we are preparing a
> declaration that Linh will take to her tonight for her to
> sign.  We will also have Linh ask Sally to get a doctor's
> note asap that states that her doctor will not permit her to
> fly.
>
> Given the circumstances and timing for Friday, that's the
> best we can do.
>
> Papool

App. DDD.[25]

Later that evening, Ms. Deitz emailed Ms. Pugal a draft declaration and then brought a copy of it to Ms. Pugal's house for her to sign. The declaration discusses certain "health reasons" that rendered Ms. Pugal "unable to fly to Delaware" for the November 4, 2022 hearing. It appears from the document production that Mr. Chong played no role in drafting or discussing with Ms. Pugal the declaration. Ms. Deitz emailed Mr. Chong a copy of the declaration the morning of November 3, and he filed it with the Court that day. App. EEE.[26]

On November 30, 2022—one year to the day after Mr. Chong filed the first of six lawsuits he filed on behalf of Lamplight—Mr. Chong wrote in an email to Ms. Pugal:

> As you know I represent your business in its patent
> infringement cases. I have been communicating with it
> through Mavexar based on you retaining it to represent
> you. I wanted to reach out to you independently and

---

[25] The email is marked "Confidential Attorney-Client Privilege and/or Common Interest Attorney-Client Privilege." The email, however, does not disclose a communication to or from a client and therefore it is not an attorney-client communication, let alone a privileged attorney-client communication.

[26] App. EEE is marked "Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege." It consists of an electronic scan confirmation and a declaration of Ms. Pugal that was filed with the Court the day before the November 4, 2022 hearing. The emails do not disclose a communication to or from a client and therefore are not attorney-client communications, let alone privileged attorney-client communications.

confirm that you want me to communicate with the
Mavexar team directly.

App. FFF at 1.[27]  Having received no response from Ms. Pugal, Mr. Chong

followed up with another email on December 12, 2022:

> I am just following up on my last email.  I need to have
> in my file that you confirm that I should directly contact
> Mavexar when handling your cases or if I should contact
> you directly.  I obviously can contact the both of you.  It
> is up to you and I am happy to do either.  Please let me
> know.

App. FFF at 3.  A few hours later, Ms. Pugal responded that Mr. Chong "may

contact Mavexar directly."  App. FFF at 2.  By the time he received this response,

Mr. Chong had filed and settled six lawsuits in Lamplight's name.[28]

V.

"It is well-settled law, regardless of jurisdiction, that attorneys owe their

clients a fiduciary duty."  *Huber v. Taylor*, 469 F.3d 67, 81 (3d Cir. 2006)

(citations omitted).  "The duty includes undivided loyalty, candor, and provision

---

[27] The emails in App. FFF are marked privileged, but because they merely
communicate the general terms of Mr. Chong's representation of Lamplight, they
are not privileged.  *Idenix Pharms.*, 195 F. Supp. 3d 639 at 643; *see also Avgoustis*,
639 F.3d at 1344.

[28] *See* notices of voluntary dismissal filed at Civ. No. 1:22-cv-418, D.I. 21 (Nov. 2,
2022); Civ. No. 1:21-cv-1689, D.I. 14 (Jun 3, 2022); Civ. No. 1:22-cv-1017, D.I.
10 (Sep. 13, 2022); Civ. No. 1:21-cv-1691, D.I. 13 (May 13, 2022); Civ.  No. 1:22-
cv-417, D.I. 7 (Apr. 14, 2022); Civ. No. 1:21-cv-1690, D.I. 9 (Mar. 2, 2022).

81

[to the client] of material information." *Id.* (citing *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988)).  The Third Court's discussion about these duties in *Huber* is applicable here:

> The fiduciary duty that an attorney owes clients is not a matter to be taken lightly. . . .  As then Judge Cardozo observed in *In the Matter of Rouss*, "[m]embership in the bar is a privilege burdened with conditions." 221 N.Y. 81, 84, 116 N.E. 782 (1917) (Cardozo, J.).  Among those conditions are the ethical obligations of giving clients full and meaningful disclosure of conflicts of interest so that the client may decide if the representation is in his or her best interest and of the terms of proposed settlement agreements, as it is the client's, not the attorney's, decision whether to settle a case.  TEX. DISCIPLINARY R. PROF'L CONDUCT 1.03 (duty to keep client informed); 1.04(f) (fee division); 1.08(f) (disclosure of aggregate settlements).  Even when clients are viewed as mere "inventory", they are still owed the renowned "punctilio of an honor the most sensitive." *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545 (N.Y. 1928) (Cardozo, J.).  As the Texas Disciplinary Rules of Professional Conduct state[,] the "obligation of lawyers is to maintain the highest standards of ethical conduct." TEX. DISCIPLINARY R. PROF'L CONDUCT, Preamble.

> This is the cost of doing business as an attorney at law, and we will not countenance shortcuts.  Disclosures to clients must be meaningful, by which we mean something beyond form disclosures, as clients must understand a conflict to give their informed consent to an intelligible waiver.

*Id.* at 82.

82

Many if not all the lawyer's fiduciary duties are codified in the American Bar Association's Model Rules of Professional Conduct. *See* MODEL RULES OF PRO. CONDUCT (AM. BAR. ASS'N, 1983) (hereinafter Model Rules). As lawyers practicing before this Court, Messrs. Pazuniak, Chong, Wernow, and Curfman are bound by the Model Rules. D. Del. LR 83.6(d).

Rule 1.2, titled "Scope of Representation & Allocation of Authority Between Client & Lawyer," provides in relevant part:

> [A] lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to settle a matter.

Model Rule 1.2. This Rule codifies what has long been recognized as a fundamental guiding principle of the attorney-client relationship: The "decision[] . . . whether to settle a civil matter, must . . . be made by the client." Model Rule 1.2 cmt. 1. Indeed, the Supreme Court has recognized since at least 1901 "that the decision to settle a case rests with the client alone." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 986 F.2d 15, 19 (2d Cir. 1993) (citing *United States v. Beebe*, 180 U.S. 343, 350–53 (1901)).

83

Rule 1.4, titled "Communications," provides in relevant part:

> (a) A lawyer shall:
>
>> (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules;
>>
>> (2) reasonably consult with the client about the means by which the client's objectives are to be accomplished; [and]
>>
>> (3) keep the client reasonably informed about the status of the matter . . . .
>
> (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

Model Rule 1.4. Under Rule 1.4, "a lawyer who receives from opposing counsel an offer of settlement in a civil controversy . . . must promptly inform the client of its substance unless the client has previously indicated that the proposal will be acceptable or unacceptable or has authorized the lawyer to accept or to reject the offer." In addition, Rule 1.4 obligates a lawyer to "explain [to the client] the general strategy and prospects of success" in any litigation matter. Model Rule 1.4 cmt. 5.

Rule 1.7 codifies the lawyer's duty of loyalty. It provides in relevant part that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest" unless the "client gives informed consent [to the

84

representation], confirmed in writing." Model Rule 1.7. Implicit in Rule 1.7 is an obligation to "determine whether a conflict of interest exists." Model Rule 1.7 cmt. 2. And in making that determination, the lawyer must keep in mind that "[e]ven where there is no direct adverseness, a conflict of interest exists if there is a significant risk that [the] lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests." Model Rule 1.7 cmt. 8.

Under Rule 1.7, "[c]oncurrent conflicts of interest can arise from the lawyer's responsibilities to another client, a former client *or a third person* or from the lawyer's own interests." Model Rule 1.7 cmt. 1 (emphasis added). If a third person is advancing or paying the lawyer's fees, Rule 1.8(f) applies. It provides that

> [a] lawyer shall not accept compensation for representing a client from one other than the client unless:
>
> (1) the client gives informed consent; [and]
>
> (2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship . . . .

Model Rule 1.8(f).

It appears that counsel violated both Rule 1.2(a) and Rule 1.4 by failing to have any communication with their clients before filing, settling, and dismissing

85

the clients' cases.  Mr. Pazuniak was sole counsel of record in the 11 cases filed in this Court on behalf of Nimitz.  He filed those cases and then moved to dismiss seven of them without ever having communicated with Mr. Hall, the sole natural person associated with Nimitz.  It is undisputed that Mr. Hall had no prior knowledge of the lawsuits and that he was neither informed of nor consented to the settlements that resulted in the motions to dismiss the seven cases filed by Mr. Pazuniak.

Mr. Chong was sole counsel of record in the six cases he filed in this Court on behalf of Lamplight.  He filed and moved to dismiss all six cases without ever having communicated with Ms. Pugal, the sole natural person associated with Lamplight.  Mr. Chong was Mellaconic's counsel of record in its case against RideCell.  Civ. No. 20-1323, D.I. 1 (Sep. 30, 2020).  He filed and moved to dismiss that case without ever having communicated with Mr. Bui, the sole natural person associated with Mellaconic.  Civ. No. 20-1323, D.I. 12 (Mar. 24, 2021).  Mr. Chong was co-counsel with Mr. Curfman in 12 cases filed in this Court on Mellaconic's behalf.[29]  They filed and then moved to dismiss those cases without

---

[29] *Mellaconic IP LLC v. Frontpoint Sec. Sols., LLC*, Civ. No. 21-0447, D.I. 1 (filed Mar. 26, 2021); *Mellaconic IP LLC v. Wyze Labs, Inc.*, Civ. No. 21-0448, D.I. 1 (filed Mar. 26, 2021); *Mellaconic IP LLC v. Central Sec. Group-Nationwide, Inc.*, Civ. No. 21-0573, D.I. 1 (filed Apr. 26, 2021); *Mellaconic IP LLC v Monitronics*

86

ever having communicated with Mr. Bui.  Finally, Mr. Chong was co-counsel with Mr. Wernow in six cases filed in this Court on Mellaconic's behalf.[30]  They filed and moved to dismiss those cases without ever having communicated with Mr. Bui.

It also appears that counsel violated Rule 1.7 and, to the extent their fees were paid or advanced by Mavexar or IP Edge, Rule 1.8(f).[31]  As an initial matter, by failing to communicate with their clients, counsel violated their obligation to ascertain at the outset of their representations whether a conflict or potential conflict existed.  Beyond that, the terms of Mavexar's consulting services

---

*Int'l, Inc.*, Civ. No. 21-0574, D.I. 1 (filed Apr. 26, 2021); *Mellaconic IP LLC v. Canary Connect, Inc.*, Civ. No. 21-0944, D.I. 1 (filed June 29, 2021); *Mellaconic IP LLC v. Fantasia Trading LLC*, Civ. No. 21-0945, D.I. 1 (filed June 29, 2021).
[30] *Mellaconic IP LLC v. Trane Techs. Co. LLC*, Civ. No. 21-1080, D.I. 1 (filed July 28, 2021); *Mellaconic IP LLC v. Linxup, LLC*, Civ. No. 21-1081, D.I. 1 (filed July 28, 2021); *Mellaconic IP LLC v. Ezlo Innovation Ltd.*, Civ. No. 21-1373, D.I. 1 (filed Sep. 28, 2021); *Mellaconic IP LLC v. Verkada, Inc.*, Civ. No. 21-1374, D.I. 1 (filed Sep. 28, 2021); *Mellaconic IP LLC v. Incognia US Inc.*, Civ. No. 21-1844, D.I. 1 (filed Dec. 29, 2021); *Mellaconic IP LLC v. Carrier Global Corp.*, Civ. No. 21-1853, D.I. 1 (filed Dec. 30, 2021); *Mellaconic IP LLC v. Connecteam, Inc.*, Civ. No. 22-242, D.I. 1 (filed Feb. 25, 2022); *Mellaconic IP LLC v. PrismHR, Inc.*, Civ. No. 22-243, D.I. 1 (filed Feb. 25, 2022); *Mellaconic IP LLC v. TimeClock Plus, LLC*, Civ. No. 22-244, D.I. 1 (filed Feb. 25, 2022); *Mellaconic IP LLC v. Avast Software, Inc.*, Civ. No. 22-540, D.I. 1  (filed Apr. 27, 2022); *Mellaconic IP LLC v. Deputy, Inc.*, Civ. No. 22-541, D.I. 1 (filed Apr. 27, 2022); *Mellaconic IP LLC v. Justworks, Inc.*, Civ. No. 22-542, D.I. 1 (filed Apr. 27, 2022).
[31] As noted above, Mr. Bui testified at the November 4, 2022 evidentiary hearing that Mavexar paid Mellaconic's attorney fees in the form of a loan.  Civ. No. 22-0244, D.I. 20 at 96:8–14.

agreements with counsel's clients created at least potential conflicts of interest between Mavexar and the clients. Because of those potential conflicts, counsel's blind adherence to Mavexar's directions to file and settle cases in the clients' names created a significant risk that counsel's actions materially limited their representations of their clients.

The financial relationship between Mavexar and Nimitz, for example, makes clear that their interests were not perfectly aligned in the seven cases Mr. Pazuniak filed and settled without ever having spoken or otherwise communicated with Mr. Hall. According to Mr. Hall, Mavexar gets 90% of the profits obtained from asserting the #328 patent in litigation and Nimitz gets the remaining 10%. Nimitz, however, effectively takes on 100% of the risk associated with any litigation. Indeed, although Mr. Hall said he "wouldn't be able to explain it well" when I asked him at the November 4, 2022 hearing how Nimitz paid for the #328 patent, his answer to the question was spot on: "There was an agreement between Mavexar and myself where I would assume liability." Civ. No. 21-1247, D.I. 26 at 69:17–18.

That liability has at least three forms. First, under 35 U.S.C. § 285, Nimitz can be required to pay the attorney fees of any defendant that prevails in an infringement case brought in Nimitz's name. Second, Nimitz can be required to

88

pay any sanctions imposed by a court pursuant to Federal Rule of Civil Procedure 11 or the court's inherent powers.  Third, Nimitz is required under the Mavexar consulting services agreement to reimburse Mavexar for the "Costs and Expenses" (which are defined in the agreement to include attorney fees as well as costs and expenses) advanced by Mavexar to litigate the #328 patent:

> For all Costs and Expenses relating to the monetization of the [#328 patent], Consulting Company shall advance such Costs and Expenses as one or more loans to Client. Such loans are reimbursable from Gross Recovery.  In the event any such loan is not paid back in full from Gross Recovery, Client shall be responsible for full payment of all such loans.  If Client fails to make such payment within 30 days following the termination of the final litigation filed pursuant to this Agreement, Consulting Company shall have all available recourse pursuant to law to obtain recovery for such loans.

App. K at 3.  *See also* App. X at 3; App. NN at 3.

The only risk Mavexar assumes when an attorney files at Mavexar's direction an infringement case in Nimitz's name is the potential that Nimitz will not comply with its contractual obligation to reimburse Mavexar for the fees and costs Mavexar advances to that attorney that exceed any gross recovery.  In other words, Mavexar has virtually nothing to lose and everything to gain (i.e., 90% of everything) from asserting the #328 patent in infringement suits around the country.  Nimitz, by contrast, receives a tiny fraction of the litigation gains but it

89

and potentially Mr. Hall personally[32] have lots to lose if the litigation results in an adverse decision, sanctions, or fees and costs that exceed the gross recovery. In light of these vastly different profit and risk profiles, it cannot be said that Mavexar's and Nimitz's interests were the same when it came to deciding to file or to settle the lawsuits Mr. Pazuniak brought in this Court in Nimitz's name.

As with Nimitz, Mellaconic's and Lamplight's interests in filing and settling patent infringement suits are not coextensive with Mavexar's interests. Mellaconic's and Lamplight's consulting agreements with Mavexar are identical to Nimitz's agreement with Mavexar; and therefore, like Nimitz, Mellaconic and Lamplight assume all the risk when Mavexar has attorneys assert their respective patents in infringement litigation. Mellaconic's financial arrangement with Mavexar differs slightly from Nimitz's. As noted above, Mr. Bui testified that the LLCs Mavexar formed in his name are obligated to pay Mavexar 95% of the profits gained from licensing and litigating the LLCs' patents. That Mellaconic's arrangement with Mavexar is even more lopsided than Nimitz's arrangement

---

[32] *See, e.g., D.O.C.C. Inc. v. Spintech Inc.,* 1994 WL 872025, at *20 (S.D.N.Y. Aug. 15, 1994) (holding corporate officer personally liable for attorney fees under § 285 where officer's active participation in tortious conduct resulted in a finding that infringement suit was filed and maintained in bad faith, the corporation had no paid employees, and the corporation's only address was the officer's residential apartment).

makes it even more likely that Mellaconic's interests conflict with Mavexar's interests with respect to the filing and settling of cases.

The profit split between Mavexar and Ms. Pugal's LLCs is unknown. As with the Mellaconic and Nimitz productions, there is no document in Lamplight's production that identifies the percentage of the Net Proceeds Lamplight is required to pay Mavexar. The limited record evidence suggests that Lamplight's percentage share of any licensing or litigation profits is minimal at best. When Ms. Pugal texted Ms. Deitz that "you know that I don't even make money on any of the compan[ies] including [Lamplight]," Ms. Deitz did not deny the assertion. On the contrary, she acknowledged in her response that "I know you don't have that kind of money [to pay a sanction][;] that is why I'm trying to explain the severity of [you're] not going [to court]." App. ZZ at 12–14.

As a general matter, "a lawyer cannot delegate his fiduciary duties to another in an effort to avoid its strictures or to avoid responsibility for the manner in which they are undertaken . . . ." *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 234 (2d Cir. 1977). "[I]n the case of duty of loyalty, its non-delegability is so patent as to be axiomatic." *Huber*, 469 F.3d at 81 n.18. In these cases, counsel either ignored or delegated to Mavexar (i.e., IP Edge) their fiduciary

91

duties. Mavexar, for its part, expressly disclaimed in its consulting services agreements with those clients that it owed the clients any fiduciary duties:

> The Consulting Company shall provide non-legal services . . . .
>
> Client understands that Consulting Company is not a law firm, accounting firm, tax advisory, or the like. Client will seek appropriate third[-]party accounting, tax, legal or similar advisory services. . . .
>
> The parties understand that Consulting Company is not a fiduciary of Client, and will act as an independent contractor.

App. K at 1; App. X at 1; App. NN at 1.

Counsel insist that they do not represent IP Edge or Mavexar and that their only client in each action they filed was the plaintiff LLC in that action. Mr. Pazuniak was most emphatic about this point in his October 18, 2022 email to Mr. Hall. He wrote there: "[A]s a legal and professional matter, my only client is Nimitz Technologies, and, thus, you. I do not represent Mavexar or any other entity, and I would be in breach of professional responsibilities if I placed any interest ahead of yours." App. S at 2. Unfortunately, this recognition of the fiduciary responsibilities Mr. Pazuniak owed to Nimitz came six months after he had already settled and moved to dismiss seven suits he had filed in Nimitz's name. And since Mr. Pazuniak had never communicated with Mr. Hall before he

92

filed, settled, and moved to dismiss Nimitz's cases at Mavexar's direction, how could he have been sure that his actions did not put Mavexar's interests ahead of Nimitz's?

Counsel seem to hold the view that a client can delegate to a third party all litigation decisions, including the decision to settle a case, and that an attorney can conduct all communications with a client through that third party. In the reply brief he filed with the Federal Circuit in support of Nimitz's petition for mandamus, for example, Mr. Pazuniak wrote "[i]n excess of caution" that under section 134(2) of the Restatement 3d of the Law Governing Lawyers, "[Nimitz] had the right to authorize Mavexar to act as its consulting agent to act on [Nimitz's] behalf as if it was the client." Section 134(2), however, provides in relevant part that

> [a] lawyer's professional conduct on behalf of a client may be directed by someone other than the client if: (a) the direction does not interfere with the lawyer's independence of professional judgment; (b) the direction is reasonable in scope and character, such as by reflecting obligations borne by the person directing the lawyer; *and (c) the client consents to the direction* . . . .

D.I. 26 at 17 n.1. RESTATEMENT (THIRD) OF THE L. GOVERNING LAWYERS § 134(2) (AM. L. INST. 2000) (emphasis added). Here, it is undisputed that Mr. Pazuniak filed and settled seven Nimitz cases without ever having communicated with Mr.

93

Hall, let alone having obtained Mr. Hall's informed consent to have Mavexar direct Mr. Pazuniak's professional conduct.

The "Third Parties," "Instructions," and "Communication" sections of Sand, Sebolt's engagement letter with Mellaconic quoted above, *supra* pp. 46–47, similarly suggest that Messrs. Wernow and Curfman take the position that they obtained Mr. Bui's consent to having Mavexar direct their conduct with respect to all matters in Mellaconic's cases when they received from Ms. Deitz an electronic signature for Mr. Bui dated March 11, 2021 under an "Acknowledgement" on the engagement letter's last page. App. BB. But even assuming that a client could delegate to a third party the authority to approve the lawyer's filing and settling of the client's lawsuit and assuming further that Mr. Bui received and read the letter and signed the acknowledgement himself, his signature could not constitute informed consent to having Mavexar make all decisions relating to litigation brought in Mellaconic's name. Under the Model Rules, a client's informed consent to a proposed course of conduct can only be obtained "after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." Model Rule 1.0(e). Here, neither Mr. Wernow nor Mr. Curfman had ever spoken with Mr. Bui as of March 11, 2021, and nothing in the engagement letter apprised Mr.

94

Bui about potential conflicts of interests between Mellaconic and Mavexar or about the risks Mellaconic would face by asserting its patent in infringement litigation. The letter is exactly the type of form disclosure condemned by the Third Circuit in *Huber*. Mr. Bui's "acknowledgement" of the engagement letter's terms is, in a word, illusory.

Counsel's relationship with IP Edge and Mavexar and their failure to fulfill their fiduciary duties is especially concerning because of the obvious disparity in the sophistication of the LLC plaintiffs as opposed to Mavexar and IP Edge. That disparity was readily apparent from Mr. Bui's testimony at the November 4, 2022 hearing. It can also be seen in the text message exchanges between Ms. Pugal and Ms. Deitz. And it is evident from the lopsided terms of the consulting servicing agreements.

The terms of that agreement and counsel's actions in these cases deprived the LLC plaintiffs of the benefit of independent counsel. We can only guess whether the LLC plaintiffs would have agreed to file and settle these cases had they had counsel who cared only about the LLC plaintiffs and their interests. Perhaps, with the benefit of independent counsel, Mr. Bui would have agreed to file these suits but only if Mellaconic received more than a five percent share of the litigation proceeds. And if Mellaconic truly owned the #435 patent, perhaps, with

95

the benefit of independent counsel's advice, Mr. Bui could have sold the patent.[33]
These and related questions will remain unanswered because counsel here failed to
satisfy their "ethical obligations of giving [their] clients full and meaningful
disclosure of conflicts of interest so that the client[s] [could] decide if the
representation [wa]s in his or her best interest and of the terms of proposed
settlement agreements." *Huber*, 469 F.3d at 82. I will therefore refer counsel to
their respective offices of disciplinary counsel.

## VI.

Mavexar's consulting agreement with the LLC plaintiffs in these cases
describes the "services" Mavexar provides as "non-legal" and expressly states that
Mavexar is "not a law firm." The documents produced in response to the
November 10 Memorandum Order, however, make clear that numerous Mavexar
and IP Edge actors engaged in the practice of law on behalf of Nimitz, Mellaconic,
and Lamplight. The documents show specifically that Messrs. Chaudhari,

---

[33] Under the Consulting Services agreement, Mellaconic "agree[d] to maintain
clear and exclusive title to the [#435 patent]." App. X at 1. But even though the
Termination section of the agreement has a paragraph that expressly addresses the
consequences that would follow "[i]n the event Client sells or transfers a portion or
all of the right, title, and interest in the [#435 patent] *for non-monetary
consideration*," App. X at 4 (emphasis added), the agreement says nothing about
the consequences that would follow if Mellaconic sold the #435 patent for
monetary consideration.

Bodepudi, and Tran each acted as a lawyer for one or more of the three LLC plaintiffs. The lawyer tasks they performed varied by individual and LLC and included providing patent infringement claim charts,[34] drafting and editing legal filings,[35] conducting legal research,[36] summarizing and analyzing legal research,[37] crafting legal arguments,[38] preparing a declaration for Ms. Pugal,[39] and prepping Mr. Bui and Mr. Hall for their testimony at the November 4, 2022 hearing.[40]

Mavexar and IP Edge are Texas entities. In Texas, an individual can be criminally prosecuted for the unauthorized practice of law. See Tex. Penal Code Ann. § 38.123. Texas law defines the "practice of law" in relevant part as

> the preparation of a pleading or other document incident to an action or special proceeding or the management of the action or proceeding on behalf of a client before a judge in court as well as a service rendered out of court, including the giving of advice or the rendering of any service requiring the use of legal skill or knowledge . . . .

Tex. Gov't Code Ann. § 81.101(a).

---

[34] App. GGG at 1–3.
[35] App. GGG at 4–11.
[36] App. GGG at 12–13.
[37] App. GGG at 12–13.
[38] App. GGG at 12–13.
[39] App. GGG at 14–15.
[40] App. GGG at 16–21.

Messrs. Chaudhari, Bodepudi, and Tran appear to be lawyers and residents of Texas.  In Texas, in "general[], a corporation can employ attorneys in-house to represent its own interests but cannot engage in the practice of law by providing legal representation to others with different interests." *Unauthorized Prac. of L. Comm. v. Am. Home Assur. Co.*, 261 S.W.3d 24, 26 (Tex. 2008).  In these cases, for the reasons discussed above, Nimitz, Mellaconic, and Lamplight had different interests than Mavexar (and IP Edge) did.

As it appears that Messrs. Chaudhari, Bodepudi, and Tran engaged in the unauthorized practice of law, I will refer them to the Texas Supreme Court's Unauthorized Practice of Law Committee.

VII.

Section 261 of the Patent Act requires the PTO to "maintain a register of interests in patents and applications for patents and [to] record any document related thereto upon request." 35 U.S.C. § 261.  Although the recording of patent assignments with the PTO is not mandatory, federal law requires that any assignments submitted for recording with the PTO be true and accurate.  Indeed, in order to file an assignment for recording in the PTO's Electronic Patent Assignment System (EPAS), the filer (referred to in the EPAS as the "submitter") must first affirmatively consent (by clicking a button on the screen) to an

98

acknowledgement that "providing false or spurious information such as false or improper assignment documents or security agreements[] is a misrepresentation to the federal government" that "is prohibited and subject to criminal and civil penalties, including all penalties applicable to willful unauthorized access" of the EPAS. App. B.

The acknowledgement cites, and thus points the EPAS user to, two specific regulations promulgated by the PTO (37 C.F.R. §§ 1.4, 11.18) and to 18 U.S.C. § 1001. Section 1.4 provides in relevant part that "[t]he presentation to the [PTO] (whether by signing, filing, submitting, or later advocating) of any paper by a party, whether a practitioner or non-practitioner, constitutes a certification under § 11.18(b)." 37 C.F.R. § 1.4. Section 11.18(b)(1) provides in relevant part:

> By presenting to the [PTO] . . . (whether by signing, filing, submitting, or later advocating) any paper, the party presenting such paper, whether a practitioner or non-practitioner, is certifying that—
>
> (1) All statements made therein of the party's own knowledge are true, all statements made therein on information and belief are believed to be true, and all statements made therein are made with the knowledge that whoever, in any matter within the jurisdiction of the [PTO], knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact, or knowingly and willfully makes any false, fictitious, or fraudulent statements or representations, or knowingly and willfully makes or uses any false writing or document knowing the same to contain any false,

99

> fictitious, or fraudulent statement or entry, shall be
> subject to the penalties set forth under 18 U.S.C. [§] 1001
> and any other applicable criminal statute . . . .

37 U.S.C. § 11.8(b)(1). Section 1001 makes it a crime to knowingly submit to a federal agency a "materially false, fictitious, or fraudulent statement or representation." 18 U.S.C. § 1001(a).

I express no opinion about whether IP Edge's filing with the PTO of the assignments for the patents asserted in these cases violated the PTO's rules or § 1001. But I believe it appropriate to bring these matters to the attention of the PTO and the Department of Justice to allow them to conduct further inquiry into whether the PTO's rules or § 1001 were violated. The Department may also deem it appropriate to investigate whether the strategy employed by IP Edge to hide from the defendants in these cases and the Court real parties in interest, including France Brevets, violated any federal laws. [41]

---

[41] The French government dissolved France Brevets in October 2022—after Nimitz had settled 11 cases in this Court. *See En capitalisant sur le retour d'expérience de plus de dix années de France Brevets, le gouvernement réorganise le pilotage et les actions de sa politique de soutien à la propriété industrielle au service de l'innovation [By capitalizing on the feedback from more than ten years of France Brevets, the government is reorganizing the management and actions of its policy of support for industrial property in the service of innovation]*, SECRÉTARIAT GÉNÉRAL POUR L'INVESTISSEMENT [GENERAL SECRETARIAT FOR INVESTMENT OF THE FRENCH REPUBLIC] (Oct. 21, 2022), https://www.gouvernement.fr/en-capitalisant-sur-le-retour-d-experience-de-plus-de-dix-annees-de-france-brevets-le-

100

VIII.

The reality in these cases is that the de facto owner of the asserted patents—that is, the party that truly controls and profits from their assertion—is IP Edge. Brandon LaPray said the truth when he told Mr. Pazuniak in his August 17, 2021 email that "we"—i.e., IP Edge—"bought the patents." IP Edge, however, has gone to great lengths to hide the "we" from the world. Rather than having the asserted patents assigned to itself or to its own LLCs, IP Edge arranged for the patents to be assigned to LLCs it formed under the names of relatively unsophisticated individuals recruited by Linh Deitz. The LLCs were empty vessels with no assets until IP Edge arranged for the assignment of the patents to those LLCs.

The housing of assets in a separate LLC has consequences. LLCs cannot act in a court without legal counsel. For the LLC plaintiffs to file infringement cases, they had to have counsel. And because IP Edge and Mavexar do not wholly own the LLC plaintiffs and because IP Edge and Mavexar are not law firms, Texas law prohibits them from acting as the LLC plaintiffs' lawyers. Messrs. Chaudhari, Pant, Bodepudi, and Tran chose to use separate LLCs to insulate themselves, IP

---

gouvernement [https://perma.cc/WYV8-8JT4]. Nothing in Nimitz's production shows that France Brevets ever relinquished or transferred its interest in the settlement proceeds from Nimitz's assertion of the #328 patent.

101

Edge, and/or Mavexar from the potential liabilities of patent litigation. They must accept the consequences that flow from that strategy.

Counsel of record for the LLC plaintiffs in these cases must also accept the consequences for the roles they played in implementing that strategy. The reality is that counsel's de facto clients were IP Edge and Mavexar. Counsel insist otherwise; indeed, they are adamant that their clients are the LLC plaintiffs. That being the case, counsel were obligated to give to the LLC plaintiffs their undivided loyalty and to provide the LLC plaintiffs with sufficient information and unconflicted advice for the LLC plaintiffs to make informed decisions about whether to bring and settle any proposed lawsuits. Instead of fulfilling those obligations, counsel treated the LLC plaintiffs as "mere inventory." *Huber*, 469 F.3d at 82. Their loyalty was not to their clients, but rather to IP Edge.

## complaint delaware 21-1490

---

From:  Meg Kelly (meghankellyesq@yahoo.com)

To:  lisa.dolph@delaware.gov

Cc:  meghankellyesq@yahoo.com; david.weiss@usdoj.gov; zi-xiang.shen@delaware.gov;
margaret.naylor@delaware.gov; supremectbriefs@usdoj.gov

Date:  Tuesday, March 5, 2024 at 12:33 PM EST

---

Hi Lisa,

I spoke with Peggy on the phone yesterday and asked if I could print out documents to submit to the US Supreme Court if I brought my own paper. I indicated I would bring my own paper and would print out 11 copies of the Brief not yet drafted, and not the appendix.  The Brief's pages are limited to 40 pages. In addition I am required to file a table of contents and index too.

Peggy indicated she did not think I could find a way to access my papers but if I did I could do so.

Now I am at the law library. I have invested hours in figuring out a way to do so, and she has since changed her mind causing harm based on my detrimental reliance of the state's assertion through her.

I was working on printing out the documents instead of drafting it.

Her intent was to deprive me of full and fair access to the courts with partiality to the DE Supreme Court as opposed to the impartial rule of law applicable to teh state via the 1st and 14th Amendment.

This is not okay.  Could you please help me Lisa Dolph by granting me permission.  I am shaking I am so upset. This is two hours out of my way about an hour here and back when you consider parking.

Thank you,
Meg

## Confirmation Meg called Peggy for permission first 21-1490

From:  Meg Kelly (meghankellyesq@yahoo.com)

To:    lisa.dolph@delaware.gov

Cc:    meghankellyesq@yahoo.com; david.weiss@usdoj.gov; zi-xiang.shen@delaware.gov;
       margaret.naylor@delaware.gov; lisa.dolph@delaware.gov

Date:  Tuesday, March 5, 2024 at 12:45 PM EST

---

Please see the attached to confirm I called the law librarian first and gained permission first.
If you could pull the conversations from March 4, 2024 it may be used to confirm I was granted permission that is
now denied to my detriment.

Even more concerning, I was not able to gain access to CMF by cell phone or internet this morning despite entering
the correct password on my device, computer or phone.

All of the sudden i was able to gain access. It started to work. It indicated I had the wrong password but it was
correct. Alex at the Delaware District Court and Pacer both aware of the problem  and the sudden access.

The Delaware Supreme Courtmay not deny my  1st and 14th  amendment Equal access due to partiality to the
government as opposed to the impartial rule of law.

Thank you,
Meg


Sent from my iPhone


IMG_3926.PNG
397.6kB



## Re: Confirmation Meg called Peggy for permission first 21-1490

From:   Meg Kelly (meghankellyesq@yahoo.com)

To:       lisa.dolph@delaware.gov

Cc:       david.weiss@usdoj.gov; zi-xiang.shen@delaware.gov; lisa.dolph@delaware.gov; meghankellyesq@yahoo.com; margaret.naylor@delaware.gov

Date:   Tuesday, March 5, 2024 at 01:01 PM EST

Since I indicated I disagreed with the law library and did not want to talk. I wanted to research. Peggy  kicked me out of the law library.
This is not okay.  Please note I did not want to print any briefs today. I merely sought to figure out a way to print.
Then I wanted to research. I was denied the opportunity to research.
Meg

Sent from my iPhone

> On Mar 5, 2024, at 12:45 PM, Meg Kelly <meghankellyesq@yahoo.com> wrote:
>
> Please see the attached to confirm I called the law librarian first and gained permission to print my brief. She indicated I could do so if I could find a way to access them. I said there is a 40 limit and I would need 11 copies. She said if I could figure out a way to do so I have permission.

> If you could pull the conversations from March 4, 2024 it may be used to confirm I was granted permission that is now denied to my-detriment.

> The Delaware Supreme Court through tjeir agent may not deny me 1st and 14th  amendment Equal access due to partiality to the government as opposed to the impartial rule of law.

The change in stance, by rebuffing in permission was done with knowing intent to obstruct access to the courts given knowledge of poverty and means creating a substantial burden I  sought to alleviate.
This is more egregious given I had to drive two hours and expending hours in the law library to find a solution to print.  Law library patrons cannot print from their email or from accessing documents otherwise. I discovered I could print from CMF. Though there was problems accessing my account by call or otherwise during the morning.

>
> Thank you,
> Meg
> <IMG_3926.PNG>


  >
  >
  > Sent from my iPhone

## Re: Confirmation Meg called Peggy for permission first 21-1490

From:  Meg Kelly (meghankellyesq@yahoo.com)

To:    lisa.dolph@delaware.gov

Cc:    david.weiss@usdoj.gov; zi-xiang.shen@delaware.gov; meghankellyesq@yahoo.com;
       margaret.naylor@delaware.gov

Date:  Tuesday, March 5, 2024 at 01:26 PM EST


Peggy kicked me out of the law library  in retaliation for calling JoAnne and Lisa at the Delaware Supreme Court. I spoke with JoAnne and left a message with Lisa while sitting at the law library. I did it while I was there to address a grievance.

I left a lengthy voice mail that caused the law librarian to kick me out based on the state's retaliation for petitioning the court for help. The law librarian is an agent of the state.

I wanted to research. I do not have the means to drive at other times. I am sitting in my car awaiting Lisa Dolph's help.

Thank you,
Meg
Sent from my iPhone

> On Mar 5, 2024, at 1:01 PM, Meg Kelly <meghankellyesq@yahoo.com> wrote:
>
> Since I indicated I disagreed with the law library and did not want to talk. I wanted to research. Peggy  kicked me out of the law library.
> This is not okay.  Please note I did not want to print any briefs today. I merely sought to figure out a way to print.  Then I wanted to research. I was denied the opportunity to research.
> Meg
>
> Sent from my iPhone
>
>> On Mar 5, 2024, at 12:45 PM, Meg Kelly <meghankellyesq@yahoo.com> wrote:
>>
>> Please see the attached to confirm I called the law librarian first and gained permission to print my brief. She indicated I could do so if I could find a way to access them. I said there is a 40 limit and I would need 11 copies. She said if I could figure out a way to do so I have permission.
>>
>> If you could pull the conversations from March 4, 2024 it may be used to confirm I was granted permission that is now denied to my-detriment.
>>
>> The Delaware Supreme Court through tjeir agent may not deny me 1st and 14th  amendment Equal access due to partiality to the government as opposed to the impartial rule of law.
>>
> The change in stance, by rebuffing in permission was done with knowing intent to obstruct access to the courts given knowledge of poverty and means creating a substantial burden I  sought to alleviate.
> This is more egregious given I had to drive two hours and expending hours in the law library to find a solution to print.  Law library patrons cannot print from their email or from accessing documents otherwise. I discovered I could print from CMF. Though there was problems accessing my account by call or otherwise during the morning.
>>
>>
>> Thank you,
>> Meg
>> <IMG_3926.PNG>
>>

>>
>> Sent from my iPhone

PACER access Code Invalid username and password from my private devices phone and laptop(with automatically saved passwords) and public law librarian computers inaccessible this morning/accessible by all 3 later in the PM

From:  Meg Kelly (meghankellyesq@yahoo.com)

To:    pacermail@psc.uscourts.gov; pacer@psc.uscourts.gov

Cc:    meghankellyesq@yahoo.com

Date:  Tuesday, March 5, 2024 at 04:20 PM EST

Good afternoon,

I was unable to access CMF earlier today. Zoni confirmed my user name was correct  "MeghaKellymegha"
Zoni indicated if I had any failed attempts accessing my account using this user name she would see it. She looked at my history and indicated she could not see any failed attempts throughout my history.

She could not see the failed attempts today, March 5, 2024. I made several attempts using the correct password and user name on 3 devices my cell phone using cell phone data not the internet, my lab top and the law library's computer. I revealed the password before printing a picture of it on paper, I attach hereto with the password covered up.  Zoni indicated none of the pacer representatives had access to my password.  So I covered up my password.

Zoni said she would see any failed attempts, but she did not see the failed log in attempts today.

The call times were unusually high today.  I called multiple times to get through and am concerned others were also experiencing the same problem.  Thank you for taking note of this unusual problem and for letting me know if you found a reason or a cause of it.

Thank you,
Meg
MeghaKellymegha username

  Multiple failed log in attempts using the correct password.pdf
201.7kB

**ℹ PACER Maintenance, 03/10/2024**

Our systems will undergo maintenance on Sunday, March 10, 2024, from 5:00 a.m. to 4:00 p.m. ET. Access to certain portions of this site may be temporarily unavailable.

An official website of the United States government. Here's how you know ∨

Log in to PACER Systems ⇥

Your browser must be set to accept cookies to log in to this site. If your browser is set to accept cookies and you are experiencing problems with the login, delete the stored cookie file in your PC. Close and reopen your browser before trying again.

**◀) Delaware District Court Login**
* Required Information

Invalid username or password

| | |
|---|---|
| **Username** * | MeghaKellymegha |
| **Password** * | |
| **Client Code** | |

Need an accoun

This is a restricted government website for o...
activities of PACER subscribers or users of this system for any purpose,
and all access attempts, may be recorded and monitored by persons
authorized by the federal judiciary for improper use, protection of system
security, performance of maintenance and for appropriate management by
the judiciary of its systems. By subscribing to PACER, users expressly
consent to system monitoring and to official access to data reviewed and
created by them on the system. If evidence of unlawful activity is
discovered, including unauthorized access attempts, it may be reported to
law enforcement officials.

800 - 676 - 6856

PACER FAQ          Privacy & Security                Contact Us

This site is maintained by the Administrative Office of
the U.S. Courts on behalf of the Federal Judiciary.

**PACER Service Center**
(800) 676-6856
pacer@psc.uscourts.gov

## More serious CMF issue/other attorneys oddly experiencing problems/Fw: PACER access Code Invalid username and password from my private devices phone and laptop(with automatically saved passwords) and public law librarian computers inaccessible this morning/accessible by all 3 later in the PM

| | |
|---|---|
| From: | Meg Kelly (meghankellyesq@yahoo.com) |
| To: | lisa.dolph@delaware.gov |
| Cc: | margaret.naylor@delaware.gov; david.weiss@usdoj.gov; zi-xiang.shen@delaware.gov; supremectbriefs@usdoj.gov; meghankellyesq@yahoo.com |
| Date: | Tuesday, March 5, 2024 at 04:47 PM EST |

Hi Lisa,

Thank you for confirming I left a message with you as I sat in the law library, not with the Lissa at the USSC.  I was beginning to worry.

Since I was able to regain access from the bailiff during a previous time I was denied while at the law library I hoped I could regain access today in order to research.

Thank you for confirming you were not able to help me have access to the law library today and that you would talk to the administrator to resolve the problem.  I have more cases arising based on cases started before this Court beyond the one case where an appeal is due March 12.

I am home now.

Another issue of importance to the courts that arose today, March 5, 2024. that relates to safeguarding the courts and the petitioners including attorneys who defend the rights and liberties of the people coming before the courts that is very serious.

I was not able to gain access to CMF despite using the correct user name and passcode.  The error message was "Invalid username or password."  I revealed the password to confirm it was correct, saving a control print PDF on my devise I obviously am not going to share, but I also printed 1 page on my own paper with prior permission to test it out by Peggy before permission was reneged showing I have the correct password and username.

I sent it to PACER attaching the same and request they confirm the password and username is correct. They confirmed it was correct. More concerning is Zoni the PACER represetative ibdicated PACER did not have documentation of my failed attempts at my cell phone, my laptop or the law library's computer.  She indiacted they always get failed attempts but did not get any from me today or apparently ever. Since my password and username are autoloaded on my cell phone and personal computer this was suspicious.  All three devices worked after the failed attempts.

This is a larger problem than merely me if other lawyers cannot access to the courts which vitiates justice by an obstacle so great as to deprive others to the courts too creating injustice guaranteed.

I was on hold for an extraordinary longer time than usual at the law library.  I am on hold now with PACER, with more than 50 other callers, meaning the problem may not be limited to me.  After more than 30 minutes I got a message asking me to leave a message.  I am calling again instead of leaving a message.  Now the wait time is 64 minutes. I am 54th in line.

The reason why it took hours to test out this manner to print at the patron's access as opposed to other ideas is I was unable to log onto CMF.

The back doors opened by 9/11's Patriot's Act allows for non-government entities access to our devices to allow for the digital currency by the private entity the Federal Reserve, others and hackers.  This has decreased safety under the guise of safety for all.  I have averred my belief there is plans to overthrow the government after 2050 by NGOs

who take over the governments' authority to govern and guide by ruling without the individuals check upon both government and private individuals and entities the 1st Amendment right to petition coupled with the 5th and 14th Amendment rights to Due Process, including a fair meaningful opportunity to be heard prior to an arbitrary government backing as government agents performing a government function for the alleged welfare of the people, with immunity by the recently litigated case relating to section 203 in a hearing last week before the US Supreme Court appears to grant the forums who control the channels to access resources, facebook digital wallets for example..

When I petition the courts for help it is never to destroy the people who infringe upon my equal access to interests, or liberty, it is to uphold the rule of law as applied against me and by creating precedent applied to others.

Do I want Peggy to get into trouble for kicking me out of the law library in retaliation for calling Lisa Dolph at the DE Supreme Court expressing my grievance while sitting in her law library and respectively disagreeing with her while complying with her requests. NO. I merely invoke my 1st and 14th Amendment rights to petition coupled with due process to correct infringements upon my rights. I am upset I am deprived of the ability to research today because she required I go since I disagreed and did not want to discuss it further because she was my opponent in the petition for help before the DE Supreme Courts apparent representative Lisa Dolph.

This is to confirm I do not want Peggy to get into trouble and I merely desire to protect my access to resources and liberties, including the liberty interest to fair access to the courts given poverty creates a substantial burden on my ability to research without disparate treatment based on viewpoint in speech in petitions. The 1st Amendment right to petition does protect the right to access to the courts to complain to the government about the government without fear of punishment.

My grandpop's brother was one of the head people in the FBI. He is dead now. But I see how the new budget debate appears top reduce funding to the FBI which protects us as opposed to the CIA which uses people and their information as property not as a free people to exploit for material gain in contravention of my religious beliefs. Matthew 6:24

My dad's cousin Mike Kelly worked at the same place that former US AG William Barr worked at Warner Bro, which is weird. I was scolded by a relative to take off his picture from facebook since he does not like his likeless on facebook. It is as if people in power know more than the common man as to the dangers of facebook.

Facebook now Meta is part of the scheme to automate currency through wallets to allow NGO gov backed channels to control those channels to control a no longer free and independent government or people that allows for the overthrow.

I am especially alarmed that 203 allows editorial content on facebook. Meaning the equal access to speak or associate with opponents who make us smarter by debate on internet forums entirely controlled by private entities where people are captive audiences to compelled information and advertisements by whoever controls the algorithms. Will the people be compelled to use Meta or the Metaverse to buy and sell in the future without restraint by the gov by the immunity it appears to grant entities who will be used to eliminate the governments' purpose by governing and guiding by ruling an eliminating the people's most important check the petition? I hope not, but lobbyists are indicating their desire to eliminate people judges, people, lawyers and the rule of law. The Venus Project specifically talks about eliminating the rule of law per the attached link.

How can the use of Laws be eliminated?

### How can the use of Laws be eliminated?

Today we try to control human behavior by enacting laws or signing treaties without changing the physical condit...

### How can the use of Laws be eliminated?

Today we try to control human behavior by enacting laws or signing treaties without changing the physical condit...

I do not want Peggy to get into trouble. I care about her and she and other law librarians aid in granting access to the rule of law necessary to petition effectively for all especially pro se and in forma pauperis claimants.  However, I should not be denied access to the law library based on viewpoint in my petitions. This is not the first time I was denied access to the Sussex County law library. That is not okay.

I care about Peggy even if I should disagree with her.  Yesterday she agreed to print documents on March 11-12 if I could find a means to do so only to renege to my detriment after I expanded time and resources to assure I could do so today.

Further I was denied access to research today and do not have the means to drive to the law library whenever I desire.  The price of gas is unaffordable in light of the DE Supreme court order placing me on religious/disabled preventing me from working at my former law firm based on my religious beliefs contained in my private petitions.

I do not believe the same as others. I believe the natural man is without eternal life doomed to destruction in hell based on living based on his desires or the desires of others, for convenience, avoidance of costs, profit, position, power or material gain as opposed to laying down desires to do what is right by not sacrificing the lives and liberties of others for material gain, especially the minorities who inconvenience the masses.
I believe people go to hell when their desire for money to care for their own blinds their eyes from caring without repentance.  This sin is what I believe is the mark of the beast. The love for material gain to care for their own drives out humanity's love for one another and for God leading to people to harm others here to gain the world to lose their souls in hell.

Equal Protections prevents human sacrifice of life and liberty of the minority for the material gain of the mob of the many.  That limit on the government makes us freer and prevents all of humanity from making mammon their God unrestrained by the just rule of law, love or God to prevent human sacrifice of other people's life and liberty the Constitution charges all including the government to protect not oppress, exploit or sacrifice to serve the economy or material gain.

I write in haste to assert my rights without waiver.

Thank you,
Meg

----- Forwarded Message -----
**From:** Meg Kelly <meghankellyesq@yahoo.com>
**To:** PACERMAIL/SAT/AO/USCOURTS <pacermail@psc.uscourts.gov>; PACERMAIL/SAT/AO/USCOURTS <pacer@psc.uscourts.gov>
**Cc:** Meg Kelly <meghankellyesq@yahoo.com>
**Sent:** Tuesday, March 5, 2024 at 04:20:17 PM EST
**Subject:** PACER access Code Invalid username and password from my private devices phone and laptop(with automatically saved passwords) and public law librarian computers inaccessible this morning/accessible by all 3 later in the PM

Good afternoon,

I was unable to access CMF earlier today. Zoni confirmed my user name was correct  "MeghaKellymegha" Zoni indicated if I had any failed attempts accessing my account using this user name she would see it. She looked at my history and indicated she could not see any failed attempts throughout my history.

She could not see the failed attempts today, March 5, 2024. I made several attempts using the correct password and user name on 3 devices my cell phone using cell phone data not the internet, my lab top and the law library's computer. I revealed the password before printing a picture of it on paper, I attach hereto with the password covered up.  Zoni indicated none of the pacer representatives had access to my password.  So I covered up my password.

Zoni said she would see any failed attempts, but she did not see the failed log in attempts today.

The call times were unusually high today.  I called multiple times to get through and am concerned others were also experiencing the same problem.  Thank you for taking note of this unusual problem and for letting me know if you found a reason or a cause of it.

Thank you,
Meg
MeghaKellymegha username

  Multiple failed log in attempts using the correct password.pdf
201.7kB

## SUPREME COURT OF THE UNITED STATES
## OFFICE OF THE CLERK
## WASHINGTON, DC  20543-0001

March 1, 2024

Meghan Kelly
34012 Shawnee Drive
Dagsboro, DE 19939

    RE: Kelly v. USDC ED PA
      No: 23A596

Dear Ms. Kelly:

    The application (23A596) to file petition for a writ of certiorari in excess of page limits was denied on February 20, 2024.

    Therefore, you must correct and resubmit your petition as soon as possible.  Unless the petition is submitted to this Office in corrected form within 60 days of the date of this letter, the petition will not be filed.  Rule 14.5.

    A copy of the corrected petition must be served on opposing counsel.

    When making the required corrections to a petition, no change to the substance of the petition may be made.

Sincerely,
Scott S. Harris, Clerk
By:

Lisa Nesbitt
(202) 479-3038

Enclosures

MEGHAN KELLY, ESQ.
34012 Shawnee Drive
Dagsboro, DE 19939
Meghankelly@yahoo.com
(302) 493-6693

Clerk of the United States Supreme Court
1 First Street, NE
Washington, DC 20543

RE: *Meghan Kelly, Applicant v. United States District Court Eastern District of Pennsylvania*
Application No. 23A596/ Please resubmit the application to Chief Justice Roberts for
consideration

January 3, 2024

Dear Honorable Clerk of Court:

Please resubmit the application for additional pages to file a writ of certiorari, along with

the related documents to Chief Justice Roberts which was denied by Justice Alito on 1/3/24 in

Meghan Kelly, Applicant v. United States District Court Eastern District of Pennsylvania

Application No. 23A596.

Thank you.

January 3, 2024

Respectfully Submitted,

/s/Meghan Kelly

Meghan Kelly, Esquire
34012 Shawnee Drive
Dagsboro, DE 19939,
(302) 278-2975
meghankellyesq@yahoo.com,
Not acting as a lawyer
US Supreme Court Number 283696

1

Under Religious objection I declare, affirm that the foregoing statement is true and correct

Dated: 1/3/2024

(printed) Meghan Kelly

(signed) Meghan Kelly

UNITED STATES DISTRICT COURT IN THE DISTRICT OF DELAWARE

Meghan Kelly )  Civil Action No.: 1:21-1490
                                    )  (CFC)
           Plaintiff, )
    v.                              )
Disciplinary Counsel Patricia B.    )
Swartz, et al                       )
           Defendants. )

CERTIFICATE OF SERVICE OF
PLAINTIFF MEGHAN KELLY'S ___180*___ Affidavit

I, Meghan M. Kelly, Esquire, hereby certify on _March 5, 2024_ I had a true

and correct copy of the above referenced document, served to Defendants, through their

counsel through email electronically:

Zi-Xiang Shen
Delaware Department of Justice
820 North French Street
6th Floor
Wilmington, DE 19801

Dated  March 5, 2024

Respectfully submitted,

Meghan M. Kelly
Meghan Kelly, Esquire
34012 Shawnee Drive
Dagsboro, DE 19939
meghankellyesq@yahoo.com

Under religious protest as declaring and swearing violates God's teachings in the Bible, I

declare, affirm that the foregoing statement is true and correct.

Dated:  March 5, 2024

_____Meghan Kelly_____ (printed)

_____ (signed)

1